IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL ATKINS,

                            Plaintiff,

                                                    Civ. Action No.
                                                    9:11-CV-0366 (GTS/DEP)

            v.

D. MENARD, *et al.*,

                            Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

MICHAEL ATKINS, *pro se*
04-A1-965
Mohawk Correctional Facility
6514 Rt. 26
P.O. Box 8451
Rome, NY 13440

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN        CHRISTOPHER W. HALL, ESQ.
Attorney General of                        Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Michael Atkins, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  In his complaint Atkins contends that, in violation of the Eighth Amendment, he was beaten by several corrections workers, who are named as defendants, and that when he was interviewed three days later after complaining about the incident he was struck in the face several times while Corrections Lieutenant Allen, who is also a defendant in the action, stood by and failed to protect him.  As relief, plaintiff's complaint seeks damages in the amount of $5,000,000 and asks that all defendants be charged for hate crimes and violations of the Eighth Amendment.

Currently pending before the court is a motion for partial summary judgment brought by the defendants, seeking dismissal of plaintiff's failure to protect claim. In their motion defendants argue that Atkins is procedurally barred from pursuing that cause of action by virtue of his failure to file and pursue the necessary grievance in order to satisfy his exhaustion obligation before commencing suit.  Having carefully reviewed defendants' motion and plaintiff's opposition, I conclude that plaintiff has

2

failed to demonstrate the existence of triable issues of material fact surrounding the question of whether he did in fact exhaust administrative remedies with respect to the failure to protect claim, or should be excused from that requirement, and therefore recommend that the defendants' motion be granted.

I.    BACKGROUND[1]

Plaintiff is a prison inmate being held in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"); at the times relevant to his claims in this action, Atkins was designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *See generally* Complaint (Dkt. No. 1).

In his complaint plaintiff alleges that on July 18, 2008, he was retrieved from his cell by two unknown officers and escorted to the front of C-block, where Sergeant Menard as well as several corrections officers, including defendants Hayes, Russell, Moak, and Martin, were waiting. Complaint (Dkt. No. 1) § 6.  Atkins claims the officers then proceeded to strike him in the face, back, and head, knock out a tooth, and threaten him

---

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

with a razor.  *Id.*

On July 21, 2008, Atkins approached Clinton Superintendent Dale Artus, as he was making his rounds, and reported the July 18, 2008 assault, claiming to be suffering from lingering health conditions attributable to the incident.  Complaint (Dkt. No. 1) § 6.  Superintendent Artus ordered that Atkins be escorted to the facility's medical unit for an examination.  After being examined by a nurse, Atkins was interviewed by Lieutenant Allen and three unknown officers.  *Id.*  During the interview, Atkins claims he was "smacked" in the face by officers whenever he mentioned the names of staff members who assaulted him, and that Lieutenant Allen witnessed that conduct but nonetheless failed to protect him from it.  Complaint (Dkt. No. 1) § 6, 7.

Atkins submitted a written inmate grievance complaint to prison officials, complaining of the alleged assault of July 18, 2008.  Atkins Aff. (Dkt. 38) Exh. 2; Brousseau Aff. (Dkt. No. 34-2) ¶¶ 10-11 and Exh. B. While dated July 20, 2008, the grievance was not date-stamped as having been received until August 1, 2008, and was responded to by Superintendent Artus on September 17, 2008.  Brousseau Aff. (Dkt. No. 34-2) ¶ 10 and Exh. B.  Between the time that the grievance was

4

submitted and the superintendent responded, Atkins wrote letters to

Superintendent Artus, DOCCS Director of Inmate Grievance Program

Karen Bellamy, and Tara Brousseau, the Inmate Grievance Program

Supervisor at Clinton, complaining that he had not received a response to

his grievance, advising that he wished to appeal the matter to a higher

level, and alleging that prison staff members were playing "grievance

games" with him.[2]  *See* Atkins Aff. (Dkt. No. 38) ¶ 6 and Exhs. 1, 3, 4, and

8.  Atkins also filed several other grievances while at Clinton, although

none pertained directly to the alleged assault on July 21, 2008 or the

failure of defendant Allen to protect him, instead addressing such matters

as corrections officers allegedly reading his legal mail and his requests for

a CT scan, dentures, and a raise.  *See* Brousseau Aff. (Dkt. 34-2) Exh. A.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on April 4, 2011, and was thereafter

granted leave to proceed *in forma pauperis*.  Dkt. Nos. 1, 4.  As

defendants, plaintiff's complaint names Sergeant Menard, Corrections

Officers B. Hayes, Russell, L. Martin, and Moak, and Corrections

---

[2]     Plaintiff also wrote to Superintendent Artus on September 26, 2008,
inquiring as to why his Central Office Review Committee ("CORC") appeal of the
Superintendent's denial of the July 20, 2008 grievance was never processed. Atkins
Aff. (Dkt. No. 38) Exh. 6.

Lieutenant Allen.  Complaint (Dkt. No. 1) § 3.  In his complaint, plaintiff

asserts claims of assault and failure to protect.[3]  *See* Complaint (Dkt. No.

1) § 7.

On December 23, 2011, defendants moved for partial summary

judgment seeking dismissal of plaintiff's failure to protect claim, arguing

that he did not satisfy his statutory obligation to exhaust available

administrative remedies before commencing suit.  Dkt. No. 34.  Plaintiff

has since responded in opposition to that motion in papers filed on

January 11, 2012.  Dkt. No. 38.  Defendants' motion, which is now ripe for

determination, has been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

_____

[3]        While the claim is nowhere mentioned in his complaint, in his memorandum of law plaintiff asserts that defendant Allen's actions, and those of the three corrections officers, taken on July 21, 2008, were in retaliation for his having reported the assault from three days earlier.  *See* Plaintiff's Memorandum (Dkt. No. 38-1) ¶ 1.

6

warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

7

the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.   Exhaustion of Remedies

In their motion, defendants assert that plaintiff's failure to protect claim is procedurally barred based upon his failure to exhaust administrative remedies with regard to that cause of action.  In response, plaintiff claims to have submitted a grievance regarding the July 21, 2008 incident, but that due to interference by prison staff it was never processed and decided.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6

(E.D.N.Y. Jan. 31, 2007).[4]  "[T]he PLRA's exhaustion requirement applies

to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive

force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.

Ct. 983, 992 (2002) (citation omitted).

If the court finds that an inmate plaintiff failed properly to exhaust

available remedies prior to commencing the action, his or her complaint is

subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL

2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also*

*Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the

PLRA requires "proper exhaustion" of available remedies).  "Proper

exhaustion" requires a plaintiff to procedurally exhaust his or her claims by

"compl[ying] with the system's critical procedural rules."  *Woodford*, 548

U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43

(2d Cir. 2007) (citing *Woodford*).[5]

---

[4]      Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

[5]      While placing prison officials on notice of a grievance through less formal
channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff
nonetheless must meet the procedural requirement of exhausting his or her available
administrative remedies within the appropriate grievance construct in order to satisfy
the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-
98 (2d Cir. 2004)) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[6]  *Macias*, 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed catechism, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions in preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.[7]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special

---

[6]     Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See, e.g.*, *Newman v. Duncan,* No. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.) .

[7]     Defendants have preserved the defense of non-exhaustion by raising it in their answer.  *See* Answer (Dkt. 17) ¶ 9 ("To the extent Plaintiff has failed to exhaust administrative remedies for any claim, such claim should be dismissed.").

circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[8]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

Plaintiff does not contest the availability of a mechanism for seeking internal administrative relief with respect to complaints regarding prison conditions at Clinton.  New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[9]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the

---

[8]     In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14; *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004);

[9]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

grievance.  *Id.* at §§ 701.4(b), 701.5(b).  If an appeal is filed, the

superintendent of the facility next reviews the IGRC's determination and

issues a decision.  *Id.* at § 701.5(c).  The third level of the process affords

the inmate the right to appeal the superintendent's ruling to the CORC,

which makes the final administrative decision.  *Id.* at § 701.5(d).

Ordinarily, absent the finding of a basis to excuse non-compliance with

this prescribed process, only upon exhaustion of these three levels of

review may a prisoner seek relief pursuant to section 1983 in a federal

court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002)

(citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284,

at *3 (S.D.N.Y. Dec. 11, 2000)).

Defendants have submitted compelling evidence suggesting that

plaintiff never filed a grievance regarding the July 21, 2008 incident and, in

any event, clearly did not pursue that grievance through to the CORC.

Plaintiff, in stark contrast, contends that he attempted to avail himself of

the IGP by submitting a grievance regarding the July 21, 2008 incident,

but that through the actions of prison officials he was thwarted in his

efforts to pursue the grievance through to resolution.  The issue in this

case, then, can be distilled into the question of whether, as he asserts,

plaintiff filed a grievance but was precluded from pursuing it by the actions of prison officials or, as defendants allege, he never submitted a grievance regarding July 21, 2008 events.

Ordinarily, these conflicting accounts would reflect the existence of a genuine issue of material fact precluding the entry of summary judgment concerning the exhaustion issue.  However, there are two reasons why, in this instance, plaintiff's claim of having filed a grievance does not preclude the entry of summary judgment.  First, the assertion is made in a document which is not notarized, and therefore does not constitute an "affidavit".  *Quintero v. Rite Aid of New York, Inc.*, No. 09 Civ. 6084(JLC), 2011 WL 5529818, at *5 (S.D.N.Y. Nov. 10, 2011) (citing *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir.1985)); *Soliman v. Daimler AG*, No. 10 CV 408(SJF)(AKT), 2011 WL 1627009, at * 1 (S.D.N.Y. Apr. 27, 2011).  The rule governing summary judgment motions requires that a party, to show that the fact is genuinely disputed,

> . . . must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purpose of the motion only), admissions, interrogatory answers, or other materials". . .

14

Fed. R. Civ. P. 56(c)(1)(A); *see Watson v. Wright*, No. 9:08–CV–62, 2011 WL 4527789, at * 7 (N.D.N.Y. Aug. 4, 2011) (Baxter, M.J.), *report and recommendation adopted*, 2011 WL 4528931 (N.D.N.Y. Sep 28, 2011) (Mordue, C. J.).

It is, of course, true that a statement, though not formally notarized, can have the equivalent force of an affidavit provided that it complies with the requirements of 28 U.S.C. § 1746 and thus can be considered as having evidentiary value for purposes of a summary judgment motion.  28 U.S.C. § 1746 (1994); *see Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir. 1998).  Section 1746, which is entitled "Unsworn Declarations under Penalty of Perjury", provides, that a statement stating that it is given under penalty of perjury substantially in the form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct" may be considered as the functional equivalent of a sworn affidavit for purposes of summary judgment.  28 U.S.C. § 1746; *Yearwood v. LoPiccolo*, No. 95-CIV.2544 (DC), 1998 WL 474073, at *5 (S.D.N.Y. Aug. 10, 1998).

In this instance, plaintiff's statement is not notarized, nor does it contain the required language under section 1746 for consideration as a

15

sworn declaration.  Where a purported affidavit is neither notarized nor otherwise complies with the requirements of 28 U.S.C. § 1746, even when submitted by a *pro se* party, it should be disregarded.  *Yearwood*, 1998 WL 474073, at *5.  Plaintiff's statement is therefore not evidence of anything for purposes of opposing defendants' motion for summary judgment.  *LeBoeuf*, *Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999); *Stewart v. Howard*, No. 9:09-CV-0069, 2010 WL 3907227, at *11 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.), *report and recommendation adopted*, 2010 WL 3907137 (N.D.N.Y. Sep. 30, 2010) (Sharpe, J.).

In addition, plaintiff's naked assertion that he filed a grievance regarding the July 21, 2008 incident is wholly lacking support anywhere in the record, and the documents which he himself has submitted strongly suggest that no such grievance was, in fact, filed.  Plaintiff has not offered a copy of the grievance allegedly filed concerning the failure to protect incident.  And, tellingly, the letters he wrote to prison officials inquiring concerning the status of his grievance refer only to the single grievance, related to an assault by officers, and certain of those letters specifically reference the July 18, 2008 assault.  *See, e.g.,* Atkins Aff. (Dkt. No. 38)

16

Exhs. 1, 3, 4, and 6.  None of those communications references a second grievance, nor do any make mention of the July 21, 2008 incident.  *Id.* Similarly, a grievance filed by Atkins on September 29, 2008 accuses staff at Clinton of "playing grievance games and tampering with [his] mail", but refers only to his grievance related to the July 18, 2008 incident, which he desired to appeal to the CORC, and makes no mention of a subsequent grievance concerning the July 21, 2008 events.  *See id.*, Exh. 7.

Ordinarily, credibility determinations fall exclusively within the province of a jury, and such assessments are therefore inappropriately made by a court on a motion for summary judgment.  *Rule v. Brine*, Inc. 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia*, *Anderson*, 477 U.S. at 255, 106 S. Ct. 2513).  The Second Circuit has, however, created a very narrow exception to this rule.  *See Jeffreys,* 426 F.3d 549; *see also Slacks v. Gray*, No. 9:07-CV-510, 2009 WL 3164782, at * 13 (N.D.N.Y. Sept. 29, 2009) (Mordue, C.J.).  In *Jeffreys*, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines

17

that "no reasonable person" could credit the plaintiff's testimony.  *Jeffrey*s,

426 F.3d at 54-55.  The *Jeffreys* court cited with approval the district

court's opinion in *Shabazz*, 994 F. Supp. at 468-71, which granted

summary judgment in an excessive force case based upon the absence of

any evidence in the record to corroborate the plaintiff's version of the

events, highlighting the "many inconsistencies and contradictions within

the plaintiff's deposition testimony and affidavits."  *Slacks*, 2009 WL

3164782, at *13 (citing *Jeffreys*, 426 F.3d at 555 and quoting *Shabazz*,

994 F. Supp. at 470).[10]

   In order to qualify for application of the *Jeffreys* exception a

defendant must meet the following three requirements: 1) the plaintiff must

rely "almost exclusively on his own testimony"; 2) the plaintiff's testimony

must be "contradictory or incomplete"; and 3) the plaintiff's testimony must

---

[10]   The court in *Shabazz* found that when the facts alleged by the plaintiff
are "so contradictory that doubt is cast upon their plausibility," the court may "pierce
the veil of the complaint's factual allegations ... and dismiss the claim."  *Shabazz*, 994
F. Supp. at 470.  While approving of the lower court's reasoning in *Shabazz*, the
*Jeffreys* court was careful to distinguish *Fischl v. Armitage*, 128 F.3d 50, 56 (2d
Cir.1997), another case it had previously decided, wherein it reversed the grant of
summary judgment in an excessive force case.  *Jeffreys*, 426 F.3d at 554-55.  In doing
so, the court emphasized that in *Fischl* the plaintiff's testimony that he was beaten was
supported by photographs showing severe bruises, hospital records showing that he
had fractures of the head; by a physician's opinion that plaintiff's injuries were
consistent with having been kicked in the head; and that the plaintiff's eye socket
fracture could not have been self-inflicted.  *Id.*

be contradicted by evidence produced by the defense.  *Benitez v. Ham*,
No. 9:04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009)
(Mordue, C.J. and Lowe, M.J.) (citing and quoting *Jeffreys*).

Based upon a careful review of the entire record before the court, I
have concluded that these elements have been met, and this case
therefore presents one of those rare exceptions to the rule that credibility
determinations are inappropriately made when ruling on a summary
judgment motion. This finding is based upon the fact that, in the face of
admissible evidence offered by defendantd showing that plaintiff did not
properly exhaust his remedies, plaintiff has failed to come forward with
evidence demonstrating a triable issue of fact.  To the contrary, the
plaintiff's allegations are made only in the form of an unsworn statement,
he has failed to provide a copy of the alleged grievance filed concerning
the July 21, 2008 incident, and the several letters written to DOCCS
officials requesting information concerning the status of his grievance
refer only to a single grievance and, in several instances, specifically refer
to the July 20, 2008 grievance and the July 18, 2008 incident without any
mention of the events of July 21, 2008.  Simply put, careful review of the
record now before the court shows that no reasonable jury could credit

plaintiff's version of the events surrounding his claim of exhausting administrative remedies.[11]

## IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint arises out of an alleged assault by corrections officers and a lieutenant's subsequent failure to protect plaintiff during an investigation three days later.  The record now before the court convincingly establishes that while plaintiff did file a grievance concerning the initial assault – although it does not appear to have been pursued to completion before the CORC - no such grievance was filed complaining of the failure of Corrections Lieutenant Allen to protect him during an interview conducted three days later.  Having concluded that defendants have convincingly established plaintiff's failure to exhaust available administrative remedies regarding that claim, and finding no basis to

_____

[11]       As was earlier noted, there is a third, catch-all factor under the Second Circuit's 2004 decisions addressing exhaustion, under which a plaintiff may be excused from failing to exhaust by demonstrating the existence of special circumstances justifying excusing his or failure to exhaust.  *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10.   Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable.  *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).  In this instance, plaintiff has not alleged the existence of any special circumstances of the type contemplated by the Second Circuit in *Hemphill*.

excuse the exhaustion requirement, it is hereby respectfully

RECOMMENDED, that defendants' partial motion for summary

judgment (Dkt. No. 34) be GRANTED, and that all claims by the plaintiff

against defendant Allen be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      July 3, 2012
            Syracuse, NY



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro se* prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

### (4)

### Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> **FN12.** Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> **FN13.** Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> **FN1.** The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> **FN2.** Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 🗝 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

   FN3. The amended complaint reads as follows:

   That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

   FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996.) Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

*5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

*1 Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are as available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Pamela QUINTERO, Plaintiff,
v.
RITE AID OF NEW YORK, INC., Defendant.
No. 09 Civ. 6084(JLC).

Nov. 10, 2011.
*OPINION AND ORDER*

JAMES L. COTT, United States Magistrate Judge.

*1 Pamela Quintero has filed this action against her former employer, Rite Aid of New York, Inc., pursuant to the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL"). Quintero alleges that she was subjected to unequal terms and conditions of employment and a hostile work environment, retaliated against, and ultimately terminated based on her disability. Rite Aid now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, Rite Aid's motion for summary judgment is granted as to Quintero's claims of unequal terms and conditions, hostile work environment, and termination under the ADA, and as to all her state law claims. The motion for summary judgment is denied as to Quintero's retaliation claim under the ADA.

**I. BACKGROUND**

**A. Facts**

Quintero is a 24–year–old female who began experiencing epileptic seizures when she was a child.[FN1] (Complaint, dated July 6, 2009 ("Compl."), ¶ 2 (Dkt. No. 1); Deposition Transcript of Pamela Quintero, dated Jan. 18, 2011 ("Quintero Tr."), 86:5–7, attached as Exhibit ("Ex.") H to the Dempsey Certification, dated Apr. 15, 2011, in Support of Defendant's Motion for Summary Judgment ("Dempsey Cert.") (Dkt. No. 29);[FN2] Declaration of Raul Quintero, dated May 20, 2011, in Support of Plaintiff's Opposition to Defendant's Motion

for Summary Judgment ("Quintero Decl."), ¶ 3 (Dkt. No. 34)). Quintero also suffers from developmental learning disabilities and was placed in special education classes in school. (Compl. ¶ 2; Quintero Decl. ¶ 4). In September 2006, on the advice of a neurologist who determined that a brain tumor was the cause of her seizures, Quintero underwent surgery to have the tumor removed. (Quintero Tr.: 76:7–77:7; Quintero Decl. ¶ 4). The surgery was completed without any complications. (Quintero Tr.: 97:4–7). Quintero continues to take medication and consults her neurologist on a monthly basis. (Quintero Tr.: 60:23–62:8, 97:12–15).

> FN1. Unless otherwise noted, the facts are either undisputed or, where disputed, construed in the light most favorable to Quintero. The facts summarized here are derived from the pleadings and submissions on file, including the parties' respective statements of fact submitted pursuant to Rule 56.1 of the Court's Local Civil Rules.

> FN2. Rite Aid's initial submission included two exhibits that revealed Quintero's full date of birth and social security number. (Dkt. No. 27). Pursuant to the Court's Order dated April 28, 2011, Rite Aid filed redacted versions of the two exhibits on April 29, 2011. (Dkt. No. 29).

In January 2007, Quintero was hired to work at a Rite Aid store in Carmel, New York. (Defendant's Local Rule 56.1(a) Statement of Material Facts in Support of Motion for Summary Judgment, dated Apr. 15, 2011 ("Def.Statement"), ¶ 1 (Dkt. No. 25)). Rite Aid is a wholly-owned subsidiary of Rite Aid Corporation, which operates retail stores primarily engaged in selling prescription and over-the-counter medications. (Answer, filed July 30, 2009, ¶ 3 (Dkt. No. 3)). During her employment, Quintero was supervised by two Rite Aid employees, Janek Jesman ("Jesman") and George Whalen ("Whalen"), who were the Head Manager and Assistant Manager, respectively, of the Carmel store. (Quintero Tr.: 109:24–110:8; Declaration of Pamela Quintero, dated May 23, 2011, in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pamela

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

Quintero Decl."), ¶ 2 (Dkt. No. 35)). On her job application and in her employment paperwork, Quintero did not indicate that she had any physical disability, mental disability, or learning disability. (Def. Statement ¶ 2; Dempsey Cert., Ex. D). Quintero asserts, however, that on her first day of work, her father, Raul Quintero, met with a supervisor and informed him that Quintero had a seizure disorder and had recently undergone brain surgery. (Quintero Decl. ¶ 8). Her father explained to the supervisor that although Quintero's doctor had given her the "green light" to work and her seizures were "largely under control," she could still have a seizure. (*Id.*). He requested that the supervisor contact him if Quintero had a seizure at work. (Plaintiffs Rule 56.1 Counterstatement, dated May 23, 2011 ("Pl.Statement"), ¶ 2 (Dkt. No. 37)).

**\*2** Under Rite Aid's company policy, in order to accommodate any employee with an alleged disability, Rite Aid must receive medical documentation establishing the disability and setting forth the associated limitations and restrictions. (Def. Statement ¶ 11). Though Quintero did not submit any documentation regarding her medical condition along with her employment application, her father offered to make such documentation available if requested by Rite Aid. (Pl. Statement ¶ 6; Quintero Decl. ¶ 6). Quintero asserts that Rite Aid never made such a request. (Pl. Statement ¶ 6; Quintero Decl. ¶ 9). Notwithstanding the absence of medical documentation, each of Quintero's supervisors was made aware of her medical condition. Jesman testified about a conversation he had with Quintero's father, during which he was informed of Quintero's condition. (Pl. Statement ¶ 7; Deposition Transcript of Janek Jesman, dated Jan. 20, 2011, 27:12–32:9, attached as Ex. I to the Dempsey Cert.). Whalen testified that Quintero herself told him about her seizure condition and brain surgery on several occasions, and that Quintero had shown him pictures of her brain surgery. (Pl. Statement ¶ 7; Deposition Transcript of George Whalen, dated Mar. 25, 2011 ("Whalen Tr."), 120:23–126:9, attached as Ex. L to the Dempsey Cert.).

Quintero initially worked as a cashier/stock person and her responsibilities included arranging products on shelves to have them face the same direction. (Answer ¶ 4; Quintero Tr.: 107:11–108:14). She eventually worked in the store's photo department, handling transactions at the cash register and removing film from cameras. (Quintero Tr.: 121:7–11, 122:18–123:11). At some point, Quintero's responsibilities were changed to cleaning, which she alleges other employees were not made to do, and carrying boxes. (Quintero Tr.: 124:21–125:6, 175:23–176:3). Quintero alleges that at times she would have difficulty carrying boxes, and that Whalen would ignore her requests for assistance. (Compl.¶ 6).

In her deposition testimony, Quintero stated that on multiple occasions Whalen threw items at her, screamed at her in front of customers, and mocked the way she spoke. (Quintero Tr.: 186:9–187:16, 192:19–193:23). Although she was unable to state the exact number of times Whalen behaved this way, she recalled three specific incidents. Quintero described one incident where Whalen corrected her work and then mocked her by laughing with other employees and making funny faces in her direction. (Quintero Tr.: 152:24–156:18). Quintero described another incident where Whalen was looking at her and making fun of her with two other employees. (Quintero Tr.: 158:22–159:10).

The third incident occurred on or about September 4, 2007, and ultimately led to Quintero's alleged termination from Rite Aid. Quintero contends that Whalen screamed at Quintero because she was unable to carry heavy cases of beer. (Quintero Tr.: 146:25–147:23). Whalen's conduct caused Quintero to cry. (*Id.*). Whalen also repeatedly hit refrigerator doors and mocked Quintero by making "funny faces." (Quintero Tr.: 147:3–23). Quintero told Whalen that she felt as though she was being treated like "someone with no papers," and she asked why he was behaving in such a manner. (Quintero Tr.: 148:2–15). Whalen responded by saying that Quintero "had to do whatever he said because there were no papers in her file saying she had to be treated differently than anyone else." (Compl. ¶ 8; Pamela Quintero Decl. ¶ 2). Quintero then complained to Whalen that he was discriminating against her, and that she was going to report his conduct. (Compl.¶ 9). In response, Whalen taunted Quintero by asking "who are you planning to call, [George] Bush?" (Quintero Tr.: 148:2–15).

**\*3** Quintero alleges that soon after her argument with Whalen, her hours "were reduced significantly, to as little

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

as fifteen hours per week." (Quintero Decl. ¶ 10). On or about October 4, 2007, Quintero was called into a meeting with Whalen and a District Manager, Maryann Durse ("Durse"). (Compl. ¶ 9; Def Statement ¶ 10). Together, Whalen and Durse presented Quintero with a "Written Notice Form," which contained details of the incident between Whalen and her on September 4, 2007. (Quintero Tr.: 135:11–136:8, 146:6–14; Rite Aid Written Notice Form, dated Sept. 14, 2007, attached as Ex. F to the Dempsey Cert.; Rite Aid Written Notice Form (reverse side), dated Oct. 4, 2007, attached as Ex. G to the Dempsey Cert.). According to Quintero, they demanded that she sign the form. (*Id.*). Quintero refused. Durse threw the paper at Quintero and told her she was fired. (Quintero Tr. 135:11–136:8, 145:11–22). Quintero was then ordered to leave the store and wait for her ride outside. (Quintero Tr.: 164:6–20). Rite Aid denies this version of events, and contends that Quintero was not terminated, but instead walked out of the meeting and quit. (*See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment, dated Apr. 15, 2011 ("Def.Mem."), at 3 (Dkt. No. 26)).

On or about July 30, 2008, Quintero timely filed charges of disability discrimination against Rite Aid with the United States Equal Employment Opportunity Commission ("EEOC"). (Compl.¶ 10). On or about May 11, 2009, Quintero received a Right to Sue letter from the EEOC. (*Id.* ¶ 11).

**B. Procedural History**

Quintero filed the Complaint in this action on July 6, 2009.[FN3] Quintero alleges claims under the ADA and NYSHRL on the basis of her alleged disability, consisting of unequal terms and conditions of employment, hostile work environment, retaliation, and unlawful termination. (*Id.* ¶ 1 (p. 4), 13–19).

> FN3. The numbering of paragraphs in the Complaint does not proceed sequentially, such that a handful of paragraph numbers are repeated. For clarity, paragraph numbers that are used more than once in the Complaint will be referred to as "Compl. ¶ ___ (p. ___)."

Following an unsuccessful settlement conference and a period for discovery, on April 18, 2011, Rite Aid moved

for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[FN4] Rite Aid also submitted the Dempsey Certification and its Rule 56.1(a) Statement of Undisputed Material Facts.

> FN4. The parties consented to have this Court handle this case for all purposes under 28 U.S.C. § 636(c) on March 11, 2010. (Dkt. No. 9).

On May 23, 2011, Quintero filed an opposition to Rite Aid's motion (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated May 23, 2011 ("Pl.Mem.")), along with supporting declarations of Theresa B. Wade ("Wade Decl."), Raul Quintero, Pamela Quintero, and Thomas Kaplan, Psy. D. ("Kaplan Decl."). (Dkt.Nos.33–36).[FN5] Attached to the Kaplan Declaration, which is dated May 23, 2011, is an undated psychological evaluation by Dr. Kaplan of Quintero completed at the request of the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") of the State of New York. (Kaplan Deck, Ex, A ("Kaplan Report") (Dkt, No, 36–1)). Rite Aid filed its reply on June 8, 2011. (Reply Memorandum to Defendant's Motion for Summary Judgment, dated June 8, 2011 ("Def. Reply Mem.") (Dkt. No. 38)).

> FN5. Rite Aid asks the Court to disregard Quintero's opposition papers because they were never physically served on Rite Aid. (Def. Reply. Mem. ¶ 1 n. 1). Rite Aid acknowledges that the papers were filed electronically on the Court's Electronic Case Filing ("ECF") system on May 23, 2011, and it does not dispute that its counsel's e-mail address is part of the ECF record that receives notice of all activity in this case. Rite Aid's counsel, therefore, would have received an ECF notice upon Quintero's filing her opposition papers on May 23, 2011. Moreover, Rite Aid filed a reply to Quintero's opposition approximately two weeks after it was filed. Therefore, because Rite Aid had notice of the opposition papers and an opportunity to reply, and did reply, the Court will consider the opposition papers.

**II. *DISCUSSION***

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

**A. Summary Judgment Standard**

**\*4** Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). An issue of fact is material if it "might affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also, e.g. Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir.2006). To prove the presence or absence of a genuine dispute over any material fact, the parties must cite to "particular parts of materials in the record," including, among other things, depositions, documents, affidavits, and declarations. Fed.R.Civ.P. 56(c)(1)(A).

In ruling on a summary judgment motion, a court must resolve ambiguities and draw factual inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 574 (2d Cir.2005). Furthermore, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir.2006) (quoting Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997)). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir.2010). In short, the court is confined to "issue-finding," not "issue-resolution." Gallo v. Prudential Residential Servs., Ltd. ., 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party bears the initial burden of establishing that there are no genuine issues as to any material facts. See Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its initial burden, the nonmoving party must then cite specific facts

in the record to establish that there are material issues of fact requiring a trial. See Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir.1998) (citing Celotex, 477 U.S. at 322). To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, "circumstantial evidence may be ... sufficient to raise a genuine issue of material fact precluding the grant of summary judgment." Gayle v. Gonyea, 313 F.3d 677, 684 (2d Cir.2002).

**\*5** Courts must be "especially cautious" when deciding whether to grant summary judgment in discrimination cases because direct evidence of an employer's intent to discriminate is rare. Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir.1999). Courts therefore must scrutinize the record "for circumstantial evidence that could support an inference of discrimination." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir.1996). "Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir.2006) (quotation marks and citations omitted); Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.2001) ("summary judgment may be appropriate even in the fact-intensive context of discrimination cases").

**B. Evidentiary Challenge to Kaplan Declaration**

As a threshold matter, Rite Aid challenges the admissibility of the Kaplan Declaration and Kaplan Report on the grounds that they are unsworn, not notarized, and not made upon personal knowledge, and should therefore be considered inadmissible hearsay. (Def. Reply Mem. ¶ 13). Rule 56 provides that an affidavit submitted in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) (citations omitted).

To be admissible in a summary judgment proceeding, an affidavit must be sworn to before an officer authorized to administer oaths, such as a notary public. *See Pfeil v. Rogers,* 757 F.2d 850, 859 (7th Cir.1985). Alternatively, under 28 U.S.C. § 1746, an unsworn declaration made under the penalty of perjury has the same evidentiary weight as an affidavit if it includes language in substantially the same form as "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct" followed by a signature and date of execution. *See, e.g ., LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (unsworn letter that met requirements of 28 U.S.C. § 1746 deemed admissible as affidavit in summary judgment); *Williams v. Elzy,* No. 00 Civ. 5382(HBP), 2003 WL 22208349, at *5 (S.D.N.Y. Sept.23, 2003) (same). In his Declaration, Kaplan "declares under penalties of perjury that [his] statements are true," and his signature and the date appear at the end of the document. (Kaplan Decl. ¶ 1). Kaplan's unsworn declaration, therefore, meets the requirements of Section 1746 and is admissible evidence that may be considered in ruling on the pending motion.

By contrast, the Kaplan Report is unsworn and, if it had been submitted on its own, would be inadmissible. Although it is signed, it is not declared to be true under penalty of perjury and is undated. *See, e.g., United States v. All Right, Title & Interest in Real Prop. & Appurtenances,* 77 F.3d 648, 657–58 (2d Cir.1996) ("unsworn letter was an inappropriate response to the ... motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court"); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) ("unsworn statements are not admissible to controvert a summary judgment motion"). Nonetheless, an unsworn medical report supported by an appropriate affidavit may be considered in opposition to a summary judgment motion. *See, e.g., Berk v. St. Vincent's Hosp. & Med. Ctr.,* 380 F.Supp.2d 334. 352 (S.D.N.Y.2005) ("[U]nsworn expert reports do not satisfy the admissibility

requirements of Fed.R.Civ.P. [56(c)(4) ], and cannot be used to defeat a summary judgment motion *without additional affidavit support."* ) (emphasis added); *Nasrallah v. Helio De,* No. 96 Civ. 8727(SS), 1998 WL 152568, at *4 (S.D.N.Y. Apr.2, 1998) (unsworn medical reports are "patently not competent evidence" and are inadmissible to oppose summary judgment when attached to attorney affidavit because counsel has neither first-hand knowledge of facts nor medical expertise).

**\*6** Here, Kaplan himself affirms that his statements are based on personal knowledge and authenticates his psychological evaluation of Quintero. He states that the document attached to his Declaration is a "true and correct" copy of an evaluation that he conducted of Quintero "on or about May 6, 2009," and whose "information and conclusions ... are true and correct to the best of [his] knowledge and information[.]" (Kaplan Decl. ¶ 2). In light of Kaplan's representations, the evidence is "sufficient to support a finding that the matter in question is what [Kaplan] claims." Fed.R.Evid. 901(a). The Court therefore will consider both Kaplan's Declaration and his Report in adjudicating Rite Aid's summary judgment motion.[FN6]

> FN6. Rite Aid also challenges the Kaplan Report because it contains no information about Quintero's condition during the relevant period in 2007 (as the evaluation took place in 2009). (*See* Def. Reply Mem. ¶ 14). This argument goes to the *weight* the Court should give the Report, not its *admissibility. See, infra,* at p. 20.
>
> In addition, to the extent that Rite Aid raises a double-hearsay argument—that is, the Kaplan Report contains hearsay because it is based on statements made by Quintero to Dr. Kaplan during the evaluation (Def. Reply Mem. ¶ 15)—it is without merit. Kaplan's Report can be based on patient statements, since these are facts "of a type reasonably relied upon by experts in" Kaplan's field and "need to be admissible in evidence in order for the opinion ... to be admitted." Fed.R.Evid. 703; *see also* Fed.R.Evid. 703, Advisory Comm. Notes, 1972 Proposed Rules ("a physician in his own

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients").

## C. Summary Judgment Under the ADA and NYSHRL

The ADA creates a private right of action for disability-based employment discrimination, prohibiting discrimination in the workplace "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.[FN7] The NYSHRL provides that an employer, on the basis of an individual's disability, cannot "bar or ... discharge from employment such individual or ... discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law. § 296(1)(a); *see also* Kinneary v. City of New York, 601 F.3d 151, 158 (2d Cir.2010) ("same elements" must be proven to establish both ADA and NYSHRL disability discrimination claims). Quintero asserts four claims of disability discrimination under the ADA and NYSHRL; unequal terms and conditions, hostile work environment, retaliation, and termination. (Compl. ¶¶ 1 (p. 4), 13–19).

FN7. In 2008, Congress amended the ADA and stated explicitly that the Amendments "shall become effective on January 1, 2009." *See* ADA Amendments Act of 2008, Pub.L. 110–325, 122 Stat. 3553 (2008). Courts in the Second Circuit have held that the 2008 ADA Amendments are not retroactive and have applied the pre-Amendment ADA to events taking place prior to January 1, 2009. *See, e.g.,* Wega v. Ctr. for Disability Rights, 395 F. App'x 782, 784 n. 1 (2d Cir.2010) (summary order) (2008 ADA Amendments are not retroactive); RaRusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 88 n. 2 (2d Cir.2010) (summary order) (same); Kravar v. Triangle Servs., No. 06 Civ. 7858(RJH)(FM), 2009 WL 805807, at *4 (S.D.N.Y. Mar. 27, 2009) (same); *see also* Fernandez–Vargas v. Gonzales, 548 U.S. 30, 37, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (noting "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication") (internal quotation marks and citation omitted). Here, the Court will apply the pre-Amendment ADA because it was in effect at the time of Quintero's alleged discrimination in 2007. *See, e.g., Casseus v. Verizon N.Y., Inc.,* 722 F.Supp.2d 326, 346 n. 14 (E.D.N.Y.2010) (applying pre-Amendment ADA to discrimination claim arising from plaintiff's termination in June 2007).

Quintero's claims of discrimination must be analyzed under the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See* McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir., 2009) (applying burden-shifting framework to ADA discrimination claims); Dawson v. Bumble & Bumble, 398 F.3d 211, 216–17 (2d Cir.2005) (applying burden-shifting framework to NYSHRL discrimination claims). Under this framework, a plaintiff has the initial burden to establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. "The burden of establishing a prima facie case is not a heavy one. One might characterize it as minimal." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir.2000). If the plaintiff succeeds in establishing a prima facie case, there is "a presumption that the employer discriminated against the employee in an unlawful manner." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir.1998). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. If the defendant carries that burden, the burden shifts back to the plaintiff to prove that the defendant's proffered explanation is a pretext for actual discrimination. Id. at 804–05. The ultimate burden of persuasion remains with the plaintiff at all times. Id. at 804.

## D. ADA Unequal Terms and Conditions Claim

**\*7** Quintero asserts that Rite Aid discriminated against her on account of her disability by subjecting her to unequal employment terms and conditions. Specifically, Quintero alleges that unlike other employees at her level, she was made to sweep and mop the floors, and carry heavy boxes without assistance. (Compl. ¶¶ 6, 1 (p. 4),

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

15). To establish a prima facie case of disability discrimination, Quintero must show "(a) that [her] employer is subject to the ADA; (b) that [she] is disabled within the meaning of the ADA or perceived to be so by [her] employer; (c) that [she] was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that [she] suffered an adverse employment action because of [her] disability." *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir.2008). Any adverse employment action because of a disability necessarily requires that a defendant know that a plaintiff is disabled. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 54 n. 7, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); *Brady,* 531 F.3d at 135. Rite Aid does not dispute that it is subject to the ADA, and does not challenge whether Quintero was qualified to perform the essential functions of her job. The parties dispute whether Quintero was disabled within the meaning of the ADA and whether she suffered an adverse employment action because of her disability.

**1. Disabled Within the Meaning of the ADA**

To prevail on a disability discrimination claim under the ADA, Quintero must establish that she was disabled within the meaning of the ADA.[FN8] The ADA defines disability " 'with respect to an individual' " and "makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), *superseded by statute on other grounds,* Pub.L. 110–325, 122 Stat. 3553 (2008) (quoting 42 U.S.C. § 12102(2)). Under the ADA, "disability" is defined in three alternative ways: (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 150 (2d Cir.1998). Quintero contends that she was disabled under all three definitions, and that she suffered from a physical impairment because of epileptic seizures, and a mental impairment from her learning disability. (Pl. Mem. at 10, 12). Furthermore, Quintero must establish that she was disabled under the ADA during the relevant time period, which in this case is between January and October 2007. *See, e.g., Miller v. McHugh,* No. 09 Civ. 7425(SAS), 2011 WL 4091466, at *9 (S.D.N.Y. Sept.14, 2011) (summary judgment granted because plaintiff not disabled in relevant time period). For the reasons explained below, the Court finds that Quintero was not disabled within the meaning of the ADA due to either her seizure disorder or learning disability.

FN8. Rite Aid's principal challenge to Quintero's claim of disability is predicated on Quintero's statements at her deposition, in response to questions from counsel, that she did not have a physical or learning disability while working at Rite Aid and that she does not currently have such a disability. (Def. Statement ¶¶ 3, 5; Quintero Tr.: 101:14–17, 102:9–16, 172:23–175:2). Quintero's father responds that his daughter's "intellectual disability inhibits her ability to understand the nature of her disabilities or the fact that she has disabilities," and that she was confused at her deposition. (Quintero Decl. ¶ 12; Pl. Statement ¶ 3). Rite Aid argues that Mr. Quintero's position is without merit because his daughter has not previously asserted that she was unable to answer such questions and, moreover, her lawyers did not make any corrections to the transcript after the deposition. (Def. Reply Mem. 3, 4). Quintero's admission, Rite Aid contends, is dispositive evidence that she was not disabled during the relevant time period.

As a factual matter, the Court observes that Quintero's answers at her deposition hardly constitute an unequivocal admission. The answers, when read in context, are at best inconclusive. At different points, Quintero answered nearly identical questions with different responses and appeared confused by the nature of the questions. For example, Quintero gave seemingly contradictory answers to two similar questions relating to the presence of any physical disability in 2007. (Quintero Tr.: 174:13–16, 174:20–23). Nevertheless, the Court notes that Quintero failed to make any changes to her deposition transcript and her counsel has not cited any authority for the proposition that the Court disregard a portion of the deposition testimony because of Quintero's alleged inability,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

unsupported by any submitted medical evidence, to understand the nature of her disabilities. In any event, given that the Court's consideration of Quintero's statements does not affect the outcome of Rite Aid's motion, the Court declines to accept Rite Aid's arguments that Quintero's apparent admissions are dispositive of whether she was disabled or not while employed at Rite Aid.

**a. Quintero's Seizure Disorder and Learning Disability Are Not Impairments That Substantially Limit a Major Life Activity**

**\*8** To establish a disability under the first subsection of the ADA's definition of disability, Quintero must (a) prove that she suffers from a physical or mental impairment, (b) identify the activity that is claimed to be impaired and establish that such activity constitutes a "major life" activity, and (c) demonstrate that her physical or mental impairment "substantially limits" the identified "major life activity." *See Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 201 (2d Cir.2004). Since the ADA does not define "physical or mental impairment," "major life activities," or "substantial limitation," courts have looked to the EEOC's administrative regulations for guidance. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 479–80, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *superseded by statute on other grounds,* ADA Amendments Act of 2008, Pub.L. 110–325, 122 Stat. 3553 (2008); *see also Toyota,* 534 U.S. at 197 (the terms "substantially limits" and "major life activity" "need to be interpreted strictly to create a demanding standard for qualifying as disabled"). Even though these administrative regulations are not binding, courts in the Second Circuit afford them great deference. *See, e.g., Francis v. City of Meriden,* 129 F.3d 281, 284 n. 1 (2d Cir.1997); *De La Rosa v. City of New York Police Dep't,* No. 09 Civ. 5290(SAS), 2010 WL 4177626, at \*5 (S.D.N.Y. Oct.22, 2010).

Under the EEOC regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1) (2007). Epilepsy

is generally considered to be a physical impairment under the ADA. *See, e.g., Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 216 (2d Cir.2001) ( "well established" that "epilepsy constitutes a disability under the ADA"); *Franklin v. Consol. Edison Co. of N.Y., Inc.,* No. 98 Civ. 2286(WHP), 1999 WL 796170, at \*11 (S.D.N.Y. Sept.30, 1999) (idiopathic seizure disorder, or epilepsy, is a physical impairment that affects the neurological and musculoskeletal systems). Likewise, a learning disability is a mental impairment under the ADA. The EEOC defines "mental impairment" as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h). Therefore, both an epilepsy disorder and learning disability are recognized impairments under the ADA.

Not every impairment, however, "is a disability within the meaning of the ADA; rather there are two additional requirements: the impairment must limit a major life activity and the limitation must be substantial." *Capobianco v. City of New York,* 422 F.3d 47, 56 (2d Cir.2005) (citing 42 U.S.C. § 12102(2)(A)). Major life activities are those "that are of central importance to daily life," *Toyota,* 534 U.S. at 197. The EEOC regulations define major life activities to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Second Circuit has "assume[d] without deciding" that " 'sitting, standing, lifting, or reaching' " are major life activities. *See Colwell v. Suffolk Cnty. Police Dep't,* 158 F.3d 635, 642–43 (2d Cir.1998) (citation omitted), *superseded by statute on other grounds,* ADA Amendments Act of 2008, Pub.L. 110–325, 122 Stat, 3553 (2008). "In deciding whether a particular activity is a 'major life activity,' [the court asks] whether that activity is a significant one within the contemplation of the ADA, rather than whether that activity is important to a particular plaintiff." *Colwell,* 158 F.3d at 642.

**\*9** Under the EEOC regulations, "substantially limits" means "[u]nable to perform a major life activity that the average person" can perform, or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

compared to" the average person. 29 C.F.R, § 1630.2(j)(1)(ii). To meet either of these requirements, Quintero must present evidence regarding; (1) the nature and severity of her impairments, (2) the duration or expected duration of her impairments, and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from her impairments. *See* 29 C.F.R. § 1630.2(j)(2); *Toyota,* 534 U.S. at 196–98; *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 871 (2d Cir.1998).

**1) Quintero's Epilepsy Does Not Substantially Limit Any Major Life Activity**

While a reasonable jury could find that Quintero is impaired by her epilepsy, the record is insufficient to permit a trier of fact to conclude that it substantially limits any major life activities, including those identified by Quintero in the Complaint. Quintero contends that her epilepsy impairs her ability to perform manual tasks, care for herself, and work, each of which is recognized as a major life activity. (Compl. ¶ 2 (p. 1)). *See* 29 C.F.R. § 1630.2(i). Quintero's father declares that because of her "medical condition [,]" Quintero "could not do many things that an average 20 year old could do" while she was employed at Rite Aid. (Quintero Decl. ¶ 13). Specifically, he states that Quintero could not drive, live on her own, handle her own finances, file taxes or pay bills, or take care of her own medical needs, and had limited ability to read or do math. (*Id.*). The Kaplan Report diagnoses Quintero with a "seizure disorder," but does not otherwise discuss the nature of the impairment. This evidence is insufficient to permit a jury to find a substantial limitation of a major life activity for several reasons.

The statements by Quintero's father fail to provide sufficient specific, non-conclusory information regarding the nature and severity of Quintero's physical impairment, its expected duration, or its long-term impact.[FN9] To be sure, the record is not without details regarding the extent of Quintero's seizure disorder. For example, Quintero's father asserts that his daughter's seizures began at age nine, that she "suffered continuously" until age 19, that the seizures would cause a brief loss of consciousness, and that in 2006 she underwent a brain tumor removal surgery that was intended to make her "seizures less frequent and more manageable." (Quintero Decl. ¶¶ 3, 5). These statements suggest, and it may very well be the case, that

Quintero's impairments affect her capacity to perform certain life functions. However, "it is not enough for a plaintiff to prove that an impairment 'implicates' a major life activity—he or she must prove that it is the impairment that 'substantially limits' the activity." *Bartlett v. N.Y. State Bd. of Law Exam'rs,* 226 F.3d 69, 84 (2d Cir.2000); *see Ryan,* 135 F.3d at 870 ("courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities") (emphasis in original).

> FN9. Although Quintero argues that her epilepsy substantially limits the major life activity of working (Compl. ¶ 2 (p. 1)), she fails to assert any specific factual allegations regarding the extent of that limitation. She does, however, contend that she struggled to lift heavy cases of beer while working at Rite Aid. (*Id.* ¶ 8). To the extent Quintero is asserting that her epilepsy substantially limited her ability to work because she had difficulty lifting heavy objects, that argument fails as a matter of law. An inability to lift heavy items is not a substantial limitation of one's ability to work. *See Colwell,* 158 F.3d at 644–45 (inability to lift "very heavy objects" did not impair a major life activity); *see, infra,* at p. 29.

**\*10** To that end, Quintero's father's statements, and the supporting medical evidence, simply do not provide enough information regarding Quintero's epilepsy disorder to support a finding that Quintero is disabled under the ADA. The Court is left to speculate as to several critical questions about her seizures, including, for example, their frequency, which is particularly important given that she underwent brain surgery in September 2006.[FN10] Because that surgery took place prior to Quintero's employment with Rite Aid, and since it was intended to "make [her] seizures less frequent and more manageable," the result of the surgery is directly relevant to whether Quintero in fact suffered from a seizure disorder during the relevant time period. (Quintero Decl. ¶ 5). This is especially true because Quintero's father alleges that he told Whalen, at the start of Quintero's employment with Rite Aid in January 2007, that her seizures were "largely under control." (*Id.* ¶¶ 5, 8). While Quintero states that prior to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

the surgery she experienced two to three seizures a day, she was unable to state how frequently she suffered from seizures after the surgery. (Quintero Tr.: 86:14–15, 97:19–98:14, 102:4–8). Dr. Kaplan's report is similarly silent with respect to the frequency of Quintero's seizures after her brain surgery in 2006; indeed, his report carries little weight as it reflects his examination of Quintero more than two years after her employment with Rite Aid. In light of the fact that Quintero must establish that she suffered from her disorder during the relevant time period, the Court cannot conclude from the evidence in the record that a jury could find that Quintero was in fact experiencing seizures in or around the time she worked at Rite Aid.

> FN10. It is worth noting that the record is entirely devoid of any direct evidence of Quintero's surgery, such as hospital records or medical reports by a surgeon or neurologist. Basic facts regarding the surgery are missing from Quintero's submissions, including, for example, the name of the hospital where the surgery was performed, the date of the surgery, the length of any hospital stay, or the precise medical diagnosis connecting Quintero's brain tumor with her seizures. Even the location of the hospital where the surgery was performed is in question, with Quintero testifying that it took place in Arizona but her opposition papers asserting that it took place in Texas. (Quintero Tr.: 70:24–72:2; Pl. Mem. at 11).

The only possible evidence regarding the extent of Quintero's seizures during her employment is her father's caution to Whalen at the start of her employment that "there was a possibility that [Quintero] could have a seizure [.]" (Quintero Decl. ¶ 8). But that statement is unsupported by even the most elemental facts, such as the date of Quintero's most recent seizure. *See DeFabio v. E. Hampton Union Free Sch. Dist.,* 623 F.3d 71, 81 (2d Cir.2010) (nonmoving party "must do more that simply show that there is some metaphysical doubt as to the material facts, ... and [she] may not rely on conclusory allegations or unsubstantiated speculation") (internal quotation marks and citations omitted). Without that information, no trier of fact would have any basis to link

the frequency and severity of Quintero's seizures with any alleged limitation on a major life activity. This information is especially critical for a seizure disorder, as courts have held that disorders resulting in episodic or temporary restrictions, even if caused by a lifelong impairment, do not rise to the level of a substantial limitation of a major life activity because they are insufficient in duration and long-term impact. *See, e.g., Ryan,* 135 F.3d at 871–72 (plaintiff's ulcerative colitis of the rectum did not substantially limit major life activity because plaintiff would sometimes go years without experiencing symptoms, and any symptoms varied in intensity); *Tojzan v. N.Y. Presbyterian Hosp.,* No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *7–8 (S.D.N.Y. Mar.31, 2003) (no substantial limitation of major life activity where plaintiff's back problems were episodic and not consistently severe); *see also E.E.O.C. v. Sara Lee Corp.,* 237 F.3d 349, 352 (4th Cir.2001) (plaintiff who experienced seizures once to twice a week was not substantially limited in major life activities of sleeping, thinking, or caring for herself). Indeed, "[t]o hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds." *Sara Lee,* 237 F.3d at 352.

*11 Moreover, Quintero appears to be taking antiseizure medication (Quintero Tr.: 61:6), which, according to the Kaplan Report, "effectively control[s] the problem." (Kaplan Report at 2, 9; Quintero 61:4–62:8). The effect of medication is central to any consideration of whether an impairment is substantially limiting. *See Sutton,* 527 U.S. at 482 (effect of measures taken to correct, or mitigate, physical or mental impairments "must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the [ADA]"). Where the use of medication prevents seizures, courts have found that a plaintiff is unable to establish a disability under the ADA. *See, e.g., Charneco v. Dep't of Educ.,* No. 04 Civ. 1848 (AK1I), 2006 WL 148934, at *3 (S.D.N.Y. Jan.18, 2006). Absent additional information regarding the effect of Quintero's medication on the nature of her seizures and their impact on her daily life, including the possibility that her seizures were under control during the relevant time period, no jury could determine how, if at all, Quintero's seizures affected her ability to perform manual tasks, care

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

for herself, or work. Quintero therefore has failed to establish that her seizure disorder constitutes a disability under the first subsection of the ADA.

**2) Quintero's Learning Disability Does Not Substantially Limit Any Major Life Activity**

The effect of Quintero's learning disability is similarly unsupported by any specific evidence to allow a jury to determine that it substantially limits one or more major life activities. In the Complaint, Quintero asserts that her learning disability "has an impact on all activities of central importance to her daily life, including learning and thinking." (Compl. ¶ 2 (p. 1)). In his Declaration, Quintero's father states that Quintero's learning disability "had a very significant impact on her functioning" while she was employed at Rite Aid, and states that she could not drive, live on her own, handle her own finances, file taxes or pay bills, take care of her own medical needs, and had limited ability to read or do math. (Quintero Decl. ¶ 13).

Of Quintero's identified major life activities, learning is a recognized major life activity. *See* 29 C.F.R. § 1630.2(i).[FN11] To the extent that taking care of one's own medical needs constitutes taking care of oneself, it also is a major life activity. However, some of the activities that Quintero specifically identifies do not rise to the level of major life activities. *See, e.g., Colwell,* 158 F.3d at 643 (driving is not a major life activity); *MacGovern v. Hamilton Sunstrand Corp.,* 170 F.Supp.2d 301, 308 (D.Conn.2001) (doing taxes is a "relatively minor undertaking[ ]" and not a major life activity). *Compare Pare v. City of Bristol,* 386 F.Supp.2d 43, 52 (D.Conn.2005) (thinking "has not been recognized as a separate major life activity") *with Baerga v. Hosp. for Special Surgery,* No. 97 Civ. 0230(DAB), 2003 WL 22251294, at *4 (S.D.N.Y. Sept.30, 2003) (citing EEOC Enforcement Guidance: The Americans with Disabilities Act and Psychiatric Disabilities, EEOC Notice Number 915.002) (thinking is included on an EEOC list of major life activities).

> FN11. Quintero asserts that she is limited in "all activities of central importance to her daily life." (Compl.¶2). This, however, is the very definition of a "major life activity." *See Toyota,* 534 U.S. at 197 (major life activities are "activities that are

of central importance to daily life"). Since Quintero's statement would implicate nearly every possible major life activity, it is impermissibly broad. The Court declines to speculate as to how Quintero's learning disability substantially limits any and all major life activities and will instead focus only on those activities that Quintero has specifically identified.

**\*12** Despite having identified certain major life activities, Quintero has failed to submit sufficient evidence to establish that her learning disability substantially limits any of those activities. First, as with Quintero's seizure disorder, the record does not establish several basic facts with respect to Quintero's learning disability. Quintero's submitted evidence does not describe the duration of Quintero's learning disability, its long-term impact, or the effect of any correcting or mitigating measures. *See Sutton,* 527 U.S. at 481–82. Similar to Quintero's assertion that she was hospitalized for brain surgery in 2006, Quintero's statement that she "was diagnosed with learning disabilities" at some unspecified point in the past is not supported by any medical evidence. (Quintero Decl. ¶ 4). The record is bereft of any information regarding this alleged diagnosis or any details about the nature of the disability over the course of Quintero's life.

While Quintero has not presented any evidence of her mental impairment before and during her employment at Rite Aid, she is able to establish the presence of a learning disability as early as 18 months after her employment ended. Quintero relies extensively on the findings from Dr. Kaplan's report, which is entitled "Comprehensive Psychological Evaluation" and was completed for purposes of determining Quintero's eligibility for social services from VESID. (Quintero Decl. ¶ 4; Kaplan Report at 1). The Report includes Dr. Kaplan's observations regarding Quintero's background and behavior. After completing several achievement and intelligence assessments, Dr. Kaplan finds that Quintero has an IQ of 67, which is below that of most of her peers. (Kaplan Report at 4–7). Dr. Kaplan diagnoses Quintero with "mild mental retardation." (Kaplan Report at 8). However, the undated report appears to have been based on tests that were completed on May 6, 2009, well after Quintero

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

stopped working at Rite Aid. (Kaplan Report at 1). Further, the Report makes no reference to the nature of Quintero's mental impairments around the time of her employment at Rite Aid, or that her learning disability is a lifelong impairment. The Report would therefore be of no assistance to a fact-finder in deciding whether Quintero's learning disability substantially limited a major life activity during the relevant time period in this case.

Even if the Kaplan Report had offered an assessment of Quintero's learning disability in 2007, however, it would still be insufficient to establish that her "mild mental retardation" causes substantial limitation of any major life activity. "It is insufficient for [Quintero] to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [Quintero] ... to prove a disability by offering evidence that the extent of the limitation caused by [her] impairment in terms of [her] *own experience* is substantial." *Toyota,* 534 U.S. at 198 (emphasis added) (internal quotation marks and citations omitted). Neither Kaplan's statements nor Quintero's arguments provide any specific evidence on how Quintero's learning disability substantially limits a major life activity. Assertions by Quintero's father—that, for example, Quintero is unable to care for her medical needs—amount to little more than declarative statements, as they are unsupported by specific examples (or, in the case of medical needs, what Quintero's medical needs are). Apart from those statements, Quintero is left to rely on Dr. Kaplan's report, which offers only psychological diagnoses from outside the relevant time period, not any assessment of the effect of Quintero's "mild mental retardation" on her day-to-day activities from January 2007 to October 2007. In light of these evidentiary deficiencies, the Court finds that Quintero has not established that her learning disability constitutes a disability as defined under the first subsection of the ADA.

**b. Quintero Does Not Have A Record of Impairment**

*13 The second subsection of the ADA's definition of disability allows a plaintiff to prove a disability if she has a record of physical or mental impairment. 42 U.S.C. § 12102(2)(B). Quintero argues that her history of seizures constitutes a record of physical impairment that substantially limited one or more of her major life activities. The EEOC regulations define "record of impairment" as where a person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Quintero argues that her hospitalization in connection with her brain surgery in 2006 sufficiently represents a record of a substantially-limiting physical impairment. In doing so, she relies on two cases where courts have found a record of impairment based on hospitalization and specifically noted that an impairment that was "serious enough to require hospitalization" was one that substantially limited one or more major life activities. (Pl. Mem. at 10 (citing *School Bd. of Nassau Cnty. v. Arline,* 480 U.S. 273, 281, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)* (finding record of impairment based on plaintiff's hospitalization for acute tuberculosis); *and Mark v. Burke Rehabilitation Hosp., No. 94 Civ. 3596(RLC), 1997 WL 189124, at *4 (S.D.N.Y. Apr.17, 1997)* (finding record of impairment based on plaintiff's hospitalization for cancer surgery))).

The first, and most obvious, problem with Quintero's argument here is the complete absence of any evidence relating to her hospitalization, such that there is no "record" of hospitalization. *See supra* at n. 11. Moreover, as a matter of law, by asserting that the fact of her hospitalization is, by itself, sufficient to establish a disability under the ADA, Quintero ignores binding authority that leads to exactly the opposite conclusion. In *Colwell,* the Second Circuit quoted the Fifth Circuit's observation that *Arline*

can not be construed to obviate the requirement, explicit in the ADA and its implementing regulations, that purported conditions be examined to ascertain whether a specific condition substantially limited a major life activity. *The ADA requires an individualized inquiry beyond the mere existence of a hospital stay.* Although the Court in *Arline* noted that the plaintiff's hospitalization established a record of impairment, the defendant had conceded that her acute tuberculosis had been substantially limiting .... [The contrary reading of *Arline* ] would work a presumption that any condition requiring temporary hospitalization is disabling-a presumption that runs counter to the very goal of the ADA.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

158 F.3d at 645–46 (quoting *Burch v. Coca–Cola Co.,* 119 F.3d 305, 317 (5th Cir.1997)) (alteration and emphasis in original). Quintero's argument that her hospitalization for brain surgery establishes a disability under the ADA runs up against the very same presumption that *Colwell* and *Burch,* and many other decisions, seek to avoid. *See Taylor v. U.S. Postal Serv.,* 946 F.2d 1214, 1217 (6th Cir.1991) (*Arline* should not be read "as establishing the nonsensical proposition that any hospital stay is sufficient to evidence a 'record of impairment' "); *see, e.g., Horwitz v. L. & J.G. Stickley, Inc.,* 20 F. App'x 76, 80 (2d Cir.2001) (summary order) ("Because past hospitalization, even coupled with continued treatment, does not create a record of a substantially limiting medical condition, the plaintiff was not protected by the ADA."); *Berk v. Bates Advertising USA, Inc.,* 25 F.Supp.2d 265, 267 (S.D.N.Y.1998) ("Given the Second Circuit's analysis in *Colwell,* I can no longer give [plaintiff's] hospitalization ... controlling weight on the existence of a disability under the ADA."); *Owens v. Longo,* No. 06 Civ. 0281(GLS)(DRH), 2008 WL 84594, at *6 (N.D.N.Y. Jan. 7, 2008) ("[A] plaintiff will not automatically be found disabled upon presentation of records of a medical appointment or surgery regarding an impairment."). Allowing the mere fact of Quintero's hospitalization to establish a disability—with no evidentiary showing of how, if at all, the impairment for which she was hospitalized imposed a substantial limitation, *see Colwell,* 158 F.3d at 645—would recognize an impermissible, and wholly counterintuitive, exception to the ADA. Quintero therefore cannot establish that she has a disability under the ADA because of a "record of impairment."

**c. Quintero Was Not "Regarded As" Disabled By Defendant**

**\*14** Quintero also asserts that she meets the third subsection of the ADA's definition of disability because Rite Aid regarded her as having a disability. Under this prong of the ADA's disability definition, the decisive issue is not whether the employee has a disability, but whether the employer regarded the employee as " 'disabled *within the meaning of the ADA.* ' " *Giordano v. City of New York,* 274 F.3d 740, 748 (2d Cir.2001) (quoting *Colwell,* 158 F.3d at 646) (emphasis in original). The Supreme Court has explained that an individual can be "regarded as"

disabled within the meaning of the ADA in one of two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.' " *Sutton,* 527 U.S. at 489.

Quintero has failed to put forth any evidence to demonstrate that Rite Aid regarded her as substantially limited in her ability to perform a major life activity, or even to allege a specific major life activity in connection with the "regarded as" disability definition. Instead, Quintero asserts that Jesman and Whalen's knowledge of her physical impairment is sufficient to prove that they regarded her as disabled. However, evidence that Quintero's supervisors knew of Quintero's brain surgery, which Rite Aid concedes, has no bearing on whether Rite Aid regarded Quintero as limited in a major life activity. *See Reeves,* 140 F.3d at 153 ("mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action") (internal quotation marks and citation omitted). While Rite Aid was made aware of Quintero's seizure disorder and corrective brain surgery, it was not informed that her impairment substantially limited any major life activities. Quite the opposite, in fact, as Quintero's father instructed Quintero's supervisor that her seizures "had been largely under control" since the surgery and that she had received the "green light" to work. (Pl. Mem. at 11).

While Quintero's father did advise the supervisor of the possibility that Quintero could suffer another seizure on the job, that statement made no mention of any actual limitation from which Quintero may suffer. (Quintero Decl. ¶ 8). At her deposition, Quintero testified that following the surgery her doctor advised her "not to do ... hard work," and that this warning prompted her father to speak with the supervisor at Rite Aid. (Quintero Tr.: 150:6–14). Even if Quintero's father had repeated the doctor's warning about "hard work" to Whalen or Jesman, that limitation is far too vague. To notify Whalen that Quintero was substantially limited in the major life activity of working, Quintero's father would have had to advise Whalen that Quintero was limited in "either a class of jobs

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

or a broad range of jobs." 29 C.F.R. § 1630.2(j)(3)(i). The regulations further state that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); *see Sutton,* 527 U.S. at 493. "Hard work" does not constitute a particular job, much less a class of jobs or a broad range of jobs. *See, e.g., Young v. Benjamin Dev. Co.,* No. 03 Civ. 10209(RJS), 2009 WL 498933, at *7 (S.D.N.Y. Feb.17, 2009) ("The need to limit [p]laintiff's tasks to 'light duty' suggests that an impairment may have *affected* his work," but does not "demonstrate that he suffered from a *substantial* impairment.") (emphasis in original).

**\*15** Quintero further argues that Whalen's comments that she "had to do whatever [he] said because there were no papers in [Quintero's] file saying she had to be treated as differently than anyone else" support an inference that Rite Aid regarded her as disabled. (Pl. Mem. at 11). To reach this conclusion, Quintero would need to establish, under *Sutton,* either that Rite Aid believed Quintero had a physical impairment that substantially limited a major life activity, or that Rite Aid mistakenly believed that Quintero's nonlimiting impairment substantially limited a major life activity. Under either application of the *Sutton* standard, Quintero cannot make the requisite showing.

At best, the evidence of Whalen's comments, which were made in the context of a disagreement over Quintero's ability to carry heavy cases of beer, promote a theory that Whalen regarded Quintero as unable to carry heavy boxes of merchandise. Even if Whalen did consider Quintero as having such a limitation, it is insufficient to prove a disability under the "regarded as" definition. A limitation on carrying heavy objects is a specific job function, not a specific job or a broad class of jobs, and so does not substantially limit Quintero's ability to work. "[T]he inability to satisfy the requirements of a particular assignment does not mean that such a person is regarded as handicapped." *Heilwil v. Mount Sinai Hosp.,* 32 F.3d 718, 719 (2d Cir.1994); *see Colwell,* 158 F.3d at 644–45 (inability to lift "very heavy objects" did not impair a major life activity); *Bethea v. Potter,* No. 08 Civ. 2789(RWS), 2010 WL 423105, at *9 (S.D.N.Y. Feb.5, 2010) (no substantial limitation of work where only limitation was inability to lift 70 pounds). Nor could such

an activity itself be considered a major life activity. *See Epstein v. Kalvin–Miller Int'l, Inc.,* 100 F.Supp.2d 222, 225 (S.D.N.Y.2000) (" 'strenuous activity' is not a major life activity cognizable under the ADA"). Quintero's apparent inability to carry heavy cases of beer does not mean that she was unable to successfully complete other responsibilities commensurate with her position, which she was, in fact, able to do. Her limitation is thus not sufficiently broad to satisfy the major life activity requirement under the ADA, and any perception by Rite Aid of that limitation is therefore insufficient. *See, e.g., Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 524–25, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (no substantial limitation where petitioner unable to work as mechanic who drives commercial motor vehicle, but able to work as mechanic generally); *E.E.O.C. v. J.B. Hunt Transp., Inc.,* 321 F.3d 69, 75 (2d Cir.2003) (driving freight-carrying tractor-trailer trucks over long distances for extended periods of time was "a specific job with specific requirements" and inability to perform that job did not preclude drivers from other types of truck driving). Even assuming, therefore, that Whalen's comments to Quintero suggested that he thought she had a limitation of some sort, that limitation would be insufficient to prove a disability under the "regarded as" subsection of the ADA's disability definition.

**\*16** In sum, Quintero cannot establish that she was disabled under any of the ADA's definitions of disability. Given Quintero's failure to establish that she suffered from a disability under the ADA, she is unable to establish a prima facie case of discrimination on the basis of unequal terms and conditions of employment. The Court therefore finds it unnecessary to determine whether Quintero has suffered an adverse employment action for purposes of this claim, or whether Rite Aid had notice of Quintero's disability. *See, e.g., Wright–Jackson v. HIP Health Plan,* No. 07 Civ. 1819(DFE), 2010 WL 624993, at *17 (S.D.N.Y. Feb.19, 2010) (unnecessary to discuss remaining elements of prima facie discrimination case where plaintiff failed to establish one element).

**E. Hostile Work Environment Claims**

Quintero separately alleges that Rite Aid violated the ADA by subjecting her to a hostile work environment on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

account of her disability. (Compl.¶ 6, 7, 13).[FN12] "A plaintiff claiming hostile work environment based on disability must demonstrate that [she] is a member of the protected class. Which is to say, [she] must meet the definition of disability contained in the ADA." *Weiss v. Hustcdt Chevrolet,* No. 05 Civ. 4230(DRH)(MLO), 2009 WL 2132444, at *8–9 (E.D.N.Y. July 13, 2009). Because Quintero cannot establish that she was disabled under the ADA, *see supra* Section II.D.1, her disability-based hostile work environment claim also fails. *See, e.g., Ragusa,* 381 F. App'x at 88 n. 3 (plaintiff's failure to establish that she is qualified individual with disability defeats any hostile work environment claim based on disability); *Edwards v. Brookhaven Science Assocs., LLC,* 390 F.Supp.2d 225, 230–32 (E.D.N.Y.2005) (same).

> FN12. As a threshold argument, Rite Aid contends, without citing to any authority, that Quintero's hostile work environment claim should be dismissed because such a claim under the ADA is improper. (Def. Mem. at 10). Rite Aid maintains that Quintero should have brought her hostile work environment claim under Title VII of the Civil Rights Act of 1964. (*Id.*). Although the Second Circuit has not explicitly held that a hostile work environment claim is cognizable under the ADA, *see Ragusa,* 381 F. App'x at 88, n. 3, courts in this Circuit have analyzed ADA hostile work environment claims under the same standards as Title VII hostile work environment claims. *See, e.g., Monterroso v. Sullivan & Cromwell, LLP,* 591 F.Supp.2d 567, 584 (S.D.N.Y.2008); *De La Cruz v. Guiliiani,* No. 00 Civ. 7102(LAK)(JCF), 2002 WL 32830453, at *9 (S.D.N.Y. Aug. 26, 2002). Accordingly, the Court will consider Quintero's hostile work environment claim as alleged under the ADA.

**F. Retaliation Claim**

Quintero alleges that as a result of her complaining about Whalen's hostile and discriminatory behavior, Rite Aid retaliated against her by changing her job responsibilities, reducing her hours, and ultimately terminating her employment. (Compl.¶¶ 9, 14, 18). The ADA prohibits an employer from retaliating against an employee for opposing "any act or practice made unlawful

by" the ADA. 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, Quintero must establish that (1) she was engaged in an ADA-protected activity, (2) Rite Aid was aware of the activity, (3) she was subject to an adverse employment action, and (4) a causal connection exists between her protected activity and the adverse employment action. *See, e.g., Richardson v. Comm'n on Human Rights & Opportunities,* 532 F.3d 114, 123 (2d Cir.2008); *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002). To prevail on her retaliation claim, Quintero need not prove that she was disabled within the meaning of the ADA, but must demonstrate "a good faith, reasonable belief that the underlying challenged actions of the employer violated th[e] law." *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir.1999) (internal quotation marks and citations omitted); *see also Sussle v. Sirina Prot. Sys. Corp.,* 269 F.Supp.2d 285, 313 (S.D.N.Y.2003) (applying *Sarno* ). Quintero asserts that soon after she informed Whalen that she was going to report his conduct, she was terminated by Rite Aid. (*Id.* ¶ 9).

**\*17** Quintero has established the first two elements of a prima facie case of retaliation. Her threat to report Whalen's conduct, which she believed was discriminatory and abusive, was an activity that is protected by the ADA. *See, e.g., Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990) (protected activities include "making complaints to management"). In addition, Rite Aid was aware of Quintero's protected activity, as she expressed her intent to report Whalen's conduct directly to Whalen himself. (Compl. ¶ 9; Quintero Tr.: 148:2–15).

Having carefully reviewed the evidence, the Court finds that there is a genuine dispute as to whether Quintero was subject to an adverse employment action. While Rite Aid does not contest that termination is an adverse employment action, *see Sista v. CDC Ixis North America,* 445 F.3d 161, 169 (2d Cir.2006) (termination is an adverse employment action), it contends that Quintero voluntarily resigned from her position. (Def. Mem. at 3, 9). To support the view that Quintero resigned, Rite Aid submits deposition testimony from several current and former Rite Aid employees, an employment manual, and written statements from Quintero's supervisors describing the events surrounding Quintero's departure in October 2007. According to Rite Aid, Durse and Jesman called a

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

meeting with Quintero to discuss her behavior during a recent argument with Whalen, during which Quintero had been yelling at Whalen. (Durse Tr.: 21:22–29:6). Durse presented Quintero with a "Written Notice Form," which was an incident report to document Quintero's insubordination. Quintero refused to sign the document, quit her job, and left the store. (*Id*). Rite Aid also contends that Quintero could not have been terminated at her meeting with Durse because Durse did not have authority to terminate employees. (Def. Mem. at 9).

Quintero relies on her own deposition testimony to support the view that she was terminated. Quintero asserts that, a few weeks after an argument between Whalen and her, she was called into a meeting with Whalen and an unidentified regional manager. They presented Quintero with a "Written Notice Form," which contained details of the incident. (Quintero Tr.: 135:11–136:8,146:6–14). They demanded that Quintero sign the form. (*Id.*). Upon her refusal to sign the paper, the regional manager threw the paper at Quintero and informed her that she was fired. (Quintero Tr. 135:11–136:8,145:11–22). Quintero was then ordered to leave the store and wait for her ride outside. (Quintero Tr.: 164:6–20).

The question of whether Quintero was terminated from Rite Aid or that she quit is the very definition of a genuine issue of material fact. Given the conflicting versions of events, the Court is called upon to weigh the parties' evidence and make credibility determinations, which "are jury functions, not those of ajudge[.]" *Anderson,* 477 U.S. at 255; *see also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although the Second Circuit has recognized an exception to this rule where a plaintiff relies almost exclusively on her own testimony and where that testimony is contradictory and incomplete, that exception does not apply here. *See Rojas v. Roman Catholic Diocese of Rochester,* No. 10–4132–cv, 660 F.3d 98, 2011 WL 4552460. at *5–6 (2d Cir. Oct. 4, 2011) (district court properly disregarded plaintiff's deposition testimony as "sham evidence" because of contradictions with prior statements and admissions); *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005). Rite Aid has not

made any argument to establish that Quintero's testimony is "so self-contradictory or implausible as to rule out crediting it." *Bennett v. Vaccaro,* No. 08 Civ. 4028(LTS)(MHD), 2011 WL 1900185, at *8 (S.D.N.Y. Apr. 11, 2011). The principal argument that Rite Aid advances to debunk Quintero's version of events is that because Durse lacked authority to fire employees, she could not have fired Quintero. (Def. Mem. at 9).[FN13] Rite Aid also contends that Quintero could not have been terminated for refusing to sign the "Written Notice Form," as there is no such consequence for refusal to sign. While these arguments may be true as a matter of Rite Aid company policy, they by no means establish conclusively that it was impossible for Quintero to have been fired at the October 4, 2007 meeting. Such a determination is one for a jury.[FN14]

FN13. Rite Aid also relies on the "Written Notice Form" for a handwritten notation on the reverse side that says "refused to sign; walk off job[,]" which presumably indicates that Quintero refused to sign the document and resigned. (Ex. G, Dempsey Cert.). Quintero challenges the admissibility and authenticity of the reverse side of the form because while the front side is dated September 14, 2007, the reverse is dated October 4, 2007. (Pl.Mem.14). In addition, Quintero asserts that the reverse side was produced after the close of discovery, which Rite Aid concedes. (*Id.*). Notwithstanding the questions of admissibility, which the Court need not resolve at this time, the form fails to establish that Quintero was not terminated.

FN14. Quintero has failed to provide evidence to create a genuine issue as to whether she suffered any other adverse employment actions in retaliation for her complaint to Whalen about his behavior. As a matter of law, an adverse employment action must be "more disruptive than ... an alteration of job responsibilities ." *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir.2008) (citation omitted). Even if Quintero's alleged alteration of responsibilities resulted in "significantly diminished material responsibilities," and could therefore constitute

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

an adverse employment action, that action could not be considered retaliation. *Id.* (citation omitted). To prove causality, an adverse employment action must take place after a plaintiff engages in a protected activity. *See, e.g.,* *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001) (no causal nexus for retaliation where adverse employment actions began five months prior to protected activity). Quintero does not allege, and the evidence does not suggest, that any of her responsibilities were different after her September 4, 2007 argument with Whalen.

In addition, Quintero's claim that Rite Aid retaliated against her by reducing her work hours is unsupported by any evidence other than Quintero's conclusory statements, which are insufficient to defeat summary judgment. In fact, the record appears to indicate that Quintero's hours were not reduced. According to earnings statements produced by Quintero—submitted to the Court by Rite Aid, not by Quintero—she worked 29.00 regular hours and .50 overtime hours between August 26, 2007 and September 8, 2007. (QUINTERO 000007, attached as Ex. E to the Dempsey Cert.). Between September 9, 2007 and September 22, 2007, Quintero worked 39.50 regular and .20 overtime hours. (QUINTERO 000006, attached as Ex. E to the Dempsey Cert.). It appears that, if anything, Quintero's hours were increased after she complained to Whalen about his behavior, which took place around September 4, 2007. Given this record, Quintero cannot establish that her alleged reduction of hours or changed job responsibilities constitute adverse employment actions.

**\*18** The final element to establish a prima facie case of retaliation is causation. In addition to direct evidence, courts have held that a causal connection can be "established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Lovejoy–Wilson,* 263 F.3d at 224 (internal

quotation marks and citation omitted); *see also* *Barkley v. Penn Yan Cent. Sch. Dist.,* No. 09–3975–cv, 2011 WL 3890442, at *3 (2d Cir. Sept.6, 2011) (summary order). While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish" a causal connection, courts have found proof of such causation where the protected activity and adverse employment action are one month apart. *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir.2001); *see, e.g.,* *Jute v. Hamilton Sunstrand Corp.,* 420 F.3d 166, 176 (2d Cir.2005) (adverse actions within one month of protected activity could establish causal connection); *Treglia,* 313 F.3d at 721 (same). Here, Quintero informed Whalen that she was going to report his allegedly discriminatory conduct on or about September 4, 2007. The next day, Whalen told Jesman that Quintero was "insubordinate." (Whalen Tr.: 104:22–106:12). One month later, Quintero was allegedly terminated. The temporal proximity between Quintero's protected activity and her alleged termination could lead a rational jury to find the requisite causal connection. Accordingly, because Quintero's version of events, if credited, may lead to a finding of retaliation, summary judgment is not appropriate on Quintero's retaliation claim under the ADA.[FN15]

> FN15. Quintero has met her burden to establish a prima facie case of retaliation. Under the burden-shifting framework set forth in *McDonnell–Douglas,* the burden shifts to Rite Aid to offer a legitimate, non-discriminatory reason for Quintero's termination. Rite Aid has offered no such reason; it simply denies the very fact that Quintero was terminated. Given Rite Aid's failure to meet its burden at this stage, summary judgment is inappropriate on Quintero's retaliation claim for this reason as well.

**G. ADA Termination Claim**

To establish a prima facie case of discriminatory discharge under the ADA, Quintero must demonstrate that: (1) Rite Aid is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability. *See, e.g.,* *Ryan,* 135 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5529818 (S.D.N.Y.)

(Cite as: 2011 WL 5529818 (S.D.N.Y.))

869–70. As Quintero has not established that she suffers from a disability within the meaning of the ADA, she has failed to set forth a prima facie case for wrongful termination. *See, e.g., Witchard v. Montefiore Med. Ctr.,* No. 05 Civ. 5957(JSR), 2009 WL 602884, at *21 (S.D.N.Y. Mar.9, 2009) (granting summary judgment on wrongful termination claim where plaintiff's impairments were not disabilities under the ADA); *Watson v. Arts & Entm't Television Network,* No. 04 Civ.1932(HBP), 2008 WL 793596, at *10–15 (S.D.N.Y. Mar.26, 2006) (same). The Court therefore grants summary judgment to Rite Aid on Quintero's termination claim under the ADA.

**H. State Law Discrimination Claims**

In the Complaint, Quintero alleges violations of the NYSHRL on the same grounds—unequal terms and conditions, hostile work environment, retaliation, and termination—as her federal discrimination claims. (Compl.¶¶ 16–19). Although Rite Aid does not discuss Quintero's state law claims in detail in its motion for summary judgment, it seeks to dismiss the Complaint in its entirety and argues that Quintero's "allegations are wholly unfounded and factually unsupported." (Def. Mem. at 2). In her opposition papers, Quintero makes no reference to her state law claims and asserts no arguments to establish a prima facie case of discrimination under the NYSHRL. In the entirety of Quintero's opposition papers, the New York Executive Law is mentioned only once-on the final page of Plaintiff's Rule 56.1(a) Counterstatement of Facts, in the context of disputing the legality of a Rite Aid company policy. (Pl. Statement ¶ 11).

**\*19** "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York,* 269 F.Supp.2d 68, 75 (E.D.N.Y.2003). A district court "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Lipton v. Cnty. of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2005); *see also Blouin ex rel. Estate of Pouliot v. Spitzer,* 356 F.3d 348, 363 n. 9 (2d Cir.2004) (claims abandoned where appellant mentioned, but did not present any argument, on state law claims). Courts have deemed state law discrimination claims abandoned where a plaintiff fails to address those claims in opposition papers. *See, e.g., Thomas v. City of*

*New York,* No. 03 Civ. 1797(CPS), 2007 WL 2156652, at *6 n. 17 (E.D.N.Y. July 25, 2007) (disability discrimination claims under NYSHRL considered abandoned where plaintiff "provide[d] no argument" in opposition to motion to dismiss); *Douglas v. Victor Capital Grp.,* 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (state law claims dismissed where only mention of NYSHRL in opposition papers was "a passing reference that [the] complaint was brought under both the ADA and the NYSHRL"). Since Quintero has failed to address her state law claims in any manner in the opposition to the motion for summary judgment, those claims are deemed abandoned, and summary judgment is granted to Rite Aid.

### III. *CONCLUSION*

For the foregoing reasons, the motion for summary judgment is granted with respect to Quintero's claims for unequal terms and conditions, hostile work environment, and termination under the ADA, and for all claims under New York state law. The motion for summary judgment is denied as to Quintero's retaliation claim under the ADA. The Clerk is directed to close docket number 24.

The parties are directed to appear for a final pre-trial conference to set a trial date on the retaliation claim on November 29, 2011 at 11:00 a.m.

**SO ORDERED.**

S.D.N.Y.,2011.

Quintero v. Rite Aid of New York, Inc.
Slip Copy, 2011 WL 5529818 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 1627009 (E.D.N.Y.)

(Cite as: 2011 WL 1627009 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Mark SOLIMAN, Plaintiffs,
v.
DAIMLER AG, Mercedes–AMG GmbH,
Mercedes–Benz USA, LLC, Progressive Northeastern
Insurance Company, Defendant.
No. 10 CV 408(SJF)(AKT).

April 27, 2011.
Mark Soliman, Melbourne, FL, pro se.

John P. Hannigan, John A. Risi, Bleakley Platt & Schmidt,
LLP, White Plains, NY, for Defendant.

**ORDER**

FEUERSTEIN, District Judge.

I. Introduction

*1 On June 8, 2009, *pro se* plaintiff initiated this
action against Daimler AG, Mercedes–AMG GmbH,
Mercedes–Benz USA, LLC (collectively, "the Mercedes
defendants"), and Progressive Northeastern Insurance
Company ("Progressive") to recover damages for injuries
sustained in an automobile accident. Plaintiff filed a
second amended complaint ("the complaint") on
November 30, 2009. On July 14, 2010, 2010, Progressive
filed a motion to dismiss the complaint pursuant to Rule
12(c) of the Federal Rules of Civil Procedure. Pursuant
to a referral, Magistrate Judge A. Kathleen Tomlinson issued
a Report and Recommendation on. February 9, 2011 (the
"Report") which recommended that Progressive's motion to
be granted. The Court adopted the Report as unopposed
on February 24, 2011. On February 25, 2011, plaintiff's
objections were filed. Plaintiff's objections are deemed to
include a motion for reconsideration.

II. Factual Background

Plaintiff was injured in a car accident in which he was

the front seat passenger. Report at 1. The vehicle's owner,
the wife of the driver, had insured the vehicle with
Progressive. *Id.* Plaintiff claims that, as a result of the
accident he experienced broken bones in his legs and arms
and a head injury which included a laceration treated with
ten (10) staples. *Id* at 2. Plaintiff states that he was unable
to work for three (3) months. *Id.*

Plaintiff, represented by Alan Weinreb ("Weinreb"),
filed personal injury and lost wage claims which were
handled by Progressive. *Id.* at 3. Progressive settled the
personal injury lawsuit and denied plaintiff's claim for lost
wages. *Id.* Following two (2) hearings before the New
York No–Fault Arbitration Tribunal plaintiff's claim for
lost wages was denied. *Id.* at 4. The decision was affirmed
by the Master Arbitrator. *Id.*

Plaintiff now contends that the vehicle in which he
was injured contained a design flaw which caused the
accident and plaintiff's injuries. Progressive acquired the
vehicle, sold it to a salvage yard, and notified plaintiff of
the sale on April 7, 2009. *Id.* at 5.

Plaintiff has not objected to the foregoing facts as
articulated in the Report or the application of New York
law except where noted.

III. Discussion

A. Timeliness of Motion

A motion for reconsideration must be served within
fourteen (14) days of the entry of the order. L.R. 6.3. As
the order was entered on February 24, 2011, plaintiff's
motion for reconsideration is timely.

Plaintiff was ordered to file objections within fourteen
(14) days of service of the report. An affidavit of service
filed by Progressive indicates that the Report was served
by overnight delivery service on February 10,2011.
DE218. The triggering date is not to be counted when
computing time. Fed.R.Civ.P. 6(a)(1)(A). Plaintiff's
objections were received by the Court on February 25,
2011, fifteen (15) days after service. Although plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1627009 (E.D.N.Y.)

(Cite as: 2011 WL 1627009 (E.D.N.Y.))

states that he served and postmarked the objections on February 22, 2011 in an "Affidavit of Service," Obj. at 14, it is not notarized, and does not qualify as a substitute for an affidavit pursuant to Local Civil Rule 1.10.

B. Report and Recommendation

**\*2** However, assuming plaintiff's objections were timely, they are nevertheless overruled.

1. Standard of Review

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). Any portion of a report and recommendation on dispositive matters, to which a timely objection has been made, is reviewed de novo. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. See *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. See Fed.R.Civ.P. 72(b); *Baptichon v. Nevada State Bank,* 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), *aff'd,* 125 F. App'x. 374 (2d Cir.2005); *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

Insofar as plaintiff does not object to the Report, the Court is satisfied that the Report is not facially erroneous. Plaintiff's objections discussed below are reviewed *de novo.*

2. Spoliation of Evidence

Plaintiff objects to the Report's consideration of his spoliation of evidence claim "alone," and argues that it should have considered it in the context of his allegations of collusion between Weinreb and Progressive. Objections ("Obj.") at 6. Plaintiff argues that the claim is based upon a conspiratorial business relationship between Progressive

and Weinreb.

New York law does not recognize a claim for third-party negligent spoliation of evidence. *Ortega v. City of New York,* 9 N.Y.3d 69, 876 N.E.2d 1189, 845 N.Y.S.2d 773 (N.Y.2007); *MetLife Auto & Home v. Joe Basil Chevrolet, Inc.,* 1 N.Y.3d 478, 807 N.E.2d 865, 775 N.Y.S.2d 754 (N.Y.2004). Therefore, to the extent plaintiff's claims are based upon Progressive's failure to preserve the vehicle as evidence for plaintiff's claim against the Mercedes defendants, his objections are overruled and these claims are dismissed.

3. Lost Wage Claim

Plaintiff does not contest that his claim for lost wages resulting from the accident were decided by the arbitrator and therefore are barred by the principle of collateral estoppel. See *Martin v. Geico Direct Ins.,* 31 A.D.3d 505, 818 N.Y.S.2d 265 (N.Y.2006).

However, Plaintiff argues that he is entitled to damages for the "lost value of [his] time upon launching one project vertical while developing 4–other projects when being injured in a vehicle insured by [Progressive]." Obj. at 7. The basis of this claim is unclear. Insofar as plaintiff purports to seek damages for economic loss incurred as a result of his voluntary participation in the lost wages arbitration, after a finding against him, plaintiff provides no legal support that such a claim is cognizable.

4. Remaining Medical Expense Coverage

**\*3** Plaintiff contends that the finding that the arbitration was not full and fair because it did not award him medical expenses. Obj. at 8. The objection misconstrues the Magistrate's recommendation. With respect to plaintiff's remaining medical coverage, the Report applied *Roggio v. Nationwide Mut. Ins. Co.,* 66 N.Y.2d 260, 261, 496 N.Y.S.2d 404, 487 N.E.2d 261 (N.Y.1985) which held that "a claimant denied recovery [pursuant to the No–Fault law] in arbitration as to certain medical bills cannot then turn to the courts seeking recovery of later medical bills arising from the same accident." As plaintiff chose arbitration to adjudicate Progressive's denial of his claim, this Court is not the proper forum insofar as plaintiff seeks damages for remaining medical expenses arising from the same

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1627009 (E.D.N.Y.)

(Cite as: 2011 WL 1627009 (E.D.N.Y.))

accident.

Plaintiff contends that he should not be estopped from pursuing damages in this Court because the arbitration was not full and fair. Plaintiff does not contest that he had the opportunity to present his claim and documentary evidence in support of that claim to the arbitrator. Report at 12–13. Moreover, plaintiff availed himself of the opportunity to appeal the arbitrators decision. *Id.* at 13, 496 N.Y.S.2d 404, 487 N.E.2d 261. Plaintiff has not established how he was prevented from fully litigating his case before the arbitrator. His contention that the arbitration was not full and fair because "arbitration didn't even award [him] the medical expenses needed to remove foreign objects from inside his body" and that the arbitrators, his former attorney, and the owners of the Mercedes defendants are all Jewish do not support his claim. *See* Obj. at 8.

4. Relief for Professional Misconduct

Plaintiff contends that the Report failed to address his claim that Progressive did not have a license to sell insurance "for a vehicle in New York, out of Florida." Obj. at 9. However, the Report discusses Progressive's license to sell insurance in New York, and finds no private right of action for plaintiff's claim. As there is no clear error in this section of the Report, plaintiff's objection to the recommendation to dismiss his professional misconduct claim based upon Progressive's lack of license to sell insurance is overruled.

Although plaintiff contends that Progressive committed "professional misconduct" by making multiple demands for copies of plaintiff's "records" and misusing them once they were obtained, obj. at 9–10, the Report correctly finds that the complaint fails to allege facts to support his conclusions that Progressive turned over records that he provided to its managing members, and that Progressive and Weinreb had a "history." Report at 17–18. Even if there were such a conspiracy, plaintiff has not alleged how this alleged conspiracy affected him, arguing that discovery would reveal if it "was ever discussed, and if it influenced decision making in any way." *Id.* Without facts to support these allegations, the complaint fails to state a claim for the challenged conduct. Nor has plaintiff alleged facts that, if true, demonstrate that Progressive's defense of the arbitration and claim

disputes, including the request for documents and motion practice, go beyond zealous representation and constitute harassment.

5. Other Objections

**\*4** Plaintiff's other complaints fail to raise specific objections to the Report. In any event, Magistrate Judge Tomlinson's Report contains no clear error, and therefore, Plaintiff's general objections to the Report are overruled.
II. Conclusion

For the reasons stated above, Plaintiffs objections are overruled, and Progressive's motion is granted.

**SO ORDERED.**

E.D.N.Y.,2011.

Soliman v. Daimler AG
Not Reported in F.Supp.2d, 2011 WL 1627009 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Charles WATSON, Plaintiff,
v.
Dr. Lester WRIGHT, Chief Medical Officer, DOCS;
and Doyon De Azevedo, FHSD, Clinton CF,
Defendants.
No. 9:08–CV–62 (NAM/ATB).

Aug. 4, 2011.

Charles Watson, pro se.

Aaron M. Baldwin, Asst. Attorney General, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

\*1 This matter was referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

The Second Amended Complaint alleges that defendants Wright and de Azevedo denied plaintiff constitutionally adequate medical care while he was in the custody of the New York Department of Correctional Services ("DOCS").FN1 Plaintiff seeks monetary relief as to these defendants. (2d Am.Compl.("AC"), Dkt. No. 40 at 11–12).FN2

FN1. On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

FN2. The court will cite to page numbers assigned by the Case Management/Electronic Case Filing system to the extent it seems necessary to pinpoint the reference to the record.

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 92). Plaintiff has opposed the motion (Dkt. No. 96), and the defendants filed a reply (Dkt. No. 98). For the following reasons, this court will recommend granting the defendants' motion for summary judgment and dismissing the remaining claim in the Second Amended Complaint.FN3

FN3. Plaintiff's Eighth Amendment medical claims against defendants de Azevedo and Wright survived defendants' prior motion to dismiss. (Dkt. Nos.53, 60). The Second Amended Complaint also included an unrelated claim for injunctive relief against Karen Bellamy, the Director of the DOCS Inmate Grievance Program, which was dismissed by Chief Judge Mordue in response to the motion to dismiss. (Dkt.Nos.60, 89). The earlier procedural history of this case is cogently summarized in the Report–Recommendation of Magistrate Judge Di Bianco addressing the motion to dismiss. (Dkt. No. 53 at 2–3). The case was re-assigned to me on January 4, 2010, following Judge Di Bianco's retirement.

**DISCUSSION**

**I. Background/Facts**

The Second Amended Complaint alleges that Lester N. Wright, the DOCS Chief Medical Officer, and Doyon de Azevedo, the Facilities Health Services Director ("FHSD") at Clinton Correctional Facility ("Clinton") violated plaintiff's Eighth Amendment rights by their "deliberate indifference" in interrupting his treatment for Hepatitis–C for two weeks in January 2005. (AC, Dkt. No. 40 at 11). Hepatitis–C is an infectious disease affecting the liver, caused by the Hepatitis–C virus ("HCV"). (de Azevedo Decl. ¶ 5, Dkt. No. 92–2).FN4

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

FN4. The background facts stated herein are drawn largely from defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 92–3), which in turn relies heavily on the Declaration of Dr. de Azevedo (Dkt. No. 92–2) and the documentation cited therein. Unless otherwise indicated, plaintiff did not object to the stated facts in his Statement of Disputed Material Facts (Dkt. No. 96 at 2–5). To the extent plaintiff did not specifically controvert facts stated in defendants' Rule 7.1(a)(3) statement, they may be deemed admitted under our local rules. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (the liberal standards applicable to *pro se* litigants does not excuse them from following the procedural formalities of summary judgment).

**A. DOCS HCV Guidelines**

Treatment of HCV within DOCS correctional facilities is governed by the *Hepatitis–C Primary Care Practice Guideline,* established by the DOCS Chief Medical Officer. (de Azevedo Decl. ¶ 5). Such clinical practice guidelines are implemented in an effort to maintain consistency of care throughout the DOCS system, and to stay current with scientific advances. (*Id.* ¶ 6). Such protocols are developed by those having particular expertise as to the most efficacious treatment modalities to provide other DOCS practitioners with guidance as to the standards of health care adopted in the institution. (*Id.* ¶ 7).

DOCS medical guidelines are developed in consultation with task forces of physicians and other health professionals, including DOCS practitioners and experts from academic medical colleges and hospitals, who consider national guidelines, consensus statements, and recommendations, as well as well-grounded articles in peer-reviewed medical journals. (de Azevedo Decl.¶ 6). The initial *Hepatitis–C Primary Care Practice Guideline* used by DOCS was revised several times with the evolution of care and treatment of this disease and with advancements made with research and study. (*Id.* ¶ 8). The "Guidelines" relevant to this case are dated July 2004. (*Id.;* Deft.s' Exh. A, Dkt. No. 92–4). The Guidelines are based upon, *inter alia, Recommendations for Prevention and Control of Hepatitis–C Virus (HCV) Infection and HCV–Related Chronic Disease* from the U.S. Centers for Disease Control and Prevention ("CDC") (October 16, 1998) (Deft.s' Exh. B, Dkt. No. 92–5) and the *NIH Consensus Statement on Management of Hepatitis–C: 2002* (Deft.s' Exh. C, Dkt. No. 92–6). (de Azevedo Decl.¶ 9).

**\*2** According to Dr. de Azevedo, DOCS Guidelines on the treatment of HCV take into account the complexity of the disease, treatment modalities and their success rates, and the potential side effects and complications of treatment. (de Azevedo Decl. ¶ 12). The success rate of treatment for Hepatitis–C has been relatively low. (*Id.* ¶ 13). To a great extent, success in the treatment of HCV depends upon unique factors, such as the body chemistry of an individual patient, the genotype of the virus, other conditions from which the patient may be suffering, and individual behaviors. (*Id.*). Success in the context of HCV treatment is usually defined as a "sustained viral response" ("SVR"), in which a patient maintains undetectable viral levels for a period of at least 24 weeks after concluding drug therapy. Even in such patients, however, there is a distinct possibility of relapse. (*Id.* ¶ 14).

During the 1990s, researchers discerned that combined treatment with interferon and ribavirin appeared to be effective in reducing viral loads in many HCV patients. (de Azevedo Decl. ¶ 15). The effectiveness of this treatment improved with the advent of "pegylated interferon," a modified version of the drug which remains in the body tissues for a longer period of time. Treatment with pegylated interferon and ribavirin was approved by the U.S. Food and Drug Administration ("FDA") in 2001. (*Id.*).

Even with this state-of-the-art therapy, varying percentages of patients achieve sustained viral response, depending on genotype of the virus and other factors. (de Azevedo Decl. ¶ 16). Anti-HCV therapy is more effective against genotypes 2 and 3—sustained response rate in the range of 70–80%—versus genotype 1—sustained response rate in the range of less than 30% to 50%. (*Id.* ¶ 17; Deft.s' Exh. B at 15; Deft.s' Exh. C at 18). African American males with genotype 1 HCV have a much lower sustained response rate, estimated to be in the range of only 19%. (*Id.* ¶ 18).FN5

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

FN5. See also *Reviews—Racial Disparity in Liver Disease ...,* Hepatology, Vol. 47, No. 3 (2008) at 1061. (Deft.s' Exh. E, Dkt. No. 92–8 at 4).

According to Dr. de Azevedo, all HCV treatment decisions require an analysis of the risks to the patient from the treatment versus the likely benefit to be obtained from treatment. (de Azevedo Decl. ¶ 19). Treatment with pegylated interferon and ribavirin involve significant possible side effects and serious risks of complications, which include thyroiditis, hyperthyroidism and hypothyroidism, anemia, cardiac decompensation, renal failure, pneumonitis, severe bone marrow suppression, and suicidal depression. (*Id.* ¶ 20; Deft.s' Exh. A at 5–6). Dr. de Azevedo asserts that an especially cautious approach to anti-HCV therapy is medically appropriate in light of these risks, the relatively low rate at which Hepatitis–C infection leads to liver failure and/or death, the slow rate of the disease's progression, and the relatively low success rate of treatment. (*Id.* ¶ 21). Accordingly, the DOCS Guidelines establish certain criteria and prerequisites which must be satisfied before anti-HCV treatment can begin, after being approved by the Chief Medical Officer on a case-by-case basis. (*Id.* ¶ 22; Deft.s' Exh. A at 3–5).

**\*3** The HCV Guidelines also provide that the duration of anti-HCV therapy to be administered by DOCS is to be determined based on the HCV genotype, human immunodeficiency virus ("HIV") status, and the inmate patient's initial response to therapy. (de Azevedo Decl. ¶ 23). In particular, the Guidelines state: "The length of anti-HCV treatment depends on the patient's HCV genotype and week 12 response to therapy." (*Id.* ¶ 24; Deft.s' Exh. A at 6). The Guidelines provide that, after twelve weeks of treatment, a quantitative HCV RNA (viral load blood count by laboratory testing) should be obtained. A "favorable response [to treatment] is indicated by an undetectable HCV RNA or a 2–log (100–fold) or greater reduction in HCV RNA." (de Azevedo Decl. ¶ 25; Deft.s' Exh. A at 6–7). The Guidelines go on to state, for patients with genotype 1 HCV:

If the patient has an undetectable HCV RNA and ... is genotype 1, ... treatment should continue for a total of

48 weeks ... If the patient is not undetectable after 12 weeks of treatment, but has had at least 2–1og reduction (100–fold) in HCV RNA, then continue treatment for another 12 weeks ...

(de Azevedo Decl. ¶ 26; Deft.s' Exh. A at 7). The "Length of Anti–HCV Treatment" table attached to the DOCS Guidelines provides that, if the patient has genotype 1 and the virus is still detectable after twelve weeks, without at least a two-log drop in viral load, then "Stop Rx," or discontinue medication. (de Azevedo Decl ¶ 27; Deft.s' Exh. A, Dkt. No. 92–4 at 20).

The two-log or 100–fold decrease requirement to continue therapy beyond twelve weeks is not unique to DOCS, but is based upon national standards and is in accordance with, for example, the Federal Bureau of Prisons' ("BOP") guidelines on the issue. (de Azevedo Decl. ¶ 28; Deft.s' Exh. F at 12, Dkt. No. 92–9 at 16).[FN6] The *National Institutes of Health Consensus Statement–Management of Hepatitis–C: 2002* provides that:

FN6. The Federal BOP guideline explains that viral response at week twelve is "closely correlated with treatment success" and that "failure to achieve an EVR [at least a two-log decrease in HCV RNA] at twelve weeks is considered treatment failure. Treatment should be discontinued." (*Id.*)

Early viral response (EVR), defined as a minimum 2 log decrease in viral load during the first 12 weeks of treatment, is predictive of SVR [sustained viral response] and should be a routine part of monitoring patients with genotype 1. Patients who fail to achieve an EVR at week 12 of treatment have only a small chance of achieving an SVR even if therapy is continued for a full year. Treatment need not be extended beyond 12 weeks in these patients.

(de Azevedo Decl. ¶ 29; Dft.'s Exh. C at 18).

**B. Plaintiff's Anti–HCV Treatment**

Plaintiff is an African–American male who was diagnosed as suffering from genotype 1 of the Hepatitis–C virus. (de Azevedo Decl. ¶ 32). In the spring of 2004, after

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

a number of preliminary tests, plaintiff was evaluated for possible anti-HCV treatment by the Clinton medical staff and an outside gastroenterology consultant, Dr. Ashley. (*Id*.). Dr. Ashley recommended treatment with a regimen of pegylated interferon (trade name Pegasys) and ribavirin (trade name Copegus) per "protocol." (*Id* . ¶ 33; Deft.'s Exh. G (Medical Records), Dkt. No. 93 at 31).[FN7] On June 2, 2004 Dr. Kang M. Lee, a facility physician at Clinton, ordered a regimen of Pegasys and Copegus for plaintiff, and directed that a viral load assessment be made at the three-month point-after twelve weeks. (de Azevedo Decl. ¶ 34; Dkt. No. 93 at 1). After all prerequisites for treatment under the DOCS Guidelines were satisfied, anti-HCV treatment was then approved by the DOCS Chief Medical Officer. (de Azevedo Decl. ¶ 36). Plaintiff's treatment with Pegasys/Copegus started with an injection in early October 2004, and continued with weekly injections until January 14, 2005. (*Id*. ¶ 37; Dkt. No. 93 at 88, 90–92).

> FN7. Dr. Ashley's 5/28/04 consultant's report stated that plaintiff's viral load should be checked at twelve weeks, and "need 1 log drop to continue." (*Id.;* AC ¶ 9). Dr. de Azevedo notes that the twelve-week benchmark recommended by Dr. Ashley for continuing the anti-HCV medication differed from the protocol used by DOCS, which requires a two-log drop at that point. (de Azevedo Decl. ¶ 33).

**\*4** On November 30, 2004, Dr. McDermott, a consulting gastroenterologist, noted that, after eight weeks of anti-HCV treatment, lab results reporting plaintiff's viral levels demonstrated a "partial response to Hep C Rx, but nowhere close to 2–log drop" referenced in the DOCS Guidelines. (de Azevedo Decl. ¶¶ 38–39; Dkt. No. 93 at 32).[FN8] Plaintiff claims that he was told that Dr. McDermott would recommend continuation of treatment beyond twelve weeks based on the decrease in plaintiff's viral load, but no such recommendation is reflected in the applicable medical records. (Pltf.'s Decl. ¶ 4, Dkt. No. 96 at 7; Dkt. No. 93 at 32). Plaintiff experienced some side effects, secondary to the anti-HCV medication, including periods of increased fatigue and itching. (Pltf. Decl. ¶¶ 5–6; Dkt. No. 93 at 32, 96).

> FN8. Plaintiff's viral levels dropped from

pre-treatment levels of 3,006,311 copies/mL and 578,137 IU/mL to 1,027,477 copies/mL and 197,542 IU/mL at the 8–week mark. (*Id*.).

On December 22nd, plaintiff reported to emergency sick call, complaining of shortness of breath and profuse sweating, after carrying his property up two flights of stairs. (Pltf.'s Decl. ¶ 5). Plaintiff was assessed by the on-call nurse, who determined that he did not have any shortness of breath or diaphoresis, and had normal blood pressure, pulse, and heart rate, with oxygen saturations well within normal limits, at 98%. The nurse instructed Watson to "sign up for non-sick call to address any issues-this is not emergent." (Dkt. No. 93 at 11; de Azevedo Decl. ¶ 48). According to the nurse, plaintiff then became verbally abusive and demanded to see Dr. de Azevedo, who was sitting at a desk nearby. Dr. de Azevedo states that, when he attempted to speak with the plaintiff, the inmate responded with profanity, at which time the interview was terminated. (Dkt. No. 93 at 11; de Azevedo Decl. ¶ 49). Plaintiff claims that Dr. de Azevedo made a racially derogatory remark, which prompted plaintiff's profanity. (Pltf.'s Decl. ¶ 6). The doctor denies making any racially derogatory remark. (de Azevedo Decl. ¶ 51). Plaintiff was issued a misbehavior report and was ultimately disciplined for the incident. (Pltf.'s Decl. ¶ 8). Plaintiff claims that, on the day of the incident, he filed three grievances, including one against Dr. de Azevedo for discriminatory conduct. (Pltf.'s Decl. ¶ 7 & n. 1).[FN9]

> FN9. Although there is a record of two other grievances filed by plaintiff on December 22nd, there is no documentation of a grievance filed on that date alleging discriminatory conduct by defendant de Azevedo. Well after plaintiff learned that Dr. de Azevedo planned to terminate plaintiff's anti-HCV medication, plaintiff purportedly "re-submitted" the grievance alleging a racially derogatory remark by the doctor. (*Id.;* Pltf.'s Exh. G, Dkt. No. 96–1 at 28–30). In a 12/29/2004 letter to defendant Wright complaining about the impending termination of his antiHCV treatment, plaintiff claims he previously submitted a grievance against Dr. de Azevedo. (Pltf.'s Exh. J, Dkt. No. 96–2 at 5–6).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

Plaintiff had his twelfth weekly injection of anti-HCV on December 24, 2004. (de Azevedo Decl. ¶ 41; Dkt. No. 93 at 90–92). According to Dr. de Azevedo, at the twelve-week mark, it was appropriate, and required by DOCS Guidelines, to have plaintiff's viral load checked, assess his response to therapy, and make a determination as to whether treatment should continue. (de Azevedo Decl. ¶ 42). On December 28, 2004, Dr. de Azevedo wrote in Plaintiff's Ambulatory Health Record ("AHR") that plaintiff's viral load should be assessed that week, adding, consistent with the DOCS Guideline, **"if detectable" or "no 2 log [decrease] D/C [discontinue] Pegasys."** (Id. ¶ 43; Dkt. No. 93 at 13) (emphasis added). Defendant de Azevedo states that he became involved in plaintiff's care at that time, because he was the attending physician on duty with whom plaintiff's chart was left to arrange lab work. (de Azevedo Decl. ¶ 45).[FN10] Defendant de Azevedo also noted that plaintiff's medical records indicate that, on or about December 6, 2004, plaintiff requested a call-out with the "FHSD"—Facilities Health Services Director de Azevedo—to discuss "numerous medical issues." (de Azevedo Decl. ¶ 46; Dkt. No. 93 at 10).

> **FN10.** Plaintiff claims "there is no such thing in DOCS as an attending physician on duty for non-emergent care," and asserts that Dr. Lee was his assigned primary care doctor. (Dkt. No. 96 at 2–3).

**\*5** Plaintiff alleges that, although the incident with Dr. de Azevedo on December 22, 2004, had nothing to do with his treatment, he had a "foreboding feeling" that defendant de Azevedo was "about to interfere with [his] treatment in a negative manner." (AC ¶ 12). Plaintiff alleges that, on December 27, 2004, when he went to the laboratory for his routine bi-weekly blood test, he was told that his viral load would be checked in January of 2005. (AC ¶ 11). He was called to the laboratory three days later, on December 30th, and allegedly told that the viral load test was ordered "ASAP" by Dr. de Azevedo. (Id.). Plaintiff alleges that he was "greatly disturbed" because defendant de Azevedo had not previously been involved in plaintiff's treatment.[FN11] (AC ¶ 12). On **December 31, 2004,** plaintiff received his weekly interferon injection and

claims he "was informed by the medication nurse" that it would be his last. (AC ¶ 13). Plaintiff states that upon learning of this "premature order to terminate treatment," before lab results on his viral load were available, plaintiff wrote to defendant Dr. Wright and the DOCS Commissioner protesting the "impending" termination by Dr. de Azevedo. (AC ¶ 14).[FN12]

> **FN11.** Plaintiff acknowledges that he requested to see Dr. de Azevedo on December 6, 2004. (Dkt. No. 96 at 3).

> **FN12.** In his letter of complaint to Dr. Wright, plaintiff claimed he was told on **12/29/2004** that Dr. de Azevedo would stop his medication. (Pltf.'s Exh. J, Dkt. No. 96–2 at 5–6).

Lab work that was initiated on December 30, 2004 resulted in a report dated January 3, 2005, showing that plaintiff's HCV RNA viral load had decreased from 3,006,311 to 137,099 copies/mL and from 578,137 IU/mL to 26,365 IU/mL. (de Azevedo Decl. ¶ 52; AC ¶ 15). This corresponded to a 1.34–log drop, below the two-log (or 100–fold) drop that would be required to continue treatment in accordance with DOCS guidelines. (de Azevedo Decl. ¶ 53). Nonetheless, Dr. Lee, plaintiff's primary treating physician, reviewed the lab work and, on January 7, 2005, wrote in the chart to "continue present meds." (Id. ¶ 54; AC ¶ 15; Dkt. No. 93 at 14). Plaintiff received his anti-HCV injection on that day. (AC ¶ 15).

Plaintiff alleges that on January 10, 2005, he received an answer to his December 29, 2004 letter from Dr. Wright, stating that Dr. Wright would defer to de Azevedo's decisions regarding plaintiff's medical care. (AC ¶ 16).[FN13] Defendant de Azevedo reviewed plaintiff's lab work and chart, and then discussed the case with Dr. Wright. (de Azevedo Decl. ¶ 55). Plaintiff alleges that, on January 14, 2005, he was seen by Dr. de Azevedo, for the first time since plaintiff's arrival at Clinton, two years earlier. (AC ¶ 17). Dr. de Azevedo told plaintiff that, notwithstanding Dr. Lee's decision to continue plaintiff's treatment, his medication was being discontinued because plaintiff did not achieve a sufficient (two-log) decrease in viral load under the DOCS Guidelines. (Id.; de Azevedo Decl. ¶¶ 55–56). Plaintiff did not receive any Interferon

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

for two weeks, between January 14 and January 27, 2005. (AC ¶ 20).

> FN13. The January 10, 2005 letter was from a DOCS Regional Health Care Administrator ("RHCA"), to whom Dr. Wright delegated the responsibility to respond to plaintiff's complaints. The RHCA noted that plaintiff would see a facility physician in the near future and could share his concerns with that doctor. (Pltf.'s Exh. M, Dkt. No. 96–2 at 22).

The Second Amended Complaint alleges that, on January 28, 2005, Dr. de Azevedo "inexplicably" resumed plaintiff's treatment for another twelve weeks. (AC ¶ 21). In his declaration, Dr. de Azevedo explained that, due to plaintiff's continuing protestations about the decision to terminate his anti-HCV treatment, the FHSD arranged to discuss plaintiff's case with the consultant, Dr, McDermott. (de Azevedo Decl. ¶ 57). The consultant recommended, on January 28, 2005, that plaintiff's treatment should be continued, despite the failure to meet the two-log benchmark set by the DOCS Guideline. (Id. ¶ 58; Dkt. No. 93 at 15). In his January 28th progress note, Dr. McDermott wrote that, in light of plaintiff's "significant" partial response to PEG IFN [and] Ribavirin, which "barely misses" the two-log drop, plaintiff should continue treatment to 24 weeks, at which point his viral load should be reassessed. (Dkt. No. 93 at 28). Dr. de Azevedo also consulted with Dr. Hentschel, the DOCS Regional Medical Director, and eventually with Dr. Wright. (de Azevedo Dec. ¶ 59). Based on those consultations, Dr. de Azevedo decided not to strictly adhere to the Guidelines and to allow plaintiff to resume treatment for another 12 weeks. (Id. ¶ 60).

**\*6** Plaintiff's injections resumed on January 28, 2005, and he received weekly antiHCV medication and periodic monitoring through the 24–week mark, until May 12, 2005. In May 2005, plaintiff's medication was discontinued because his viral load, reflected in laboratory results, showed that he was no longer responding to treatment. (de Azevedo Decl. ¶ 62).

Plaintiff notes that, shortly after the two-week delay in his treatment, lab results showed that his viral load

"skyrocketed," and remained "astronomical" through the final termination of his treatment. (AC ¶ 21; Pltf.'s Decl. ¶ 18; Pltf.'s Exh. O, Dkt. No. 96–2 at 25–29). Although he cites no medical evidence other than the increase in his viral load, plaintiff attributes the failure of his treatment, and the alleged hastened deterioration of his liver, to Dr. de Azevedo's two-week interruption of plaintiff's medication. (AC ¶ 20; Pltf.'s Decl. ¶ 21). Plaintiff claims that defendant Dr. de Azevedo "achieved his goal" of ensuring the failure of plaintiff's anti-HCV treatment. (AC ¶ 21).

Dr. de Azevedo states that his treatment decisions regarding the plaintiff constituted an exercise of medical judgment based upon the following factors: (1) plaintiff's low likelihood of treatment success to begin with; (2) the possibility of side effects (of which plaintiff experienced a few), if treatment were to continue; (3) lab work showing the lack of a two-log decrease in viral load after twelve injections, which is predictive of and considered treatment failure; (4) DOCS Guidelines requiring at least a two-log decrease in viral load at twelve weeks to continue treatment, which Guidelines are based upon national standards/recommendations and are in accord with the Federal Bureau of Prisons guidelines on the issue, and (5) one specialist's (Dr. McDermott's) initial use of the two-log decrease benchmark. (de Azevedo Decl. ¶ 64). Dr. de Azevedo denies that his treatment decisions were influenced by his interaction with plaintiff on December 22, 2004, or were based on any "non-medical discriminatory animus" or "retaliatory intent," as alleged by plaintiff. (de Azevedo Decl.¶¶ 47, 50–51, 63). Dr. de Azevedo asserts that, based on the factors outline above, it was also objectively reasonable for him to believe that discontinuing plaintiff's medication at the twelve-week treatment mark, did not violate plaintiff's constitutional right to medical treatment.

## II. *Summary Judgment—Legal Standards*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56 [FN14]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> **FN14.** Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

**\*7** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(c)(1) (A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's

"supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Deliberate Indifference to Medical Needs*

### A. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F.App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

extreme pain. *Bellotto v. County of Orange,* 248 F.App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

**\*8** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or nonexistent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.1992) (table).

**B. Application**

Plaintiff argues that the defendant doctors were deliberately indifferent to his serious medical needs when they discontinued his anti-HCV treatment for two weeks in January 2005. The defendants assume, for the purposes of this motion, that the interruption of plaintiff's treatment resulted in a degeneration of his condition sufficient to satisfy the objective prong of the Eighth Amendment standards for medical care. (Deft.s' Memo. of Law at 14–15, Dkt. No. 92–10). [FN15] However, the defendants argue, and the court agrees, that no reasonable jury could find that the doctors acted with "deliberate indifference" by interrupting the anti-HCV medication based on the defendants' medical judgment in applying the DOCS Guidelines to plaintiff's particular clinical situation. As discussed in section IV below, even if there were an issue of material fact relating to the subjective prong of the Eighth Amendment analysis, the defendant doctors would be entitled to summary judgment based on qualified immunity, because it was objectively reasonable for them to believe that discontinuing plaintiff's medication at the twelve-week treatment mark did not constitute deliberate indifference to his particular medical needs.

> FN15. Plaintiff alleges that his treatment ultimately failed because of the interruption of anti-HCV medication; but he provides no medical support for this causal allegation, other than the increase in his viral load after the two-week termination of his medication. (Pltf.'s Decl. ¶ 18). The court expresses no opinion as to whether the evidence adduced by plaintiff would be sufficient to establish an issue of material fact with respect to whether the interruption in treatment was a sufficiently "serious" under the objective prong of the Eighth Amendment analysis.

**\*9** Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d at 311. An inmate does not have the right to treatment of his choice. *Ross v. Kelly,* 784 F.Supp. at 45 (citing, *inter alia, Dean v. Coughlin,* 804 F.2d at 215). In order to establish "deliberate indifference," plaintiff must demonstrate more

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

The defendants have established that the decision to discontinue plaintiff's anti-HCV medication was based upon laboratory testing data, and was in accordance with DOCS Guidelines. The guideline that medication should be stopped after twelve weeks if at least a 100–fold (two-log) decrease in viral load is not achieved, is not a capricious barrier to treatment for inmates. Rather, that guideline is based upon national medical standards and recommendations, which reflect the clinical judgment that the failure to achieve early viral response-a two-log decrease-after twelve weeks is predictive of, and deemed treatment failure. Given the serious risks inherent in use of anti-HCV medications and the relatively slow rate of progression of Hepatitis–C in causing liver damage, the defendant doctors did not recklessly ignore plaintiff's serious medical needs by deciding to discontinue his treatment when his viral load did not respond to treatment to the extent called for by the DOCS Guidelines. *See, e.g., Young v. Bresler,* Civ S–03–0951, 2006 WL 2091927, at *16 (E.D.Cal. July 26, 2006) (a prison physician's determination to terminate HCV treatment cannot be considered deliberate indifference where inmate plaintiff's drop in viral load, while considerable, was less than a 100–fold (two-log) reduction, thereby evidencing treatment failure, in the opinion of the physician).

As plaintiff points out, there was disagreement among the doctors as to whether plaintiff's medication should be continued based on the more than one-log reduction in his viral load after twelve weeks .[FN16] However, "the law is clear that a difference of opinion ... even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Williams v. M.C.C. Institution,* 97 CIV. 5352, 1999 WL 179604, at *7 (S.D.N.Y. Mar.31, 1999) (citing, *inter alia, Ross v. Kelly,* 784 F.Supp. 35, 45).[FN17]

FN16. As noted above, a pre-treatment consultant, Dr. Ashley, recommended that plaintiff's treatment should continue if at least a one-log decrease in viral load was achieved at the twelve-week mark. The report of Dr. McDermott, who reviewed plaintiff's progress after eight weeks of treatment, referenced the two-log reduction standard consistent with the DOCS Guidelines. Dr. Lee recommended continuing plaintiff's treatment based on his 1.34–log reduction in viral load at twelve weeks. Dr. de Azevedo, who personally reviewed plaintiff's medical records and consulted with Dr. Wright, decided to stop plaintiff's treatment based on the two-log reduction standard. However, defendants de Azevedo and Wright agreed to re-start plaintiff's medication, after further consultation with Dr. McDermott, who recommended continuing treatment on January 28, 2005.

FN17. *See also Williams v. Smith,* 02 Civ. 4558, 2009 WL 2431948, at *9 (S.D.N.Y. Aug.10, 2009) ("a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference"); *Gillespie v. New York State Dept. of Correctional Services,* 9:08–CV–1339 (TJM/ATB), 2010 WL 1006634, at *6, (N.D.N.Y. Feb. 22, 2010) (the fact that other physicians may have previously followed a different course of treatment does not render the actions of the prison doctor "deliberate indifference") (Report–Recommendation), adopted, 2010 WL 1006643 (N.D.N.Y. Mar 19, 2010); *Wright v. New York State Dept. of Correctional Services,* 06 Civ. 03400, 2008 WL 5055660, at * 17 (S.D.N.Y. Oct.10, 2008) (decision to prescribe medication in a manner different than that recommended by an outside specialist qualifies as an exercise of medical judgment and does not give rise to a constitutional violation).

Plaintiff cites Second Circuit authority which indicates that there are circumstances under which a jury could conclude that the application of different aspects of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

the DOCS HCV Guidelines to deny treatment could constitute "deliberate indifference." *See, e.g., Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005). In *Johnson,* the court held that Dr. Lester Wright and other DOCS medical administrators were not entitled to summary judgment for denying anti-HCV medication to an inmate who had one positive test for marijuana use in the prior year, based on a DOCS guideline that allowed physicians to deny treatment to prisoners who show " 'evidence of active substance abuse.' " *Id.* at 401. The court found that a jury could conclude that the defendants did know of and disregarded an excessive risk to plaintiff's health, in light of several circumstances, including: (1) each of plaintiff's treating doctors advised the central DOCS medical staff that the denied medication was medically appropriate and (2) the defendant medical administrators did nothing to investigate or verify whether "it would be medically appropriate to ignore the unanimous advise of [the] treating physicians, including prison physicians ...." *Id.* at 404.

**\*10** Unlike *Johnson v. Wright,* where the treating doctors were all in agreement as to the appropriate treatment, there were differences of opinion among the treating and consulting physicians in this case as to whether the two-log reduction standard should be applied to stop medication in plaintiff Watson's case. (See note 16, above). Moreover, Dr. de Azevedo, following a request from plaintiff that the FHSD intervene in his care, became actively involved in plaintiff's treatment and reviewed his medical records; the doctor did *not* "reflexively" apply the DOCS Guidelines without investigating plaintiff's condition or applying his own medical judgment to the patient's particular situation. *Id.* at 406.[FN18] The court concludes that *Johnson v. Wright* is clearly distinguishable, and that no reasonable jury could find that the defendant doctors in this case acted with deliberate indifference in applying the DOCS HCV Guidelines to plaintiff Watson.

> FN18. In *Johnson,* the Second Circuit noted that there was no evidence that defendant Lester Wright reviewed the plaintiff's medical file; rather, the record strongly suggested that Dr. Wright "simply assumed the medical soundness of the following the Guidelines in plaintiff's

case" notwithstanding the contrary advice from all of the treating doctors. *Id.* at 406.

Many courts in this circuit have held that determinations as to whether to treat Hepatitis–C with interferon, pursuant to DOCS Guidelines, reflect medical judgments, not "deliberate indifference" under the Eighth Amendment. [FN19] To the extent other cases from this Circuit have concluded that application of the DOCS HCV Guidelines could constitute an Eighth Amendment violation, they have addressed reflexive or mechanical reliance on other aspects of the DOCS Guidelines that are less clearly correlated with treatment success.[FN20]

> FN19. *See, e.g., Melendez v. Wright,* 9:05–CV–1614 (NAM/RFT), 2008 WL 4757360, at \*5 (N.D.N.Y. Oct. 29, 2008) (Dr. Wright's determination that a prisoner was ineligible for hepatitis-C treatment under DOCS Guidelines because he was at stage 0 fibrosis "implicate[s] medical judgments and, at worst, negligence amounting to malpractice, but not the Eighth Amendment"); *Tatta v. Wright,* 616 F.Supp.2d 308, 313–14, 318 (N.D.N.Y.2007) (Dr. Wright's decision to delay re-treatment of plaintiff with pegylated Interferon for 22 months until he qualified under a limited exception in the DOCS treatment policies, was neither unreasonable or indifferent); *Pabon v. Wright,* 99 Civ. 2196, 2004 WL 628784, at \*7–8 (S.D.N.Y. Mar.29, 2004) (conditioning and delaying prisoners' Interferon treatment pending the results of a liver biopsy amounted to no more than "a difference in opinion as to how defendants should have treated their Hepatitis C" and is "insufficient to satisfy the 'deliberate indifference' standard"); *Lewis v. Alves,* 01–CV–0640A, 2004 WL 941532, at \*6–7 (W.D.N.Y. Mar.22, 2004) (treatment of Hepatitis–C under DOCS guidelines including "the decision to prescribe interferon/ribavirin treatment is always dependent on the exercise of medical judgment.").

> FN20. *See, e.g., Salahuddin v. Goord,* 467 F.3d at 281 ("We cannot, as a matter of law, find it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

reasonable for a prison official to postpone for five months a course of treatment for an inmate's Hepatitis C because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole."); *Hatzfeld v. Eagen,* 9:08–CV–283 (LES/DRH), 2010 WL 5579883, at * 12, 13 (N.D.N.Y. Dec. 10, 2010) (finding question of fact as to whether there was deliberate indifference by the defendants in conditioning plaintiffs HCV treatment on compliance with DOCS policy requiring inmates to first participate in substance abuse treatment program, but granting summary judgment on grounds of qualified immunity in any event); *Verley v. Wright,* 02 Civ. 1182, 2007 WL 2822199, at *2, 11, 14 (S.D.N.Y. Sept.27, 2007) (a fact finder could conclude that defendant Wright exhibited deliberate indifference by denying plaintiff HCV medication because of two prior incidents of drug use, notwithstanding several subsequent negative drug tests; however the defendant was entitled to summary judgment based on qualified immunity).

Plaintiff claims that, as a result of his interaction with Dr. de Azevedo on December 22, 2004, the doctor denied him treatment based on retaliatory motives and discriminatory animus. However, this court concludes that, notwithstanding plaintiff's conclusory allegations, no reasonable jury would find that Dr. de Azevedo's treatment of plaintiff was based on retaliatory or discriminatory motives, as opposed to an exercise of his medical judgment.[FN21] First, there is no documentary corroboration of plaintiff's claim that he filed a grievance against Dr. de Azevedo for allegedly making a racially derogatory remark until after plaintiff learned that the doctor might discontinue his treatment. (See note 9, above). The contemporaneous medical records and disciplinary records relating to the incident do not support plaintiff's belated assertion that there were racial issues involved in his brief interaction with Dr. de Azevedo on December 22nd. (Dkt. No. 93 at 11; Pltf.'s Exh. G, Dkt. No. 96–1 at 28–29; Pltf.'s Ex. I, Dkt. No. 96–2 at 2–3; de Azevedo Decl. ¶¶ 47–51). Plaintiff's conclusory claims that his treatment was denied for retaliatory or racial reasons are insufficient to create a material issue of fact

relating to the subjective prong of the Eighth Amendment standards for medical care. *See, e.g., DiChiara v. Wright,* 06–cv6123, 2011 WL 1303867, at *10 (E.D.N.Y. Mar.31, 2011) (given the lack of evidence to suggest that Dr. Wright had an unconstitutional motive for denying plaintiff's Hepatitis–C treatment, the defendant was entitled to summary judgment on the claim that the doctor delayed his treatment out of deliberate indifference); *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted).[FN22]

FN21. Any allegations that the defendants were influenced by a grievance plaintiff filed or other non-medical reason are appropriately considered within the ambit of the subjective intent inquiry of the explicit Eighth Amendment claim. *See Hardy v. Diaz,* 9:08–CV–1352 (GLS/ATB), 2010 WL 1633379, at *6 n. 11 (N.D.N.Y. Mar. 30, 2010) (Report–Recommendation), adopted, 2010 WL 1633390 (N.D.N.Y. Apr.21, 2010). Claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to survive dismissal of a claim sounding in retaliation. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). *See also Lashley v. Wakefield,* 367 F.Supp.2d 461, 469 (W.D.N.Y.2005) (plaintiff's allegation that defendant had said that plaintiff was the "asshole" that worked in the law library and who had given him a "hard time" during a library shift he worked a few weeks earlier, could not, standing alone, support a finding that defendant filed subsequent inmate misbehavior report in retaliation for plaintiff's work as a law clerk).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

FN22. *See also Brown v. White,* 9:08–CV–200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record) (citing, *inter alia, Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *McCloud v. Roy,* 9:08–CV–839 (LEK/ATB), 2010 WL 985731, at *7 (N.D.N.Y. Feb. 22, 2010) (plaintiff's conclusory allegation that he requested a bottom bunk placement from prison doctor is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record) (Report–Recommendation), adopted, 2010 WL 985737 (N.D.N.Y. Mar 16, 2010).

**\*11** When plaintiff continued to protest the termination of his medication, Dr. de Azevedo promptly reconsidered the decision which his superior had approved, consulted again with other doctors, and resumed treatment, all within two weeks. No reasonable fact finder would conclude that a doctor who was acting with a retaliatory or discriminatory intent would have responded to plaintiff's strident, continuing complaints by promptly re-evaluating the treatment plan. While there may be a question as to whether the two-week delay in plaintiff's medication constituted malpractice, which would not be material in this section 1983 action, there is no issue that the defendant doctors were applying their unbiased medical judgment, not acting with deliberate indifference.

In relying on the DOCS HCV Guidelines, Dr. de Azevedo provided rational, medically-based reasons for stopping plaintiff's medication. Even if plaintiff had made a showing of retaliatory or discriminatory motive, defendants would avoid liability under section 1983 because they have demonstrated that they would have made the same treatment decision, even in the absence of

the allegedly improper motivation. *See Lowrancey v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (the Supreme Court held that, in cases in which state action is motivated by both proper and improper reasons, the action may be sustained if it would have been taken even in the absence of the improper reason) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Bennett v. Goord,* 343 F.3d at 137 (DOCS defendants may avoid liability on a section 1983 retaliation claim if they demonstrate that they would have taken the same adverse action against the plaintiff even if he had not engaged in protected conduct).

**IV. Qualified Immunity**

Defendants argue that, even if plaintiff's Eighth Amendment claim was not dismissed outright, they would nevertheless be entitled to qualified immunity from plaintiff's claim for money damages, which is the only form of relief plaintiff seeks on this claim. The court agrees.

**A. Legal Standards**

Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

**\*12** In determining whether qualified immunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, the Supreme court later held, in *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 812, 818, 172 L.Ed.2d 565 (2009), that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases."

B. **Application**

Even if plaintiff had raised some material issue of fact relating to his Eighth Amendment claim, the defendants are still entitled to summary judgment and dismissal of plaintiff's claim for money damages on grounds of qualified immunity. It was objectively reasonable for the defendants to believe that applying the DOCS Guidelines to discontinue plaintiff's anti-HCV treatment in his particular clinical circumstances, did not constitute deliberate indifference to his medical needs.

As discussed above, the defendant doctors have established that it was objectively reasonable for them to believe that stopping plaintiff's anti-HCV medication when his viral load was not reduced by 100–fold after twelve weeks, was a medically-appropriate judgment. The defendants' treatment decision was based upon the DOCS Guidelines, which, in turn, reflect national medical standards and recommendations concerning the likelihood of treatment failure. While different doctors disagreed as to the appropriate course of treatment, the defendant doctors did not apply the DOCS Guidelines reflexively, but appropriately considered plaintiff's particular circumstances before deciding to discontinue his treatment. Under the circumstances, defendants de Azevedo and Wright are entitled to qualified immunity. *See, e.g., DiChiara v. Wright,* 2011 WL 1303867, at *11–12 (defendant doctors were entitled to qualified immunity because it was objectively reasonable for them to believe that following nationally recognized Hepatitis–C treatment guidelines did not amount to deliberate indifference, notwithstanding the contrary recommendations of some treating physicians); *Verley v.*

*Wright,* 2007 WL 2822199, at *14 (because reasonable prison medical officials could have concluded that denial of Hepatitis–C treatment pursuant to the DOCS policy then in effect was not unlawful, defendant was protected by qualified immunity); *Hatzfeld v. Eagen,* 2010 WL 5579883, at *13 (finding that it was objectively reasonable for doctors to believe that conditioning inmate's HCV treatment on participation in substance abuse counseling, pursuant to DOCS guidelines, did not violate the prisoners' constitutional rights).[FN23]

> **FN23.** Plaintiff cites *McKenna v. Wright,* 386 F.3d 432 (2d Cir.2004) in opposition to defendants' arguments regarding qualified immunity. However, that case is readily distinguishable because it was in the context of a motion to dismiss, not a summary judgment motion. *Id.* at 437 (however the case may stand at the summary judgment stage, the complaint should not be dismissed at the pleadings stage on the basis of qualified immunity).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion for summary judgment (Dkt. No. 92), be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

*13 Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2011.

Watson v. Wright
Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4527789 (N.D.N.Y.)

(Cite as: 2011 WL 4527789 (N.D.N.Y.))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 4528931 (N.D.N.Y.)

(Cite as: 2011 WL 4528931 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Charles WATSON, Plaintiff,
v.
Dr. Lester WRIGHT, Chief Medical Officer, Docs; and
Doyon De Azevedo, Fhsd, Clinton CF, Defendants.
No. 9:08–CV–62 (NAM/ATB).

Sept. 28, 2011.
Charles Watson, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Corrections and Community
Supervision, brought this *pro se* action under 42 U.S.C. §
1983. Defendants moved (Dkt. No. 92) for summary
judgment dismissing the remaining claim in the second
amended complaint (Dkt. No. 40). Upon referral pursuant
to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c),
United States Magistrate Judge Andrew T. Baxter issued
a thorough Report and Recommendation (Dkt. No. 99)
recommending that the motion be granted and the case
dismissed. After reviewing the record and applicable law,
Magistrate Judge Baxter concludes that no reasonable jury
could find that defendants acted with deliberate
indifference to plaintiff's medical needs. Nor could a
reasonable jury find that Dr. de Azevedo's treatment of
plaintiff was based on retaliatory or discriminatory
motives, as opposed to an exercise of his medical
judgment. Moreover, Magistrate Judge Baxter finds that,
even if there were an issue of material fact, defendants
would be entitled to summary judgment based on qualified
immunity, because it was objectively reasonable for them

to believe that their treatment of plaintiff did not constitute
deliberate indifference to his medical needs.

Plaintiff has submitted an objection (Dkt. No. 102).
The issues raised in plaintiff's objection have been
addressed in the Report and Recommendation, and the
Court does not discuss them again here. Upon *de novo*
review pursuant to 28 U.S.C. § 636(b)(1)(C), the Court
accepts the Report and Recommendation in all respects.

It is therefore

ORDERED that the Report and Recommendation
(Dkt. No. 99) is accepted; and it is further

ORDERED that defendants' motion for summary
judgment (Dkt. No. 92) is granted and the case dismissed;
and it is further

ORDERED that the Clerk serve copies of this
Memorandum–Decision and Order in accordance with the
Local Rules of the Northern District of New York.

IT IS SO ORDERED.

N.D.N.Y.,2011.

Watson v. Wright
Not Reported in F.Supp.2d, 2011 WL 4528931
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

(Cite as: 1998 WL 474073 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gilbert YEARWOOD, Plaintiff,
v.
Lt. Vincent LoPICCOLO, Sgt. Zaccagnino, C.O.
Haight, C.O. Hockler, and C.O. Kennedy, Defendants.
No. 95 CIV. 2544(DC).

Aug. 10, 1998.
Gilbert Yearwood, Mohawk Correctional Facility, Rome,
Pro Se Plaintiff.

Dennis C. Vacco, Esq., Attorney General of the State of
New York, By Evan A. Gordon, Esq., Assistant Attorney
General, New York, for Defendants.

MEMORANDUM DECISION

CHIN, D.J.

*1 Pro se plaintiff Gilbert Yearwood brings this
action pursuant to 42 U.S.C. § 1983 alleging that he was
beaten by prison guards at Fishkill Correctional Facility
("Fishkill") on March 17, 1995 in retaliation for filing
grievances against two correctional officers. Defendants
move for summary judgment pursuant to Fed.R.Civ.P.
56(c) on the grounds that: (1) plaintiff has failed to offer
sufficient evidence to support his claims, (2) the Eleventh
Amendment bars this action, and (3) defendants are
entitled to qualified immunity. Plaintiff cross-moves for
summary judgment in his favor.

Because I hold that plaintiff has failed to submit
evidence raising a triable issue of fact,[FN1] defendants'
motion is granted in all respects, plaintiff's motion is
denied, and the complaint is dismissed.

FN1. Accordingly, I need not address the merits
of defendants' affirmative defenses.

BACKGROUND

Plaintiff commenced this Section 1983 action against
defendants by filing an unsworn complaint on March 29,
1995, seeking, inter alia, $1,000,000 in damages.
According to Yearwood's unverified complaint, on March
17, 1995, Correctional Officer Nicholas Hockler,
Lieutenant Vincent LoPiccolo, and Sergeant Michael
Zaccagnino allegedly brought him to Special Housing Unit
("SHU") P and assaulted him in retaliation for instituting
grievance procedures against LoPiccolo and Zaccagnino.
The complaint states that sometime prior to the alleged
beating (it is unclear when), Hockler supposedly told
LoPiccolo and Zaccagnino that Yearwood had "a big
mouth." Yearwood alleges that the three officers led him
from an unspecified location to SHU P, where Hockler
supposedly grabbed his neck and "started choking [him]
and LoPiccolo hit [him] on the right side of [his] head
with a pair of keys and Zaccagnino punch[ed] [him] in the
mouth busting [his] bottom lip."

Yearwood maintains that this beating rendered him
unconscious, and that upon awakening, Hockler kicked
him in the groin. Hockler and LoPiccolo then allegedly
moved him to SHU 4—2, where, according to the
complaint, the assault continued. After plaintiff was placed
in keeplock, Correctional Officers Robert Haight and
Gerard Kennedy allegedly joined in the assault.

The unsworn complaint does not explicitly invoke any
particular constitutional provisions. Because I am required
to liberally construe plaintiff's pro se papers "to raise the
strongest arguments that they suggest," however, I
construe the complaint as raising two constitutional
claims: a First Amendment retaliation claim and an Eighth
Amendment "cruel and unusual punishment" claim. See
Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995) (quoting
Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)).

At a conference on September 6, 1996, I established
a discovery deadline of November 8, 1996. That deadline
was eventually extended to December 21, 1997. All told,
more than two years passed between the filing of the
complaint and the close of discovery; both sides had
ample opportunity to conduct the requisite discovery in
this case.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

(Cite as: 1998 WL 474073 (S.D.N.Y.))

**\*2** The parties now cross-move for summary judgment. In moving for summary judgment, defendants have submitted a notice of motion, sworn affidavits denying in substance plaintiff's allegations, a Rule 56.1 Statement of Undisputed Facts, as well as documentary material in the form of Yearwood's medical records. Defendants' notice of motion informs plaintiff they are moving for summary judgment pursuant to Fed.R.Civ.P. 56 and specifically warns him that:

> [Y]ou may not simply rely on your complaint, but you must respond by affidavits or as otherwise provided ..., setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in our affidavits will be accepted by Judge Chin as being true unless you submit affidavits or other documentary evidence contradicting our assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

In opposing summary judgment, plaintiff has submitted a document stylized as an "Opposition Motion to Defendants Summary Request Motion" and "Affidavit." In this document, which is not notarized or signed but states that its author "declares [its contents] under penalty perjury," Yearwood states that he has filed grievances against LoPiccolo and Zaccagnino. He does not set forth facts countering defendants' sworn version of the alleged beating. Instead, he simply calls defendants' account "false stories" and states in conclusory fashion that he has "physical evidence towards the defendants," but submits none. He has also failed to submit a Rule 56.1 Counterstatement of Disputed Material Facts. Yearwood does attach a few letters either sent to or received from prison officials regarding grievances that he filed against LoPiccolo and Zaccagnino.

Yearwood also has submitted a document titled, "pro se motion for summary judgment," but neither submits a Statement of Undisputed Facts nor any evidence in support of his cross-motion.

DISCUSSION

A. *Standard for Summary Judgment*

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving such a motion, a court must assess whether there are any material factual issues to be tried, drawing all reasonable inferences against the moving party and viewing the evidence in the light most favorable to the non-moving party. *See Adams v. Department of Juvenile Justice of the City of New York,* 143 F.3d 61, 65 (2d Cir.1998).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Id.* Material factual disputes exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,*—U.S.—, 118 S.Ct. 169 (1997).

**\*3** Once the movant meets his or her burden of proving the absence of triable issues of fact, it is incumbent upon the non-moving party to provide additional support for the allegations in the complaint. To defeat summary judgment, a plaintiff "may not rest on the allegations in [his] pleadings, but must adduce 'significant probative supporting evidence' demonstrating that a factual dispute exists." *Dzaba v. Haythe & Curley,* No. 94 Civ. 1767(JFK), 1996 WL 31156, \*2 (S.D.N.Y. Jan.26, 1996) (quoting *Anderson,* 477 U.S. at 249), *aff'd,* 112 F.3d 503 (2d Cir.1996).

Because Yearwood proceeds pro se, this Court must give him some latitude. However, a pro se party's "bald assertions" cannot overcome a motion for summary judgment. *Dresdner v. Brockenton,* No. 93 Civ. 8814(DLC), 1996 WL 452275, \*1 (S.D.N.Y. Aug.8, 1996). Instead, he must provide the Court with "some basis to believe that his 'version of relevant events is not fanciful.' " *Id.* (quoting *Christian Dior–New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

(Cite as: 1998 WL 474073 (S.D.N.Y.))

In addition, Local Civil Rule 56.1 requires a party opposing summary judgment to include a "separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Failure to do so ordinarily calls for "[a]ll material facts set forth in [the movant's] statement ... [to] be deemed to be admitted."

B. *Plaintiff's Claims*

1. *First Amendment Retaliation Claim*

I begin by addressing Yearwood's First Amendment claim. It is well-settled that an inmate's right to seek redress of his grievances is guaranteed by the First and Fourteenth Amendments. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Indeed, purposeful interference with a prisoner's right to petition for redress in prison disciplinary proceedings or a court of law "is precisely the sort of oppression that ... section 1983[is] intended to remedy." *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987) (citation omitted).

To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate that (1) the engaged conduct is constitutionally protected and (2) the defendants' harassment was motivated or substantially caused by plaintiff's engagement in this protected conduct. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Because retaliation claims are "prone to abuse" by prisoners who can allege retaliation for "every decision [they] dislike[ ]," heightened specificity in pleading and evidentiary support is required. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) ("Because retaliation claims 'can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof ....' ") (quoting *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996)); *Gill v. Pact Org.,* No. 95 Civ. 4510(LAP), 1997 WL 539948, *12 (S.D.N.Y. Aug.28, 1997) (same).

**\*4** Plaintiff's letters indicating that he in fact filed complaints against two of the defendants a few months before the alleged attack arguably suffices to raise an issue of fact as to the first required element.

The record does not, however, present a triable issue as to the second element. Specifically, the evidence would not support a finding that defendants beat Yearwood or that they did so in response to his filing of grievances against two correctional officers.

Defendants have submitted sworn affidavits in which they deny employing any force, let alone excessive force. Rather, defendants uniformly contend that plaintiff's injuries resulted from a seizure attack. Hockler states that he discovered Yearwood wandering about in an unauthorized area of Fishkill. He states that Yearwood became belligerent and walked away from him, defying his direct orders to stop. At that point, Hockler attests that he called for assistance. LoPiccolo and Zaccagnino immediately responded to Hockler's call for help. According to defendants' affidavits, just as these three were leading Yearwood to SHU P for admission to keeplock, he began convulsing, hitting his head against the floor several times and once against a water cooler. Hockler and Zaccagnino attest that they heard Yearwood say, "I got seizures."

Defendants quickly summoned Nurse J. Banks of the Fishkill Medical Clinic, who arrived minutes later. After Yearwood recovered, defendants' evidence shows that he acted abusively toward defendants and the treating nurse. Nurse Banks examined Yearwood and indicated in her report that no treatment was necessary at that time. She also noted that the "inmate claims he had seizures." Yearwood was then charged with verbal harassment, refusal to comply with direct orders, and infliction of bodily harm upon himself, and placed in keeplock. The next day, Yearwood was again given a full-body exam by two other nurses in the Medical Clinic, who noted in their report that, notwithstanding his claims of pain and swelling, there were no signs of any marks or swelling. Yearwood received Advil and other muscle relaxants for his alleged pains.

Haight swears that he was not involved in any incident involving Yearwood. Similarly, Kennedy swears that he simply processed Yearwood into the strip cell after his treatment, all of which occurred without incident.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

(Cite as: 1998 WL 474073 (S.D.N.Y.))

The medical records, which reveal that Yearwood suffered only minor injuries, generally confirm defendants' account. Although the records note that Yearwood accused Hockler, Zaccagnino, and LoPiccolo of attacking him, they also suggest that the alleged injury to Yearwood's groin area was self-inflicted. Nurse Banks, for example, indicates in her report that at 9:15 a.m. on March 17, 1995, she observed Yearwood "squeezing [his] penis in attempt to cause self-inflicted injury," and that he was "boisterous" and "angry." *See also* 3/17/95 Health Assessment Form ("Inmate was noted to have been manipulating himself—several spots of blood on underwear"). The treating nurses also noted in the records that Yearwood was abusive and "threatening" during their examination of him and that he eventually had to be isolated and monitored for "possible injury to self and/or others." Likewise, both LoPiccolo and Hockler attest that they observed Yearwood "intentionally inflicting injury to his own penis by pulling and scratching it."

**\*5** By contrast, plaintiff has not come forward with admissible evidence to refute these sworn affidavits and documentary evidence. First, because plaintiff has failed to file a Counterstatement of Material Facts in Dispute, the facts contained in defendants' Rule 56.1 statement and buttressed by defendants' sworn accounts will be deemed to be true. *See* Local Rule 56.1; *see also Cox v. Colgane,* No. 94 Civ. 6361(DAB), 1998 WL 148424, *3 (S.D.N.Y. Mar.27, 1998)* (deeming facts in defendants' 56.1 statement to be true where pro se plaintiff failed to file 56.1 counterstatement after notice of likely consequences); *Higgins v. Coombe,* No. 94 Civ. 7492(MGC), 1998 WL 113955, *2 (S.D.N.Y. Mar.13, 1998)* (same). While defendants' notice of motion did not explicitly inform plaintiff that a Rule 56.1 Counterstatement was required, it did contain an express reference to Rule 56.1, and informed him of the consequences of failing to comply with *Fed.R.Civ.P. 56.* Where, as here, a pro se litigant received specific notice from the movant as to the consequences of failure to comply with the rules of procedure, and he acknowledged his understanding by filing some form of a response, no further notice is required before Rule 56.1 may be enforced against a pro se litigant. *See M.B. v. Reish,* 119 F.3d 230, 232 (2d Cir.1997) (stating that "easily comprehensible notice from the party moving for summary judgment would suffice")

(quoting *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). In this case, deeming defendants' version of the facts to be true, no reasonable juror could find that Yearwood was beaten at all, much less in retaliation for filing grievances against defendants. His claim therefore fails.

Second, even if I were to overlook plaintiff's procedural default and examine the record, he would still be unable to defeat summary judgment. The totality of Yearwood's submissions to the Court consists of an unverified complaint to which no effect need be given at summary judgment,[FN2] an unsigned and unsworn declaration, and assorted correspondence between Yearwood and prison officials.

> **FN2.** In contrast, a verified complaint may be treated as an affidavit if it meets the requirements of Fed.R.Civ.P. 56(e) and is of sufficient factual specificity. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Unsworn declarations that comply with 28 U.S.C. § 1746 may be treated as equivalent to sworn affidavits for purposes of a summary judgment motion. Such documents must include a verification by the declarant that its contents are "true under penalty of perjury" and must be dated. Here, Yearwood's purported "affidavit" is written "under penalty perjury" and is dated, but the document is unsigned. Thus, it fails to comport with the requirements of 28 U.S.C. § 1746 and should be disregarded.

But even if I were to fully credit this unsigned and unsworn declaration, the document still fails to raise a triable issue of fact as to plaintiff's First Amendment claim. The document fails to offer any specifics at all as to the alleged beating, but instead contains a conclusory assessment that defendants' affidavits are "false stories." He cannot defeat the motion for summary judgment, however, "by relying on ... conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996).

**\*6** There are numerous aspects in which Yearwood's declaration is deficient. It does not specify the portions of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

(Cite as: 1998 WL 474073 (S.D.N.Y.))

defendants' "stor[y]" with which he disagrees, does not set forth each defendants' purported role in the alleged retaliatory conduct, and does not explain the precise circumstances and time frame in which the alleged beating occurred. Nor does he specifically and clearly deny that he inflicted his own slight injuries. While the record does not indicate whether Yearwood has a history of seizures, he also does not explicitly deny telling defendants and Nurse Banks on March 17, 1995 that he "got seizures," and he does not deny having had seizure attacks in the past. Despite having received explicit warning that he "may not simply rely on [his] complaint," plaintiff fails to provide sufficient basis for a factfinder to believe that his "version of [the] relevant facts is not fanciful." *Christian–Dior, 792 F.2d at 38*.

Moreover, although plaintiff declares summarily that he has "physical evidence" to prove his assault, he has not tendered any documentation to that effect to this Court. He does suggest that there may have been at least one witness to the events of March 17th, but fails to provide a sworn affidavit from such an individual. Instead, he submits a letter in which a staff attorney with Prisoners' Legal Services states that she heard from an inmate that a "beat up" may have taken place on March 17, 1995 at SHU 4–2. The letter itself is inadmissible hearsay, and no affidavit from a witness has been submitted to the Court corroborating any aspect of Yearwood's allegations.

For all of these reasons, and in light of the heightened skepticism with which I must view allegations of retaliation, *see Colon,* 58 F.2d at 872, I hold that plaintiff has failed to present sufficient evidence to raise an issue of fact as to whether defendants in fact attacked him or whether, even assuming they did use force against him, they did so in retaliation for the grievances he filed against LoPiccolo and Zaccagnino. Hence, defendants are entitled to summary judgment on this claim, and plaintiff's cross-motion for summary judgment must be denied.

I now turn to Yearwood's second claim.

2. *Eighth Amendment Claim*

The Eighth Amendment, which prohibits the imposition of "cruel and unusual punishment," protects prisoners from the "unnecessary and wanton infliction of pain" by prison guards. *Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir.1993) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). There are two components to this inquiry—an objective prong and a subjective prong. *See id.* at 105.

Objectively, the plaintiff must show that the alleged use of force is grave or harmful enough to be actionable. Only the use of physical force that is "repugnant to the conscience of mankind" amounts to a constitutional violation. *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Conversely, the Constitution's "prohibition of 'cruel and unusual' punishments necessarily excludes ... *de minimis* uses of physical force." *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Second Circuit, for example, has noted that not "every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

**\*7** Subjectively, the plaintiff must then show that the prison guards acted wantonly, with the sadistic or malicious intent to harm him. *See Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105.

In this case, because plaintiff failed to comply with this Court's Local Civil Rules by not filing a 56.1 Counterstatement, defendants' version of the undisputed facts are taken as true. Based on those facts, a jury could not find that a beating actually occurred, that defendants were the culpable parties, or that an unconstitutional degree of physical force was used.

But even if I were to excuse plaintiff's failure to satisfy Rule 56.1, accept the allegations in his unsworn complaint as true, and give full effect to the statements in his unsigned declaration, the undisputed facts would still show that plaintiff did not suffer injuries amounting to "cruel and unusual punishment."

Plaintiff's medical records following the March 17, 1995 incident, the accuracy of which is uncontroverted,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

(Cite as: 1998 WL 474073 (S.D.N.Y.))

reveal that he suffered only a minor bump to the side of his head and slight bleeding in his groin area. The treating nurse determined that the small bump was not a recent injury and that the "several spots of blood" in his groin region resulted from a self-inflicted injury. No other marks, bruises, excess swelling, or edema were discovered after several full-body examinations by three nurses on two separate days despite Yearwood's claims of bruises and swelling all over his body. He received only Advil and other muscle relaxants for his alleged pain.

The medical records thus completely undermine plaintiff's allegations by strongly suggesting not only that his alleged injuries were self-inflicted, but that, even assuming any force was used against him, such force was de minimis in nature. *See, e.g., Norman v. Taylor,* 25 F.3d 1259, 1262–64 (4th Cir.1994) (keys swung at inmate's face which struck his thumb did not amount to "cruel and unusual punishment"), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *White v. Holmes,* 21 F.3d 277, 280–81 (8th Cir.1994) (keys swung at inmate which slashed his ear did not rise to Eighth Amendment violation); *Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking inmate's ankles and feet during pat frisk causing an abrasion and minor laceration on finger suggestive of de minimis force); *DeArmas v. Jaycox,* No. 92 Civ. 6139(LMM), 1993 WL 37501, *4 (S.D.N.Y. Feb.8, 1993) (punching inmate in arm and kicking him in leg constituted de minimis force), *aff'd,* 14 F.3d 591 (2d Cir.1993); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1154–55 (S.D.N.Y.1992) (shoving chair at inmate causing bruise not actionable); *Neal v. Miller,* 778 F.Supp. 378, 384 (W.D.Mich.1991) (backhand blow to groin not actionable).

Yearwood, on the other hand, does not challenge the accuracy of these medical records, nor has he submitted evidence that in any way rebuts their contents. Plaintiff has not, in short, adduced any admissible evidence that would enable a rational trier of fact to conclude that the defendants employed force of such magnitude as to be "repugnant to the conscience of mankind." For this reason, Yearwood cannot meet the objective prong of his Eighth Amendment claim. [FN3] Accordingly, summary judgment is granted in favor of defendants on this count and plaintiff's cross-motion on this count is denied.

FN3. Because plaintiff fails to meet the objective component of the excessive force inquiry, I need not address the evidence in the record bearing on the issue of defendants' subjective intent.

CONCLUSION

*8 Defendants' motion for summary judgment is granted, and the complaint is dismissed with prejudice. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

S.D.N.Y.,1998.

Yearwood v. LoPiccolo
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." FN3 *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

## C. Eighth Amendment Conditions of Confinement

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

## D. Due Process

### 1. *Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

### 2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty

interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

### E. Access to the Courts

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "*could*

cause a great effect" and "*could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). FN10

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD; D. Monell; N. Marsh; D.
Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards;
and D. Russell, Defendants.
No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.
Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the Defendants.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

#### I. *Introduction*

*\*1 Plaintiff Jesse L. Stewart, an inmate at Forest State Correctional Institution, Forest County, Pennsylvania, brings this action under 42 U.S.C. § 1983, alleging that defendants Tioga County Jail employees violated his Eighth and Fourteenth Amendment rights during his incarceration at Tioga County Jail. (*See* Compl., Dkt. No. 1.) Defendants moved for summary judgment and for dismissal based on, among other things, Stewart's refusal to cooperate at his deposition. (Dkt. No. 30.) On April 26, 2010, Magistrate Judge George H. Lowe issued a Report and Recommendation Order (R & R) recommending that defendants' motion for dismissal as a discovery sanction be denied but that defendants' motion for summary judgment be granted. (Dkt. No. 38.) Pending are Stewart's objections to the R & R. (Dkt. No. 39.) For the reasons that follow, the court adopts the R & R in its entirety.

#### II. *Standard of Review*

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. *See id.*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV. P. 56(c)); *see also Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). In considering a motion for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ...." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). The initial burden is on the moving party to inform the court of the basis for its motion, and identify those portions of the pleadings, affidavits, and discovery and disclosure materials on file that it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also SEC v. Kern,* 425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (citation omitted). And while the court remains obliged to read a pro se movant's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. *Discussion*

**\*2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

### A. *Failure to Exhaust Administrative Remedies*

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly those administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven

when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

### B. *Eighth Amendment Conditions of Confinement Claims*

**\*3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed.[FN1]

> **FN1.** Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified "medical life threatening ailments" which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999).

**C. *Due Process***

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged

deprivation and that the deprivation imposed " 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See Davis v. Barrett,* 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection." *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D. *Access to the Courts***

**\*4** Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute "evidence" sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)

(Cite as: 2010 WL 3907137 (N.D.N.Y.))

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

> [FN2.] The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. *Remaining Recommendations***

    Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. *Conclusion***

    **WHEREFORE,** for the foregoing reasons, it is hereby

    **ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

    **ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

    **ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

    **ORDERED** that the Clerk close this case; and it is further

    **ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

    **IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ruben SLACKS, Plaintiff,
v.
GRAY, Correctional Officer, Eastern N.Y. Correctional
Facility; C.O. Farrell; C.O. Hauck; Sgt. Fischer; R.N.
Anthony, Defendants.
No. 9:07-CV-510 (NAM/GJD).

Sept. 29, 2009.
West KeySummary**Prisons 310** ☞ **192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
A prison staff nurse was not deliberately indifferent to
an inmate's medical needs as there was no evidence that
his medical needs were serious. The prison record stated
that the inmate would not answer any of the nurse's
questions, and that she did not observe any abrasions,
contusions, or lacerations. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.
Ruben Slacks, Napanoch, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Shoshanah V. Bewlay, Christina L. Roberts-Ryba,
Asst. Attorneys General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983 for civil rights violations
stemming from an alleged assault by defendants Gray,
Farrell, and Fischer. Plaintiff claims that defendant Hauck
was present during the assault but failed to intervene.
Plaintiff also claims he was denied medical care by
defendant Nurse Anthony, was deprived of clothing and
toilet paper overnight, and was later improperly charged
with misbehavior to cover up the assault.

Defendants moved (Dkt. No. 48) for summary
judgment dismissing the action. Upon referral pursuant to
28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United
States Magistrate Judge Gustave J. DiBianco issued a
Report and Recommendation (Dkt. No. 52) recommending
that the motion be granted in its entirety.

Plaintiff has submitted an objection (Dkt. No. 53). In
view of the breadth of plaintiff's objections, the Court
conducts a *de novo* review of all issues pursuant to 28
U.S.C. § 636(b)(1)(C).

A party moving for summary judgment bears the
initial burden of demonstrating that there is no genuine
issue of material fact and that it is entitled to judgment as
a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v.
Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d
265 (1986). If the Court, viewing the evidence in the light
most favorable to the nonmovant and drawing all
reasonable inferences in nonmovant's favor, determines
that the movant has satisfied this burden, the burden then
shifts to the nonmovant to adduce evidence establishing
the existence of a genuine issue of material fact requiring
a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A
genuine issue of material fact exists if the evidence is such
that "a reasonable [factfinder] could return a verdict for
the nonmoving party." *Id.* at 248. If the nonmovant fails to
carry this burden, summary judgment is appropriate. *See
Celotex,* 477 U.S. at 323-24.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

Through consistent evidence, including medical records and defendants' declarations, defendants have carried their initial burden of showing that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Although plaintiff disputes some of defendants' evidence, the Court agrees with Magistrate Judge DiBianco that this is one of the rare cases in which plaintiff's allegations throughout the record are so inconsistent that no reasonable factfinder could find in his favor. Plaintiff gives multiple versions of the events-in his disciplinary hearing testimony, his grievance, his interview in connection with the grievance investigation, his complaint in the instant action, his deposition in the instant action, and his interview with a psychologist from the Office of Mental Health-which are so inconsistent and contradictory that no reasonable juror could believe them. Further, plaintiff's allegations are contradicted by the portions of the medical records that plaintiff does not dispute. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the Court determines that no reasonable juror could return a verdict for plaintiff. Thus, plaintiff has failed to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial.

*2 It is therefore

ORDERED that the Report and Recommendation of United States Magistrate Judge Gustave J. DiBianco (Dkt. No. 52) is adopted in full; and it is further

ORDERED that defendants' motion (Dkt. No. 48) for summary judgment is granted and the action is dismissed with prejudice.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to

28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that he was assaulted by defendants Gray, Farrell, and Fischer, while defendant Hauck watched, but failed to intervene. Plaintiff also claims that he was denied medical care by defendant Nurse Anthony, and that plaintiff was deprived of clothing and toilet paper over night. Plaintiff also alleges that he was later improperly charged with misbehavior to cover up the assault. Compl. (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.49, 51). For the following reasons, this court will recommend granting the summary judgment motion and dismissing plaintiff's complaint in its entirety as against all defendants.

### DISCUSSION

**1.** *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

**\*3** The Local Rules of the Northern District of New York provide that a motion for summary judgment shall include a Statement of Material Facts, "containing each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." LOCAL RULES NDNY 7.1(a)(3). The "record" for purposes of the Statement of Material Facts includes the "pleadings, depositions, answers to interrogatories, admissions, and affidavits." *Id.* The Second Circuit has held, however, that in determining whether the moving party has met its burden, the court may not rely solely on the statement of undisputed facts, it must be satisfied that the citation to evidence in the record supports the assertion. *Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.,* 373 F.3d 241, 244 (2d Cir.2004). If the moving party fails to meet its burden, the court must deny summary judgment even if the opposing party does not present any opposing evidentiary matter. *Id.* (citation omitted).

However, if the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to

respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

**2. Facts**[FN1]

> [FN1.] On August 27, 2008, Chief Judge Mordue denied plaintiff's motion for summary judgment. (Dkt. No. 47). This court has adopted the facts as stated in Judge Mordue's order and has added the evidence that has been presented in the defendants' papers.

Plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), claims that on December 3, 2006, he was on his way to the yard at Eastern Correctional Facility (Eastern), when Corrections Officer (CO) True stopped plaintiff and told him that he was going to be "pat-frisked." Compl. ¶ 1. Plaintiff states that after the frisk was completed by Officers True and Olszewski, plaintiff noticed that one of his bags was not returned to him. Compl. ¶ 2. When plaintiff inquired about the bag, CO True told plaintiff that the bag was contraband. *Id.* Plaintiff states that when he questioned CO True's statement, plaintiff was told that he had "too much of an attitude" and was going to be sent back to his cell. *Id.* Plaintiff states that he was escorted back to his cell by CO True. *Id.* Plaintiff claims that when they got back to the cell block, CO True told plaintiff that he was going to be keeplocked,[FN2] however, the block officer told CO True that he was going to have to "lock [plaintiff] in himself because there were no other officers on the block to do so." Compl. ¶ 3. As a result, plaintiff states that he was taken "up the stairs" to a different area and "locked in" by CO True. *Id.* Plaintiff claims that at approximately 10:20 a.m., the cell door opened, he was handcuffed, and escorted to the Special Housing Unit (SHU) by defendant Fisher and three other officers who have not been named as defendants. *Id.*

> [FN2.] The term "keeplock" refers to disciplinary or administrative confinement in which an inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

**\*4** Plaintiff claims that when they arrived at SHU, he

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

saw various officers, including defendants Gray, Farrell, and Hauck. *Id.* Plaintiff states that he noticed that defendant Gray was putting on, what appeared to be, leather gloves. *Id.* Plaintiff states he was then told to follow defendant Gray into the "frisk room," accompanied by defendants Fisher and Farrell while defendant Hauck stood in the doorway. *Id.* Once inside the "frisk room," plaintiff claims that he was told to place his hands up against the wall, and his glasses were taken away from him by defendant Gray. Compl. ¶ 4. Plaintiff then describes how defendant Gray began punching plaintiff until plaintiff fell to the ground, where plaintiff was "slapped in [the] head and kicked in [the] back, buttocks, and leg area" by defendants Fisher and Farrell. *Id.* Defendant Hauck allegedly stood by and watched the assault without intervening to stop the abuse.

Plaintiff claims that when the beating stopped, defendant Fisher told plaintiff to get up, but plaintiff could not comply with the order because the beating aggravated plaintiff's back injury. Compl. ¶ 5. Plaintiff claims that defendant Fisher stated that defendant Nurse Anthony told him that there was nothing wrong with plaintiff's back, and then defendant Fisher kicked plaintiff in the back again. *Id.* Plaintiff claims that the abuse continued as defendant Farrell dragged plaintiff on the floor and then picked plaintiff up and "slammed" him against the wall. *Id.* Plaintiff claims that defendant Nurse Anthony was called, but that she did not give plaintiff any medical care, rather, she just looked at him and stated "that's a refusal." *Id.*

Plaintiff states that ultimately his clothes were taken away from him and he was forced to spend the night with no clothes and no toilet paper. Plaintiff states that after the incident on December 3, 2006, Nurse Nordé visited plaintiff and asked if he was injured. Compl. ¶ 4. Plaintiff claims that he told Nurse Nordé that he was injured, and although she asked if he wanted medication for the pain, plaintiff told the nurse that he already had a prescription for pain medication, so she only gave him Bacitracin for the laceration on his elbow. *Id.*

Plaintiff states that the next day, someone from "Mental Health" came to visit plaintiff to interview him. Compl. ¶ 6. Plaintiff claims that this individual told plaintiff that defendant Fisher reported that plaintiff was

going to kill himself. *Id.* Plaintiff claims that when he told the mental health professional that the statement was a lie, the clinician told the officer to immediately give plaintiff back his clothes. *Id.* Plaintiff states that despite this order, he did not get his clothes, mattress, sheets, and blanket back until approximately five hours later. *Id.* Plaintiff also claims that he told Superintendent Brown about the incident, but that Superintendent Brown told plaintiff that his officers did not "beat up on inmates." Compl. ¶ 7.

**\*5** Plaintiff states that Sergeant Green came to take photographs of his injuries. Plaintiff claims that he was given two fabricated misbehavior reports, one of which alleged that plaintiff banged his own head against the wall during the frisk. *Id.* Plaintiff names CO George Gray; CO Thomas Farrell; Sergeant Ronald D. Fisher; Lt. Raymond Hauck; and Nurse Nancy Anthony as defendants.

Defendants' description of the events of December 3, 2006 is very different than plaintiff's statement. The defendants all agree that plaintiff was escorted to the SHU on December 3, 2006 [FN3] (Fisher Decl. ¶ 7; Farrell Decl. ¶ 4; Gray Decl. ¶ 7). Defendant Gray states that when inmates are admitted to SHU, they are "strip frisked" and searched with a metal detector. (Gray Decl. ¶ 6). Defendant Gray explains that the

> FN3. Defendant Gray's declaration states that plaintiff was escorted to the SHU on December 3, 2008. (Gray Decl. ¶ 7). This incorrect date appears to be a typographical error. There is no debate that plaintiff's allegations relate to events that occurred on December 3, 2006.

purpose of the strip frisk is to maintain security and insure that there are no weapons or contraband on the inmate. A strip frisk involves the inmate placing their hands on the wall and then following the directions to remove clothing. After the strip frisk is conducted, a nurse is called into the room in order to examine the inmate.

*Id.* Defendant Fisher states that when inmates are admitted to SHU, they are also screened for Suicide Prevention. (Fisher Decl. ¶ 6). The screening consists of asking the inmate a series of questions. (Fisher Decl. ¶

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

6).

**A. Defendant Gray**

Defendant Gray states that upon plaintiff's arrival in SHU, plaintiff was taken to the SHU frisk room, and his restraints were removed. (Gray Decl. ¶ 8). Plaintiff was then ordered to place his hands on the wall. *Id.* Plaintiff refused to comply with the order, claiming that he could not comply because of a back injury. (Gray Decl. ¶ 9; Fisher Decl. ¶ 8). Plaintiff was again ordered to place his hands on the wall, but instead, he started to bang his head on the wall and fell to the floor. (Gray Decl. ¶ 10). Plaintiff was ordered to stand up and comply with the frisk procedure, but he refused. (Gray Decl. ¶ 11). Defendant Gray states that defendant Hauck then ordered the plaintiff to comply with the order to get up and place his hands on the wall, and plaintiff complied. (Gray Decl. ¶ 12). Defendant Gray states that defendant Nurse Anthony came to SHU to examine the plaintiff, but the plaintiff refused to speak to her. (Gray Decl. ¶ 13).

Defendant Gray states that he did not kick or hit plaintiff at any time during the incident. (Gray Decl. ¶ 16). Defendant Gray also states that if he had witnessed "any sort of assault on the plaintiff," an unusual incident report would have been filed. (Gray Decl. ¶ 17). Defendant Gray states that "there was no assault on the plaintiff whatsoever." (Gray Decl. ¶ 18).

**B. Defendant Fisher**

Defendant Fisher states that he heard plaintiff refuse to comply with the strip frisk because of a "bad back." (Fisher Decl. ¶ 8). Plaintiff "continued to refuse the strip frisk and he began to bang his head against the wall." (Fisher Decl. ¶ 9). Defendant Fisher states that he observed plaintiff fall to the floor, and then refuse several orders to comply with the frisk procedures. (Fisher Decl. ¶ 10). Defendant Fisher then ordered plaintiff to comply with proper procedures, while the other officers attempted to help plaintiff get on his feet. (Fisher Decl. ¶ 11). Defendant Fisher observed defendant Hauck order the plaintiff to stand up, and plaintiff complied. (Fisher Decl. ¶ 12-13). Defendant Fisher then questioned the plaintiff about whether he had any injuries "from banging his head on the fall to the floor." (Fisher Decl. ¶ 14). Defendant Fisher claims that plaintiff stated that he had no injuries. (Fisher Decl. ¶ 15).

**\*6** Defendant Fisher then completed the "Suicide Prevention Screening Guidelines-SHU Admission Form." (Fisher Decl. ¶ 17 & Ex. A). Defendant Fisher states that "[i]n response to questions such as, 'Are you feeling suicidal' or 'Do you feel there is nothing to look forward to in the future', plaintiff responded, 'Yes.' " (Fisher Decl. ¶ 18). Defendant Fisher noted on the form "that plaintiff appeared to be under the influence of alcohol or drugs, was incoherent or otherwise acting in an abnormal manner." (Fisher Decl. ¶ 19). Plaintiff was placed on suicide watch "due to his claims of possible harm," and that the Mental Health Unit was notified. (Fisher Decl. ¶ 20). Plaintiff remained on suicide watch until December 4, 2006. (Fisher Decl. ¶ 21(a) <u>FN4</u>). Defendant Fisher states plaintiff continued to behave abnormally throughout the evening. (Fisher Decl. ¶ 21(b)).

> <u>FN4.</u> Defendant Fisher's Declaration includes two paragraphs labeled Number 21. For purposes of this Order, the court labels the first one "(a)", and the second one "(b)".

Plaintiff reported injuries to a nurse at approximately 7:30 p.m. on December 3, 2006. (Fisher Decl. ¶ 22). Plaintiff claimed that he had injuries to his right rib cage and right elbow, inflicted by C.O. Gray.<u>FN5</u> (Fisher Decl. ¶ 23). Defendant Fisher states that he notified another corrections officer, who then attempted to photograph plaintiff's injuries, but plaintiff refused to leave his cell. (Fisher Decl.¶¶ 25, 26). The photographs were taken the following day. (Fisher Decl. ¶ 27). Defendant Fisher states that he was present for the entire strip frisk procedure on December 3, 2006, and that plaintiff was never hit by defendant Gray or any other corrections officer. (Fisher Decl. ¶ 29).

> <u>FN5.</u> In his declaration, defendant Fisher states that plaintiff complained of injuries "sustained *by* C.O. Gray," (Fisher Decl. ¶ 23), however, it is clear that plaintiff was complaining about his own injuries. There is no indication that defendant Gray suffered any injuries.

**C. Defendant Farrell**

Defendant Farrell states that plaintiff was taken to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

strip frisk room, and that plaintiff refused to place his hands on the wall after the restraints were removed. (Farrell Decl. ¶ 5-6). Defendant Farrell states that plaintiff stated he could not put his hands on the wall because of a back injury. (Farrell Decl. ¶ 6). Defendant Farrell agrees with the other defendants that plaintiff refused a second order to comply, began banging his head on the wall, fell to the floor, and then began banging his head on the floor. (Farrell Decl. ¶ 7). Plaintiff continued to refuse orders to stand up until defendant Hauck gave the order to do so. (Farrell Decl. ¶ 8-9). Defendant Farrell states that plaintiff refused to speak with defendant Nurse Anthony when she arrived to examine plaintiff. (Farrell Decl. ¶ 10).

Defendant Farrell wrote a misbehavior report against plaintiff, charging him with "violating direct orders and frisk procedures." (Farrell Decl. ¶ 11). At the Tier III disciplinary hearing, plaintiff admitted that he banged his head on the floor and the wall. (Farrell Decl. ¶ 15). Defendant Farrell states that he never hit or kicked the plaintiff during the incident, and that "there was no assault on the plaintiff whatsoever." (Farrell Decl. ¶¶ 21, 22).

**D. Defendant Hauck**

**\*7** Defendant Hauck has been a Corrections Lieutenant at Eastern Correctional Facility since 2003 and has been employed by DOCS for over 25 years. (Hauck Decl. ¶¶ 2, 3). Defendant Hauck's duties include supervising all lower-ranking uniformed officers, serving as a Watch Commander, and supervising all Sergeants and Officers on a given shift. (Hauck Decl. ¶ 4). On December 3, 2006, defendant Hauck was working the day-shift at the facility. (Hauck Decl. ¶ 6). Defendant Hauck states that in order to refresh his recollection regarding this incident, he reviewed a memorandum he wrote to Captain Leghorn regarding plaintiff. *Id.* & Ex. B.[FN6] Defendant Hauck recalls that on arrival at the SHU, plaintiff "was very argumentative, [and] refused to comply with the strip frisk claiming he had back problems." (Hauck Decl. ¶ 8). Defendant Hauck states that

> FN6. Exhibit B to defendant Hauck's declaration is a copy of the memorandum that he wrote to Captain Leghorn.

At the time the plaintiff was admitted to SHU, no staff struck him. In fact the staff stopped the plaintiff from

banging his head on the wall. The plaintiff then let himself fall to the floor, claiming his back went out. Once on the floor he began banging his head on the floor. The Officers attempted to stop him from doing this.

(Hauck Decl. ¶ 9). Defendant Hauck states that if he witnessed an assault on an inmate, he would immediately intervene to stop the assault. (Hauck Decl. ¶ 10). Defendant Hauck states that "at no time was the plaintiff assaulted by Correction Officers." (Hauck Decl. ¶ 11). Defendant Hauck asserts that any injuries that the plaintiff sustained on December 3, 2006 were related to his own "destructive behavior." (Hauck Decl. ¶ 12).

**E. Defendant Nurse Anthony**

Defendant Anthony is a registered nurse, who has been employed by DOCS for 18 years. (Anthony Decl. ¶ 2). Some of defendant Anthony's duties include examining inmates when they are admitted to SHU if requested to do so by the security staff. (Anthony Decl. ¶ 4). Defendant Anthony states when an inmate is being admitted to SHU, he is first strip-frisked by the officers, and then if there is no incident, the inmate is routinely examined by a nurse that is working the evening shift. (Anthony Decl. ¶¶ 5-6). Sometimes, however, a nurse is called into SHU during the day in order to examine an inmate. *Id.* ¶ 6.

When defendant Anthony examines an inmate admitted to SHU, she asks a series of questions regarding the inmate's general health, whether the inmate has allergies, whether he is taking any medications, and whether he has any injuries. (Anthony Decl. ¶ 7). Defendant Anthony states that if she notices that an inmate has injuries or claims that he has been physically assaulted, she notes the injuries in the inmate's Ambulatory Health Record (AHR). *Id.* ¶ 8.

In this case, defendant Anthony states that she examined plaintiff on December 3, 2006 at approximately 11:05 a.m. (Anthony Decl. ¶ 10). Defendant Anthony states that plaintiff refused to answer any of her questions. (Anthony Decl. ¶ 11). The excerpt of plaintiff's AHR submitted with defendant Anthony's declaration shows that defendant Anthony documented plaintiff's examination, noting "no abrasions, contusions, or lacerations." (Anthony Decl. ¶¶ 11-12 & Ex. A) (AHR entry dated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

12/3/06 at 11:05 a.m.). The AHR shows that Nurse Nordé examined plaintiff at approximately 7:10 p .m. (Anthony Decl. ¶ 13 & Ex. A) (AHR entry of 12/3/06 at 7:10 p.m.). Nurse Nordé documented a "small laceration R elbow," and stated that plaintiff complained of pain in his right ribs. *Id.* Nurse Nordé cleansed the laceration with iodine and issued plaintiff some bacitracin ointment. *Id.* She also wrote that she would order an x-ray for plaintiff the following morning. *Id.* She noted that although plaintiff had no history of hypertension, his blood pressure was 140/102, and she would be checking the blood pressure two times per week while he was in SHU. *Id.*

**\*8** On December 4, 2006, a DOCS employee photographed plaintiff. (Fisher Decl. Ex. C at 1). The first four photographs show plaintiff standing in boxer shorts. (Fisher Decl. Ex. C at 2). The last two photographs are close-up photographs of the small laceration on plaintiff's left elbow, and a view of plaintiff's right side. (Fisher Decl. Ex. C at 3). The photograph of plaintiff's right side show plaintiff pointing at some red marks on his upper right rib cage. *Id.*

A form titled "X-Ray Requisition and Report" shows that Nurse Nordé ordered an x-ray of plaintiff's right ribs. (Anthony Decl. Ex. C). On December 12, 2006, the radiologist wrote that three views of the right rib cage "show[ ] no recent displaced right rib fracture. Right lung expanded & no right pleural effusion. IMP: NO RECENT DISPLACED RIGHT RIB FRACTURE SEEN." *Id.*

Defendant Anthony concludes that plaintiff caused his own injuries while he was in the SHU cell on December 3, 2006. (Anthony Decl. ¶ 18). Defendant Anthony bases her opinion on the fact that plaintiff had no injuries when defendant Anthony examined him at 11:05 a.m., but when Nurse Nordé examined him again at 7:10 p.m., he had a small laceration on his elbow. *Id.*

**3. Medical Care**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97

S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*9** Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff's only claim against defendant Anthony is that she did not give him any medical care after the alleged assault. Compl. ¶ 5. The entire claim consists of one sentence in the complaint, stating that when defendant Anthony finally arrived in the room, she looked at plaintiff, stated "that's a refusal," and left. *Id.* Defendant Anthony states that plaintiff refused to answer any questions regarding his condition which would be consistent with her making the comment that plaintiff attributes to her. The medical records are also consistent with defendant Anthony's statement. The AHR entry for 11:05 a.m. on December 3, 2006 merely states that defendant Anthony was asked by "security" to examine plaintiff, but he refused to answer any questions. (Anthony Decl. Ex. A). Her "assessment" was that she observed no abrasions, contusions, or lacerations. *Id.*

In his response to defendants' motion, plaintiff claims that to the extent that the medical records show that Nurse Anthony provided plaintiff medical attention on December 3, 2006, defendant Anthony must have falsified this information.[FN7] (Dkt. No. 49 at ¶ 5). It is unclear what plaintiff means by "medical attention," but defendant

Anthony only recorded what she observed. Assuming that she made the observation that there were no abrasions, contusions, or lacerations, then no "medial attention" was required. There is no claim by defendant Anthony that she did anything else.[FN8] Thus, plaintiff's accusation that defendant Anthony must have falsified records is completely unfounded.

FN7. The court notes that in defendants' reply, they argue that plaintiff failed to properly respond to the defendants' motion. (Dkt. No. 51). They argue that plaintiff did not match his numbered paragraphs to the paragraphs in defendants' statements, and that plaintiff did not cite to specific portions of the record. *Id.* Defendants stated that for this reason, the defendants' Statement of Material Facts" should be deemed admitted. *Id.* The court need not decide this issue, particularly since plaintiff is *pro se,* the court has considered plaintiff's response, and finds that even considering his response, he has not raised a genuine issue of material fact.

FN8. Plaintiff seizes upon one of the statements in defendant Anthony's declaration that plaintiff believes indicates that defendant Anthony claims to have visited plaintiff again at 7:10 p.m. (Anthony Decl. ¶ 18). Defendant Anthony states that "[d]ue to the fact that when I examined plaintiff at 11:05 AM on December 3, 2006, the plaintiff had no injuries and *subsequent to my examination the same day at 7:10 PM,* the record indicates that plaintiff had a small laceration to his elbow...." Plaintiff interprets the highlighted words as defendant Anthony's claim that *she* examined plaintiff at 7:10 p.m. Although the sentence could be interpreted this way because the sentence itself is unclear, *there is no claim by defendant Anthony that she examined plaintiff at 7:10 p.m.* Nurse Anthony has stated, and the documents attached to her declaration confirm, that it was Nurse Nordé who examined plaintiff at 7:10 p.m. (Anthony Decl. ¶ 13 & Ex. A).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

In his response to defendants' motion, plaintiff also states that defendant Anthony's behavior was "way below professional" and was in violation of DOCS regulations governing the administration of treatment to inmates. *Id.* ¶ 11. Even assuming that defendant Anthony's behavior was "unprofessional," negligent, or in violation of DOCS rules,[FN9] this would not rise to the level of a constitutional claim. As stated above, negligence is not actionable under section 1983. *Estelle,* 429 U.S. at 107.

FN9. This court makes no such finding.

**\*10** Based on the evidence in plaintiff's medical records and by plaintiff's own testimony, this court does not find that there was any "serious medical need" to satisfy the first prong of the Eighth Amendment analysis. During his deposition, plaintiff stated that his claim against defendant Anthony is that she denied him medical attention because "she come there, look at me, didn't ask me any questions and leave." Deposition Transcript (DT) at 103 (Dkt. No. 48, Roberts-Ryba Aff. Ex. A). Plaintiff stated that as far as he was concerned, the cut on his elbow was a "serious medical need" because he was bleeding. (DT at 103). Plaintiff later stated that he believed that his elbow laceration was serious because "if a person stay bleeding, he die." (DT at 105).

Although plaintiff claims that defendant Anthony did not give him "medical attention" when she saw him at 11:05 a.m. on December 3, 2006, he admitted during his deposition that at 7:10 p.m. the same day, Nurse Nordé gave him proper medical care. (DT at 104). This "proper medical care" consisted of cleansing a "small laceration" with iodine, issuing plaintiff some bacitracin ointment, and ordering x-rays [FN10] based on plaintiff's complaint of pain in his right rib area. (Anthony Decl. Ex. A). There is no notation by Nurse Nordé that plaintiff had been bleeding extensively or bleeding at all. The laceration was *small* and required only cleansing and antibiotic ointment.

FN10. The x-ray requisition report shows that the x-rays were ordered on "12/3/06," the same date as the incident. (Anthony Aff. Ex. C).

The SHU Entrance Form, completed by Nurse Nordé shows that plaintiff had a history of back pain, and he was

already receiving prescription pain medication for his back. (Anthony Decl. Ex. B). Plaintiff testified that Nurse Nordé asked him whether he needed some pain medication for the pain in his rib, but plaintiff refused, stating that he did not need any more pain medication since he already had some for his preexisting "back problem." (DT at 104). Plaintiff had x-rays taken on December 12, 2006, and the x-ray report stated that there were no fractures, the right lung was expanded, and there was no right pleural effusion.[FN11] (Anthony Decl. Ex. C).

FN11. Pleural effusion is an accumulation of excess liquid in the lung, which can be caused by trauma. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 489-93 (18th Ed.2006).

While plaintiff argues that x-rays would not show if the consistent punching had bruised plaintiff, he stated at his deposition that did not sustain any internal injuries. (DT at 105). Plaintiff stated that he knew that his ribs were "bruised" because there was a "red mark." (DT at 112). However, he also stated that although the red mark lasted two to three days, it never "bruised" at all. (DT at 112). Photographs taken of plaintiff on December 4, 2006 confirm that there was no serious bruising. (Fisher Decl. Ex. C at 3).

In *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006), the Second Circuit held that the objective prong of the Eighth Amendment standard requires the court to examine how the defendant's conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the plaintiff. In this case, there is no evidence that defendant Anthony's conduct was "inadequate." However, it is also clear that a condition of urgency did *not* exist for which the denial of medical treatment could have resulted in further significant injury or the unnecessary and wanton infliction of pain.

**\*11** Despite plaintiff's statement that if one continues to bleed, one will die, there is no indication that plaintiff's bleeding, if any, was so severe. Neither the painful rib area, for which plaintiff himself admits he had sufficient pain medication, nor the laceration on his elbow were conditions that could produce death, degeneration or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

extreme pain. The medical records and plaintiff's own testimony support this finding. Plaintiff testified that after the x-rays, he did not request any follow-up medical care for his injuries, his "red mark" lasted only a couple of days. (DT at 95, 112).

Thus, plaintiff has failed to produce any evidence to contradict the sworn statement of defendant Anthony, corroborated by the clear medical evidence showing that plaintiff did not sustain more than a *de minimis* injury. The medical evidence includes the report of Nurse Nordé, who plaintiff admits gave plaintiff "proper medical care." If the "proper medical care" consisted of cleansing the minor laceration on plaintiff's elbow and issuing some bacitracin ointment, then plaintiff did not have a "serious medical need" within the meaning of the Eighth Amendment.

Finally, regarding the alleged rib injury, the most that Nurse Anthony could have done was schedule x-rays, which were still scheduled for plaintiff the same day by Nurse Nordé. The x-rays confirmed that plaintiff had no rib injury, and no injury to his lung. Plaintiff testified that he had no internal injuries, and the "red mark" disappeared in approximately two days. There is absolutely no evidence to show that plaintiff had a "serious medical need" to which defendant Anthony could have been "deliberately indifferent." Because the court has determined that plaintiff did not have a serious medical need, it need not reach the second prong [FN12] of the Eighth Amendment analysis, and the complaint may be dismissed as against defendant Anthony.

FN12. Defendant Anthony's alleged actions, consisting of her statement that plaintiff's behavior constituted a "refusal" of care, justifying her failure to afford him proper medical care, would be part of the second prong of the Eighth Amendment test. If plaintiff had no "serious medical need," then defendant Anthony's attitude is no longer relevant to the analysis. Having said this, however, the court would point out that at plaintiff's disciplinary hearing, he testified that after the incident, the defendant officers told plaintiff that they had called the nurse, and plaintiff said "nothing's wrong. *I refuse."* (Farrell Decl. Ex. B at 10)

(Transcript of Disciplinary Hearing of Dec. 14, 2006) (emphasis added). Plaintiff then stated that when the nurse entered, "she just looked at me and said I refuse to talk to him and walked off." *Id.* It is clear from plaintiff's own testimony that shortly before defendant Anthony came into the room, plaintiff was telling the guards that "nothing" was wrong, and he did not need to see the nurse. It is thus, possible that when defendant Anthony came into the room, plaintiff did refuse to speak with her or answer her questions.

**4. *Excessive Force***

The Second Circuit has recently discussed the analysis of a claim for use of excessive force. *Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). The court must first identify the constitutional right that was infringed by the "challenged application of force." *Id.* at 268 (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). After determining that the constitutional right involved is the Eighth Amendment ban on cruel and unusual punishment, the court must judge the validity of the plaintiff's claim by reference to the "specific constitutional standard," and not to "some generalized excessive force standard." *Id.* (quoting *Graham,* 490 U.S. at 394)) (internal quotation marks omitted).

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Id.* The subjective component focuses on the *motive* for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id.* (citing *inter alia Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 7; *Whitely v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

(1973)).

**\*12** The objective component focuses on the harm done, and the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327. The court must ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8) (internal quotation marks omitted). However, where the defendants' use force maliciously and sadistically, the "contemporary standards of decency" are always violated, whether or not a "significant injury" occurs. *Id.* at 268-69 (quoting *Hudson,* 503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate. *Id.* at 269. The court in *Wright* emphasized that the prohibition against cruel and unusual punishment does *not* extend to *de minimis* uses of physical force, provided that the use of force is not "repugnant to the conscience of mankind." *Id.* (quoting *Hudson,* 503 U.S. at 10).

The lack of a serious injury is "relevant," but does not end the inquiry. *Hudson,* 503 U.S. at 7. The extent of the injury must be considered "in context." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003). The court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321.

In this case, plaintiff has alleged an excessive use of force in the SHU on December 3, 2006 by defendants Gray, Fisher, and Farrell, while defendant Hauck stood by and watched the assault. Defendants admit that they were present during plaintiff's admission to the SHU, but they deny that they used any force whatsoever against plaintiff.

**A. Defendant Hauck**

Defendants first argue that the case should be dismissed against defendant Hauck because plaintiff has not shown that this defendant was "personally involved" in the alleged incident, even though plaintiff claims that defendant Hauck stood at the doorway and watched the alleged assault. (Def. Memorandum of Law at 12-13) (Dkt .No. 48). Defendants argue that plaintiff has failed to show that defendant Hauck participated in, encouraged, condoned, or was even present during the alleged assault. *Id.* at 12. Defendants cite plaintiff's deposition testimony during which he stated that defendant Hauck watched the assault, but when asked whether defendant Hauck left the doorway at any time, plaintiff stated that he did not "think" that defendant Hauck left. *Id.* (citing DT at 102).

Plaintiff has not accused defendant Hauck of participating in the alleged beating. Plaintiff claims that defendant Hauck watched the assault from the door of the strip-frisk room. However, plaintiff does not need to "establish" that defendant Hauck was present during plaintiff's admission to SHU because defendant Hauck himself *admits* that he was present. (*See* Hauck Dec'l). Defendant Hauck describes in detail observing plaintiff bang his head on the wall, fall to the floor, and bang his head on the floor. (Hauck Decl. ¶ 9). The other defendants state that plaintiff did not get up until defendant Hauck ordered him to do so. (Farrell Decl. ¶¶ 8-9; Gray Decl. ¶ 12; Fisher Decl. ¶¶ 12-13). Thus, it is clear that defendant Hauck was present throughout the incident.

**\*13** While plaintiff does not claim that defendant Hauck participated in the alleged excessive use of force, he claims that defendant Hauck failed to intervene while the other officers were using excessive force. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Riccuiti v. N. Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997); *O'Neill v. Krzeminski,* 839 F.2d 9 (2d Cir.1988) (citations omitted).

An officer who fails to intervene is liable for the harm that could have been prevented, caused by the actions of the other officers, where that officer observes or has reason to know that excessive force is being used. *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Liability attaches where there was a "realistic opportunity to intervene to prevent the harm from occurring." *Id.* This

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

rule for law enforcement officers extends to corrections officers. *Parker v. Fogg,* 85-CV-0177, 1994 U.S. Dist. LEXIS 1696, at *8 (N.D.N.Y. Feb. 17,1994) (McCurn, J.). An officer is excused from liability, despite his presence, if the assault is "sudden and brief," such that there is no real opportunity to prevent it. *Ricciuti,* 124 F.3d at 129; *Fogg,* 1994 U.S. Dist. LEXIS 1696, at *8.

Because plaintiff alleges that defendant Hauck was at the door of the strip-frisk room during the incident, and defendant Hauck admits being present during the incident, *if* excessive force had been used against plaintiff, then defendant Hauck would have been responsible for failure to intervene. Thus, this court will not recommend dismissal based on the lack of personal involvement of defendant Hauck and will proceed to consider the merits of the plaintiff's excessive force claim.

**B. Defendants Gray, Farrell, and Fisher**

As stated above, the defendants' version of the incidents of December 3, 2006 is very different from plaintiff's description. Credibility determinations and choices between conflicting versions of the events are matters for a jury and not for the court on summary judgment. *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citing *inter alia Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255). There is a very narrow exception to the rule as stated by the Second Circuit in *Jeffreys v. City of New York,* 426 F.3d 549, 553-55 (2d Cir.2005). In *Jeffreys,* the court held that a court may grant summary judgment in the rare circumstance where there is nothing in the record to support plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could believe the plaintiff's testimony. *Id.* at 554-55.

In *Jeffreys,* the Second Circuit cited with approval the district court's opinion in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998). *Jeffreys,* 426 F.3d at 555. In *Aziz,* then-District Judge Sonia Sotomayor granted summary judgment in an excessive force case, relying upon the absence of any evidence in the record that corroborated the plaintiff's version of the events, and highlighting the "many inconsistencies and contradictions

within the plaintiff's deposition testimony and affidavits." 994 F.Supp. at 470. The court in *Aziz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Id.*

**\*14** The court in *Jeffreys* also distinguished a case in which the Second Circuit reversed the grant of summary judgment in a case in which plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Jeffreys,* 426 F.3d at 554-55 (distinguishing *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997)).

This court finds that this case is one of those rare exceptions in which plaintiff's allegations are inconsistent throughout the record; there is absolutely no medical evidence to corroborate plaintiff's multiple versions of the events; and a review of the entire record shows that no reasonable person could believe plaintiff's allegations. Plaintiff's multiple versions of the events include his disciplinary hearing testimony, during which he states that defendant Gray punched plaintiff once, causing plaintiff to fall to the floor, and then defendant Gray punched plaintiff once more after plaintiff got up off the floor, causing plaintiff to fall again. (Farrell Decl. Ex. B at 9). However, plaintiff states that when he got up the second time, he complied with the frisk procedure, and that is when defendant Anthony was called. *Id.* at 10. There were no claims of any additional beating.

During the December 14, 2006 disciplinary hearing, plaintiff also admitted banging his head against the wall and on the floor. *Id.* He did state, however, that he engaged in this behavior so that the defendants would stop beating him. In his response to defendants' motion for summary judgment, plaintiff strenuously denies that he ever banged his head on the wall or the floor, stating that if he had done so, there would have been swelling or bruising to his head. (Dkt. No. 49-2 ¶ 3; 49-3 ¶ 5; 49-4 ¶ 4; 49-6 ¶ 3; 49-7 ¶ 3).[FN13] Plaintiff now claims that the tape of the disciplinary hearing was "erroneously" transcribed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

to the extent that it contradicts his statement that he did not bang his head on the wall or the floor. (Dkt. No. 49-3 ¶ 5).

> FN13. Plaintiff has responded in opposition to each defendant's declaration. These citations are to plaintiff's affidavits in response that are all filed under docket number 49.

The court notes, however, that plaintiff's claim that the disciplinary hearing was "erroneously" transcribed is completely implausible because his testimony at the hearing regarding the issue of him banging his head is not simply one sentence that could have been misheard. (Farrell Decl. Ex. B at 10-11). Plaintiff told the hearing officer an entire story regarding the reason that plaintiff banged his head, and even stated that "it didn't hurt because they stopped beating on me and then took me back to my cell." *Id.* at 11. Defendant Farrell testified at the disciplinary hearing, and plaintiff simply asked him "wasn't [sic] you the one that slapped me on my head when I was on the wall." *Id.* at 22. Defendant Farrell denied slapping plaintiff, but plaintiff never asked about any another conduct by defendant Farrell.

**\*15** By the time that plaintiff filed his grievance on December 15, 2006, he alleged that defendant Gray physically attacked plaintiff and defendants Farrell and Fisher kicked and slapped plaintiff while he was "on the floor." (Farrell Decl. Ex. C at 5).[FN14] However, when plaintiff was interviewed by Lieutenant Schaller for the grievance investigation, plaintiff stated that he was struck once in the rib area by defendant Gray, but "he was not struck by any other staff members however Sgt. Fisher and Officer Farrell were also present in the room and ... Lt. Hauck was located in the doorway...." (Farrell Decl. Ex. D at 16) (grievance materials). The grievance was denied by the Superintendent because no evidence of physical force was found.[FN15] *Id.* at 6.

> FN14. Defendants have not numbered the pages of Exhibit C of the Farrell Declaration. Thus, the page referred to by the court is simply the fifth page of the exhibit, not counting the certification of the documents.

> FN15. In a memorandum from Captain Leghorn to K. Lucas, the Inmate Grievance Resolution Committee Supervisor, Captain Leghorn points out the inconsistency between plaintiff's written grievance and his interview with Lieutenant Schaller. (Farrell Decl. Ex. D at 15).

By the time that plaintiff filed his complaint in this federal action, he stated that before the alleged assault, defendant Gray put on a pair of leather gloves, plaintiff was punched twice by defendant Gray, and that after plaintiff fell to the floor, he was slapped in the head and kicked in his back, buttocks and leg area by defendants Farrell and Fisher. Compl. ¶ 4. In the complaint, plaintiff added that when defendant Fisher told plaintiff to get up, plaintiff stated that he could not get up because of his back injury, but that defendant Fisher told plaintiff he did not have a back injury and kicked plaintiff again. Comp. ¶ 5. Defendant Fisher told defendant Farrell to make plaintiff stand up, and defendant Farrell dragged plaintiff across the floor causing his elbow to be bruised and "slammed" plaintiff against the wall. *Id.* The complaint continues, stating that after plaintiff put on his SHU clothes, defendant Farrell "yanked my underpants ... up so hard that it bruised my tail bone and slapped me in the back of the head." *Id.*

By the time that plaintiff was deposed in this action, plaintiff claimed that defendant Gray also had kicked plaintiff. (DT at 60, 66). Plaintiff testified that "other people" started kicking him, and that they kicked him in his back and shoulders. (DT at 62-63). Plaintiff stated that defendants Gray, Farrell, and Fisher kicked and punched plaintiff while he was on the floor. (DT at 64). Plaintiff testified that defendant Gray kicked plaintiff more than five times. (DT at 65). Plaintiff stated that defendant Fisher hit plaintiff on the head while he was down on the floor, and that the defendants kicked plaintiff hard for "two or three minutes." (DT at 68). Defendant Fisher also slapped plaintiff on the head and told him to get up. (DT at 69).

At plaintiff's deposition, he did not mention the bruised tail bone. He simply stated that defendant Farrell dragged plaintiff out of the corner, lifted him up by the waist of his pants and his shirt, and pushed plaintiff up

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

against the wall. (DT at 71). At his deposition, plaintiff also elaborated further on the beginning of the story. (DT at 52-56). Plaintiff testified that after defendant Gray punched plaintiff the first time, defendant Farrell told plaintiff to put his hands back up on the wall, and plaintiff told defendant Farrell that "if CO Gray hit me again, I'm going to take my hands back off the wall." (DT at 54-55). Plaintiff stated that he was coming back off the wall and that he was not going to "be on the wall while he keep [sic] punching me like I'm a punching bag." (DT at 55). Plaintiff stated that he intended to defend himself, with his fists if necessary. *Id.* Then plaintiff states that he put his hands back up on the wall, and defendant Gray punched him again. *Id.* Plaintiff did not make any of these statements earlier.

**\*16** As an exhibit, defendants have also included the confidential testimony of the psychologist from the Office of Mental Health (OMH), Ed Rudder, who recommended placing plaintiff on the suicide watch on December 3, 2006 after he was told that plaintiff had told the officers that he would be attempting to commit suicide that night.[FN16] (Roberts-Ryba Aff. Ex. C). Psychologist Rudder interviewed plaintiff on December 4, 2006. *Id.* Plaintiff states in his complaint that when he was interviewed by Psychologist Rudder, plaintiff told him that the officers lied when they reported that plaintiff was threatening suicide. Compl. ¶ 6. Psychologist Rudder testified that plaintiff denied making the suicidal statements, said that he was fine, but that "there must be *some misunderstanding* of some nature." *Id.* (emphasis added). Later plaintiff told Psychologist Rudder that the suicide statement was either a "misunderstanding" or "perhaps it was a fabrication." *Id.*

> FN16. Psychologist Rudder states that he was called at home on Sunday, December 3, 2006, and recommended one-on-one suicide watch until the next morning when Psychologist Rudder went to plaintiff's cell to interview him regarding plaintiff's alleged statement. (Roberts-Ryba Aff. Ex. C at 2).

Psychologist Rudder also testified that he asked the plaintiff about the notation in the log book, stating that plaintiff was banging his head and later that night, was

hiding under his bed. *Id.* Psychologist Rudder testified that plaintiff "reported that he was probably feeling frustrated and wanted to get a little attention and stated he was probably just being a *little dramatic* with his behavior to get some attention...." *Id.* (emphasis added). Plaintiff also told Psychologist Rudder that plaintiff was annoyed that he had been placed in SHU and felt that the placement was unjust. *Id.*

There was absolutely no discussion of an assault or plaintiff being injured. In fact, based on the discussion that plaintiff had with Psychologist Rudder, it appears that plaintiff reacted with frustration and anger about being placed in SHU, but plaintiff attempted to make it clear that there was nothing wrong with him mentally. *Id.* Plaintiff appears to have adjusted his statements based upon the individual to whom he was speaking. Clearly, plaintiff no longer wished to be on suicide watch because that involved a deprivation of clothing and belongings, thus, when he spoke to Psychologist Rudder, he stated that everything was fine and that the "suicide" statement was either a "misunderstanding" or a "fabrication." [FN17] When Psychologist Rudder asked plaintiff why he was banging his head, plaintiff did not tell him that it was so that the defendants would stop beating him as he alleged during the disciplinary hearing, rather, plaintiff stated that he was feeling frustrated and annoyed that he had been placed in SHU unjustly.

> FN17. It is unclear from the testimony who plaintiff is stating fabricated the suicide allegation. However, for purposes of this motion, the court will assume that plaintiff was claiming that one of the defendants fabricated that statement, rather than as an admission that plaintiff fabricated the desire to commit suicide.

All of the above evidence, together with the fact that plaintiff had no injuries other than a scraped elbow, shows that this is one of those actions in which a reasonable jury could *not* find in plaintiff's favor. It is completely implausible that if the events happened as plaintiff currently states, that he would not have had more severe injuries or at least some bruising other than a red mark that disappeared in a few days.[FN18] At his deposition, plaintiff alleged that the defendants kicked him hard and punched

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

him all over his body, from his legs to his back and shoulders, for a period of **two to three minutes.** (DT at 68). Plaintiff claimed that defendant Gray, alone, kicked him more than five times while plaintiff lay on the floor, a claim that plaintiff did not make in the complaint. (DT at 65).

> FN18. The court notes that the SHU Log Book indicates that plaintiff refused to have his pictures taken at 7:50 p.m. on the day of the incident. (Fisher Decl. ¶¶ 24-26 & Ex. B at 7). Defendant Fisher states that after Nurse Nordé informed defendant Fisher that plaintiff was claiming to be injured, defendant Fisher immediately obtained the camera to take pictures, but plaintiff refused. (Fisher Decl. ¶ 24). The pictures were taken on December 4, 2006 at approximately 11:00 a.m. (Fisher Decl. ¶ 27 & Ex. C).

*17 Even assuming that plaintiff may have been treated roughly in an attempt to get him up off of the floor as he was hitting his head, causing the scrape on plaintiff's elbow,[FN19] rough treatment does not rise to the level of a constitutional violation. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 674-75 (S.D.N.Y.2000) (citing cases in which *de minimis* uses of force did not rise to the level of constitutional violations). It appears that any conduct that may have resulted in plaintiff's elbow injury was justifiable in an attempt to get plaintiff to stand. Plaintiff's versions of the events are simply at odds with each other and at odds with the medical evidence. Plaintiff's statement to the psychologist is consistent with the statements made by the defendants, that plaintiff behaved the way he did because he was frustrated and angry over being placed in SHU for something that he did not think was justified.[FN20] Thus, based on all of the evidence, this court would recommend dismissal of the complaint as against defendants Gray, Farrell, Fisher, and Hauck.[FN21]

> FN19. It is actually unclear how or when the scrape on plaintiff's elbow was caused, but the court will assume for purposes of this motion that plaintiff's elbow was somehow scraped during the incident.

> FN20. Amazingly enough, plaintiff states in his complaint that the fact that he had no documented mental disorders poses the question why he would "allegedly" bang his head against the wall at numerous times during the pat frisk. Compl. ¶ 7. He refers to this allegation as "utterly ridiculous." *Id.* Plaintiff answered his own question at the disciplinary hearing and in his statement to the psychologist. The court understands that the psychologist testified "confidentially" at the disciplinary hearing, however, the plaintiff cannot use his confidential statements, yet not allow the rest of the statements to be discussed.

> FN21. Since there was no excessive force, defendant Hauck cannot be found liable for failure to intervene.

**5. *Pattern of Civil Rights Violations***

Plaintiff states that his second cause of action is a "pattern of civil rights violations ..." Compl. at 5. Plaintiff argues that the defendants "made their own Rules on Procedures and Practices which involved a pattern of anti-civil rights activity in the Special housing unit are [sic] causing Plaintiff physical injury and denying Medical attention." *Id.* Defendants argue that the only civil rights violation plaintiff alleges is the incident on December 3, 2006, and that "[b]y definition, on event cannot constitute a pattern." (Dkt. No. 48, Memo. at 24).

Plaintiff has not alleged any facts relating to any alleged constitutional violations other than the incident on December 3, 2006. Plaintiff's allegations of a pattern of civil rights abuses are merely conclusory allegations. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.). Since this court has recommended dismissal of the Eighth Amendment claims for denial of proper medical treatment and excessive force, plaintiff's conclusory claim of a "pattern" of civil rights violations must also be dismissed.

**7. *Conditions of Confinement***

It is unclear whether plaintiff is claiming that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

conditions of his confinement during the suicide watch were unconstitutional. He states in his complaint that he was placed in a cell with a pad, but no mattress and the lights were very bright.[FN22] Compl. ¶ 5. Plaintiff states that he was given "something like padding" to wear and was refused any toilet paper. Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment standard for conditions of confinement is similar to that for medical care.

> **FN22.** Plaintiff states that they took his tinted glasses away, which made the bright light even more uncomfortable.

**\*18** As in the medical care and excessive force analyses, there is an objective and a subjective prong to the Eighth Amendment analysis with respect to conditions of confinement. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Under the objective prong, the plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* In order to be sufficiently serious in a "conditions of confinement" case, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer,* 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 828.

In this case, plaintiff told defendant Fisher that plaintiff would be committing suicide, so plaintiff was placed on a one-on-one suicide watch.[FN23] The suicide watch involves depriving the inmate of his regular clothing and belongings. Even assuming that plaintiff's allegations regarding the conditions are completely true, the deprivation that he suffered would not rise to the level of a constitutional violation. Plaintiff was deprived of the regular mattress and his clothing overnight.[FN24] Plaintiff himself states that his belongings, including a mattress, sheets, and a blanket were returned to him the next day, although not as quickly as he would have liked. Compl. ¶ 7. The hours that plaintiff was without these materials

simply did not deny plaintiff the "minimal civilized measure of life's necessities."[FN25] Thus, assuming plaintiff is attempting to make an Eighth Amendment claim regarding the conditions of his confinement for one day, any such claim may be dismissed.

> **FN23.** It should be noted that it was Psychologist Rudder that recommended the suicide watch, based upon the notification that plaintiff had indicated that he would commit suicide that night. (Fisher Decl. Ex. B at 2) (SHU Log Book for 10:55 a.m. 12/3/06). This is corroborated by the confidential testimony of Psychologist Rudder. (Roberts-Ryba Aff. Ex. C at 2).

> **FN24.** Plaintiff also alleges that he was denied toilet paper. Even if this were the case, the denial of toilet paper overnight for one night does not rise to the level of a constitutional violation. The SHU Log Book indicates that plaintiff was removed from the "special watch" at 9:00 a.m. on December 4, 2006. Fisher Aff. Ex. B at 4. The Log Book also indicates that "Mental Health" was on the unit to see plaintiff at 9:29 a.m., and that the one-on-one watch for plaintiff was "finished" at 10:28 a.m. on December 4th. *Id.* at 9.

> **FN25.** In fact, if plaintiff had actually been suicidal, it could have been a substantial risk to leave him in his cell with materials that he could use to harm himself.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

N.D.N.Y.,2009.

Slacks v. Gray
Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
No. 9:04-CV-1159.

Oct. 21, 2009.
Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., of Counsel,
Syracuse, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge George H.
Lowe, duly filed on the 30th day of September 2009.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's Report-Recommendation,
and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in
its entirety.

2. Defendants' motion for summary judgment (Dkt.
No. 92) is GRANTED IN PART AND DENIED IN
PART. The following claims are dismissed pursuant to
Defendants' motion for summary judgment: (1) the Eighth
Amendment claims against Defendants Weissman and
Richards arising from their treatment of Plaintiff's severe
body itch, left wrist, and right ankle; (2) the claims against
Defendant Ham; (3) the claims against Defendants
Brousseau and Donelli for their handling of Plaintiff's
grievance regarding Defendant Ham; (4) the retaliation
claim against Defendants Nephew, Desotelle, and Snyder
based on their filing of misbehavior reports against
Plaintiff; (5) the claims against Defendants Brousseau,
Donelli, Girdich, and Eagen regarding their handling of
Plaintiff's grievances regarding the events of January 2 and
3, 2003; (6) the claim against Defendant LaClair; (7) the
claims against Defendant Bullis; and (8) the Eighth
Amendment claim against Defendants Weissman and
Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are
dismissed sua sponte pursuant to 28 U.S.C. §
1915(e)(2)(B): (1) Plaintiff's retaliation claim against
Defendants Weissman and Richards; and (2) the claim
against Defendant Selsky.

It is further ordered that the following claims survive
summary judgment and sua sponte review and proceed to
trial: (1) the conspiracy claim against Defendants Wright,
Snyder, and Duprat; (2) the excessive force claim against
Defendants Snyder, Duprat, Bogett, and Wright; (3) the
retaliation claim against Defendants Snyder, Duprat,
Bogett, and Wright arising from the use of excessive
force; (4) the retaliation claim against Wright arising from
his filing of a misbehavior report against Plaintiff; (5) the
failure to intervene claims against Defendants Bezio and
Duprat; (6) the retaliation claim against Defendant Bezio;
and (7) the Eighth Amendment claims against Defendants
Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

**IT IS SO ORDERED.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

### *REPORT-RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

   This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. FACTUAL AND PROCEDURAL SUMMARY

   **\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [FN1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI for his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left

wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

   FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

   Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

   (Weissman Aff. ¶¶ 4-10.)

   As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.

Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

> FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward*, 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty*, 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino*, 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson*, 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey*, No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on."[FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van."[FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant

Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor.[FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon"'s

note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed the interview was

over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

*7 On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

*8 Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two

grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN14] or (2) a challenge to the legal cognizability 14 of the claim.[FN15]

FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN15. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F.Supp.2d 348, 370 (S.D.N.Y.2005)* ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth., 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made under a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see*

*also Swierkiewicz, 534 U.S. at 512* (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)* (citation omitted).

FN17. *Swierkiewicz, 534 U.S. at 514* (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir.1995)* ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988)* ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir.2003)* (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the

strongest arguments that they suggest."[FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN25]

> FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.*, No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco*, 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also* Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g.*, See *Rhodes v. Hoy*, No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell*, No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before

dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.*, No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba*, No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), FN26 it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. FN27 Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. FN28 Stated more plainly, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended." FN29

FN26. *Sealed Plaintiff v. Sealed Defendant # 1*, No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005)

(acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Weissman/Richards Health Care**

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

*1. Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe *Atarax.* (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the *Atarax* medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was

actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe *Atarax* constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe *Atarax,* noting that he had already tried treating Plaintiff with *Hydroxyzine,* Vistril, *Allegra,* and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe *Atarax* caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of *Atarax* harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe *Atarax.*

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe *Atarax* was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.FN33

> FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." FN34 "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." FN35 The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.FN36

> FN34. 42 U.S.C. § 1997e.

> FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.FN37 First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

> FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17,

2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at \*24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

>   The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright,

Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

>   FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

*1. Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

### 2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine. [FN47] (Dkt. No. 92-10 at 31-32.)

> [FN46.] Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

> [FN47.] Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I

have not addressed Defendants' argument regarding class-based animus.

### a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

### b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at \*5, 1999 WL 151702, at \*2 (W.D.N.Y. Mar.17, 1999). "This doctrine

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

> FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.26, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y.

March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Defendants Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding

that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id. at* 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

procedural due process claim at issue in *Freeman.*" *Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.*

The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

**b.** *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I

recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

> FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

**5.** *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

> FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based

on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

### D. Disciplinary Hearing/Sentence

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

### 1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [FN53] (Dkt. No. 1 ¶ 35.)

FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.[FN54]

FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng*, 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to take a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson*, 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin*, 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal

the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved of the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a

contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. Id.

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kuhlman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body

itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. Salahuddin, 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. Id. at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." Id.; Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose*, No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be ***GRANTED IN PART AND DENIED IN PART;*** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be

dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))


foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.